# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DOE I, and DOE II,                          Case No. 3:07CV00909(CFD)

      Plaintiffs,

v.                                          Date: January 24, 2008

Individuals, whose true names are unknown,
using the following pseudonyms:
pauliewalnuts; neoprag; STANFORDtroll; :D;
lkjhgf; yalelaw; Spanky; ylsdooder; HI; David
Carr; vincimus; Cheese Eating Surrender
Monkey; A horse walks into a bar; The
Ayatollah of Rock-n-Rollah; DRACULA;           EMERGENCY RELIEF REQUESTED
Sleazy Z; Whamo; Ari Gold; Ugly Women;
playboytroll; Dean_Harold_Koh; kr0nz;
reminderdood; r@ygold; who is; Joel
Schellhammer; Prof. Brian Leiter;
hitlerhitlerhitler; lonelyvirgin; Patrick Zeke
<patrick8765@hotmail.com>; Patrick Bateman
<batemanhls08@hotmail.com>; [DOE I] got a
157 LSAT; azn, azn, azn; Dirty Nigger; leaf; t14
gunner; kibitzer; yalels2009; AK47,

      Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR EXPEDITED DISCOVERY

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND .................................................................................2

    A.   AutoAdmit.com ...........................................................................................2

    B.   Threats and defamatory attacks against DOE I....................................................3

    C.   Threats and defamatory attacks against DOE II on AutoAdmit.com. ...............6

    D.   Plaintiffs' attempts to discover the defendants' identities through informal discovery. .........................................................................................10

III. ARGUMENT ..........................................................................................................12

    A.   Plaintiffs meet the good-cause standard for permitting discovery prior to the Rule 26(f) conference. ........................................................................12

        1.   Plaintiffs also meet the heightened standard articulated in *Notaro v. Koch* for permitting early discovery. ...................................15

            a.   Plaintiffs will suffer irreparable injury if this motion is not granted ...............................................................................15

            b.   Plaintiffs can easily demonstrate far more than "some probability of success on the merits" on each claim in the FAC. ..............................................................................16

                (i)   Plaintiffs are likely to succeed on their libel claim..................................................................................16

                (ii)  DOE II is likely to succeed on her claim for copyright infringement...................................................18

                (iii) Plaintiffs are likely to succeed on the merits of their Invasion of Privacy claims. ..................................19

                (iv)  Plaintiffs are likely to succeed on their Intentional Infliction of Emotional Distress claim..................................................................................21

                (v)   Plaintiffs are likely to succeed on their claim for Negligent Infliction of Emotional Distress. .................23

            c.   Connection between irreparable harm and expedited discovery ....................................................................................24

            d.   Balancing of injury ................................................................24

**TABLE OF CONTENTS/AUTHORITIES**

Page

B.   First Amendment concerns regarding "anonymous speech" are not implicated in this case, but even if they were, plaintiffs have met their burden to unmask the defendants...................................................................25

C.   The Court should consider this motion on an expedited basis........................27

IV.   CONCLUSION...........................................................................................................27

# TABLE OF CONTENTS/AUTHORITIES

## FEDERAL CASES

*America Online,* 52 Va. Cir. at 37 ...........................................................................26

*Ayyash v. Bank Al-Madina,*
    233 F.R.D. 325, 2005 U.S. Dist. LEXIS 14276 (S.D.N.Y. July 12, 2005) .....................13, 16

*In re Baxter,*
    No. 01-00026-M, 2001 U.S. Dist. LEXIS 26001 (W.D. La. December 20, 2001) ................27

*Consolidated Brands, Inc. v. Mondi,*
    638 F. Supp. 152 (E.D.N.Y. 1986) ...........................................................................16

*Mitra v. State Bank of India,*
    2005 U.S. Dist. LEXIS 19138 ...................................................................................13

*Mitra v. State Bank of India,*
    No. 03-6331, 2005 U.S. Dist. LEXIS 19138 (S.D.N.Y. September 6, 2005)........................13

*Notaro v. Koch,*
    95 F.R.D. at 405 ....................................................................................15, 16, 24, 25, 26

*Rogers v. Koons,*
    960 F.2d 301 (2d Cir. 1992)......................................................................................19

*Sony Music Entertainment v. Does 1-40,* 326 F. Supp. 2d ...........................................14, 26, 27

*In re State Police Litigation,* 888 F. Supp. 1235 (D. Conn. 1995) .......................................20

*In re Subpoena Duces Tecum to America Online, Inc.,* 52 Va. Cir. 26, 2000 Va. Cir.
    LEXIS 220, No. 40570, at 21-22 (Va. Cir. Ct. Jan 31, 2000), rev'd on other grounds,
    American Online, Inc. v. Anonymous Publicly Trader Co., 261 Va. 350, 542 S.E.2d
    377 (Va. 2001) .......................................................................................................14

*United States CFTC v. Rodriguez,*
    No. 06 CV 0855, 2006 U.S. Dist. LEXIS 13773 (S.D.N.Y. Feb. 3, 2006) ............................13

*United States v. Irving,*
    452 F.3d 110 (2d Cir. 2006).......................................................................................27

*United States v. Perez,*
    247 F. Supp. 2d 459 (S.D.N.Y. 2003).........................................................................25

*Wilen v. Alternative Media Net, Inc.,*
    2005 U.S. Dist. LEXIS 1034, 03 Civ. 2524 (RMB) .........................................................19

## STATE CASES

*Angiolillo v. Buckmiller,*
    102 Conn. App. 697 (Conn. App. 2007)......................................................................22

*Bell v. Board of Education,*
    55 Conn. App. 400 (1999) ........................................................................................22

*Best Western Inc. v. Doe,*
    No. CV-06-1537, 2006 WL 2091695 (D. Ariz., July 25, 2006)...........................................26

*Carrol v. Allstate Insurance Co.,*
    262 Conn. 433 (2003) .............................................................................................24

*Corbett v. Register Publishing Co.,*
    33 Conn. Supp. 4 (Conn. Super. Ct. 1975) .................................................................17

*Dendrite Intern., Inc. v. Doe No. 3,*
    775 A.2d 756 (App. Div. 2001) ..................................................................................15

*Goodrich v. Waterbury Republican-American, Inc.,*
    188 Conn. 107 (Conn. 1982)..................................................................................20, 21

*Gorham v. New Haven,*

# TABLE OF CONTENTS/AUTHORITIES

**Page**

    82 Conn. 153 (Conn. 1909).................................................................16
*John Doe No. 1 v. Cahill,*
    884 A.2d 451 (Del. 2005) ........................................................15, 26
*Korn v. Rennison,*
    21 Conn. Supp. 400 (1959)..........................................................20
*Lega Siciliana Social Club, Inc. v. St. Germaine,*
    77 Conn. App. 846 (Conn. App. Ct. 2003) ............................17
*Leone v. New England Communications,*
    32 Conn. L. Rptr. 72 (2002)........................................................23
*Miles v. Perry,*
    11 Conn. App. 584, 529 A.2d 199 (1987) ..............................16
*Olson v. Bristol-Burlington Health District,*
    87 Conn. App. 1 cert. granted, 273 Conn. 914, 870 A.2d 1083 (2005) (appeal
    withdrawn, May 25, 2005)..........................................................23
*Petyan v. Ellis,*
    200 Conn. 243 (1986) ..................................................................22
*Sedlak v. Lotto,*
    NO. CV 92 328128, 1994 Conn. Super. LEXIS 3041 (Conn. Super. Ct. Dec. 1,1994)..........17
*Torosyan v. Boehringer Ingelheim Pharmaceuticals,*
    234 Conn. 1 (Conn. 1995)...........................................................17

## FEDERAL AUTHORITY

Fed. R. Civ. P. 26 ................................................................................ *passim*

406651.12

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY

Plaintiffs DOE I and DOE II move this Court, under Federal Rule of Civil Procedure 26(d), to permit limited, expedited discovery in advance of the Rule 26(f) conference. Plaintiffs require limited, expedited discovery to unearth the identities of the pseudonymous defendants and serve them with process, conduct a meet and confer, and proceed with this action. If this motion is not granted, plaintiffs will not be able to hold a Rule 26(f) conference, and, indeed, will not be able to prosecute this lawsuit.

## I.    INTRODUCTION

> " "[DOE II] (YLS 09) IS AN ANNOYING, SELFISH CUNT. I HOPE SHE GETS RAPED AND DIES.
> --Posted on AutoAdmit.com by defendant using the pseudonym "Ugly Women."

> "i would like to hate-fuck [DOE I] but since people say she has herpes that might be a bad idea."
> --Posted on AutoAdmit.com by defendant using the pseudonym "ylsdooder."

> "Cum inside [DOE II], and then punch her in the stomach seven months later."
> --Posted on AutoAdmit.com by defendant using the pseudonym "Sleazy Z."

The above statements are a sampling of the hundreds of threatening, offensive and/or defamatory messages that defendants—an unknown number of individuals using 39 pseudonyms to post messages on AutoAdmit.com—have unleashed against plaintiffs DOE I and DOE II, two female Yale Law School students. AutoAdmit.com is an Internet discussion board targeted at law students and lawyers, describing itself as "[t]he most prestigious law school discussion board in the world."[1] Plaintiffs' First Amended Complaint asserts causes of action for libel, invasion of privacy, negligent and intentional infliction of emotional distress, and theft of one plaintiff's copyrighted photographs. Those causes of action are strong, as explained below. However, the anonymity that emboldened defendants to make statements they were unwilling to make under

---

[1] *See* Declaration of Steve Mitra in Support of Plaintiffs' Motion for Expedited Discovery, filed herewith, ("Mitra Decl."), Ex. A.

their real names has also thwarted plaintiffs' attempts to identify the defendants and serve them with process. This, despite considerable efforts by plaintiffs to identify defendants and seek their cooperation.

The Federal Rules of Civil Procedure and this Court's Local Rules require the parties to meet and confer prior to initiating formal discovery. But without formal discovery, plaintiffs will be unable to meet and confer (or serve the defendants) because the defendants' identities are unknown. Plaintiffs thus are stuck in a classic "Catch-22" situation. Appropriately, this Court has discretion to permit expedited discovery in these situations. Plaintiffs simply ask that the Court exercise that discretion so that plaintiffs can identify the defendants who attacked their reputations from behind the veil of secrecy provided by the AutoAdmit.com message board— and so that the lawsuit can proceed.

## II. FACTUAL BACKGROUND

### A. AutoAdmit.com

AutoAdmit.com is an Internet discussion board on which participants post and review comments and information about undergraduate colleges, graduate schools, and law schools.[2] The AutoAdmit website is administered by Jarret Cohen and was moderated for some time by Anthony Ciolli.[3] The site was launched in 2004 and, according to statements made by Cohen and Ciolli, draws between 800,000 and one million visitors per month.[4]

Anyone who uses the Internet and goes to the AutoAdmit site, either directly or via an Internet search engine such as Google, may view the messages posted to the discussion board. After a participant posts a new message, any further comments or responses to the subject area of that message are collected as a "thread." Message threads can be quite lengthy depending on the

---

[2] AutoAdmit also has a "mirror site" located at http://xoxohth.com, which contains virtually the same content featured on AutoAdmit. *See* Mitra Decl. ¶ 3, Ex. B. The site http://www.xoxoreader.blogspot.com is a web log that republishes information from the AutoAdmit mirror site located at http://xoxohth.com. *See id.* ¶ 3.

[3] *Id.* ¶ 4, Ex. C.

[4] *Id.*

level of interest in a particular subject.[5]

Registered AutoAdmit users may post new messages and respond to the messages of other registered users.[6]  Individuals who register with the AutoAdmit site may, but are not required to, provide their real names.  Posters thus can adopt multiple user names.[7]  The AutoAdmit website appears to use "persistent pseudonymity," which means that changes in pseudonyms retroactively change previously-stored posts to reflect the changed pseudonym.[8]

The threads on the AutoAdmit site can be found by searching on the site or through search engines such as Google.  By entering a person's name as a search term, a search engine will list various threads in which that name appears in search results.[9]  At times, posters will take steps to ensure that AutoAdmit threads containing statements about an individual appear as one of the first search results returned by a Google search—a practice referred to as "google-bombing."[10]

### B.    Threats and defamatory attacks against DOE I.

DOE I  is a student at Yale Law School ("YLS").[11]  Through an acquaintance, DOE I learned that she was the subject of a message thread on AutoAdmit.com.[12]  This thread was authored by a poster using the pseudonym "STANFORDtroll" and was titled "Stupid Bitch to Attend Yale Law."  In the message, "STANFORDtroll" told DOE I's classmates to "watch out

---

[5] *Id.* ¶ 5.

[6] *Id*. ¶ 6, Ex. D.

[7] *Id.* ¶ 6.

[8] *Id.*

[9] *Id*. Ex. E

[10] *See The New Oxford American Dictionary*, (2d ed. 2005) (defining "google bombing" as "the activity of designing Internet links that will bias search engine results so as to create an inaccurate impression of the search target."), *available at* http://www.oxfordreference.com/views/ENTRY.html?entry=t183.e32368&srn=1&ssid=1092921 276; *see also* Declaration of DOE II in Support of Plaintiffs' Motion for Expedited Discovery, filed herewith, ("DOE II Decl.") Ex. 22 at 7.

[11] Declaration of DOE I in Support of Plaintiffs' Motion for Expedited Discovery, filed herewith, ("DOE I Decl.") ¶ 2.

[12] *Id.* ¶ 3.

for her."[13]

The thread that followed STANFORDtroll's message contained numerous threats, usually of a sexual nature, and false claims about DOE I:

- "i'll force myself on her, most definitely."[14]

- "I think I will sodomize her.  Repeatedly."[15]

- "I wish to rape [DOE I] and [DOE II] in the ass."[16]

- "just don't FUCK her, she has herpes"[17]

Other posters suggested that DOE I deserved to be raped.  For example:

- Defendant "Spanky" posted a message stating "[c]learly she deserves to be raped so that her little fantasy world can be shattered by real life."[18]

- "ylsdooder" threatened "i would like to hate-fuck [DOE I] but since people say she has herpes that might be a bad idea."[19]

Still other posters made false statements about DOE I that were harmful to her reputation. In particular:

- A defendant using the pseudonym "[DOE I] got a 157 LSAT" falsely stated that DOE I had raped co-plaintiff DOE II.[20]

- A pseudonymous poster "yalelaw" falsely stated that DOE I had engaged in a lesbian affair with an administrator at YLS.[21]

- A pseudonymous poster "lkjhgf" falsely stated that DOE I had bribed officials at YLS to gain admission.[22]

- "STANFORDtroll" started a thread titled "[DOE I] of Yale Law got a 159 on the LSAT" and falsely claimed that DOE I received a lower-than-expected LSAT score

---

[13] *Id.* Ex. A at 4.

[14] Posted by defendant "neoprag."  *See id.* Ex. A at 7.

[15] *Id.* at 11.

[16] Posted by defendant "Dirty Nigger." *Id.* Ex. B at 2.

[17] Posted by defendant ":D." *Id.* Ex. A at 15.

[18] *Id.* Ex. C at 2.

[19] *Id.* Ex. D.

[20] *Id.* Ex. E at 27.

[21] *Id.* at 37.

[22] *Id.* at 24-25.

for a Yale Law student.[23]

These false statements were posted without provocation by DOE I. After she discovered the messages about her on the AutoAdmit site, DOE I sent several email messages to the site administrators, asking them to remove the offensive messages about her.[24] Anthony Ciolli sent DOE I a response stating that the messages would not be removed.[25]

The posters did not limit their false and harassing statements to the AutoAdmit message board; they also sent harassing and defamatory messages directly to DOE I and the YLS faculty. In June 2007, "Patrick Zeke" sent an email to many members of the YLS faculty titled "Yale Law Faculty concerning pending lawsuit."[26] The email parroted the false and harmful comments about DOE I made on AutoAdmit, including: "[DOE I] is barely capable of reading (159 LSAT)," and "it seems like the risk of contracting herpes from [DOE I] would convince any rational person to go to a prostitute first."[27] This indisputably defamatory email was then posted as a thread on the AutoAdmit site by pseudonymous poster "lonelyvirgin."[28]

The harassing comments posted about DOE I harmed her reputation and caused her severe emotional distress, including stress, fearful feelings, insomnia and severe anxiety.[29] As a result, DOE I's academic and work performance deteriorated, and she withdrew socially and isolated herself from her friends and classmates.[30] Eventually, the harassment caused DOE I to take a leave of absence from school.[31] Defendants' threatening, defamatory and offensive conduct also caused DOE I to suffer damages, including but not limited to lost wages, increased

---

[23] *Id.* Ex. F.

[24] *Id.* ¶ 7.

[25] *Id.*

[26] *Id.* Ex. G.

[27] *Id.*

[28] *Id.* Ex. H at 1-2.

[29] *Id.* ¶ 10.

[30] *Id.* ¶¶ 11-14.

[31] *Id.* ¶ 15.

student loans, and other costs and expenses.[32]

### C.    Threats and defamatory attacks against DOE II on AutoAdmit.com.

In early February 2007, DOE II, then a first-year law student at Yale Law School, was told by one of her friends that she was the subject of a thread on AutoAdmit.com.[33]  Thereafter, DOE II visited the AutoAdmit website and found the first of hundreds of messages about her, most of which contained sexual and vulgar comments, and others that included threats of violence or rape and/or made false statements about her harmful to her reputation.[34]  Among the many offensive, threatening and false comments that were posted about DOE II, some of the most egregious threads contained, for example, the following messages:

- "Ugly Women" posted a message stating, "[DOE II] (YLS 09) IS AN ANNOYING, SELFISH CUNT.  I HOPE SHE GETS RAPED AND DIES.[35]

- "AK47" wrote, "Women named . . . [DOE II] should be raped."[36]

- "Dirty Nigger" wrote,  "I wish to rape [DOE I] and [DOE II] in the ass."[37]

- "Ugly Women" falsely stated that DOE II fantasized about being raped by her father.[38]

- "DRACULA" falsely stated that DOE II enjoyed having sex while her family members watched.[39]

- "Sleazy Z" stated falsely that DOE II was "into scat" and encouraged others to "punch [DOE II] in the stomach" when seven months pregnant.[40]

- "Whamo" falsely alleged that DOE II had the "clap."[41]

- "The Ayatollah of Rock-n-Rollah" falsely claimed that DOE II engaged in

---

[32] *Id.* ¶ 17.

[33] DOE II Decl. ¶ 2.

[34] *Id.* Ex. 1 (First message thread started by defendant "HI").

[35] *Id.* Ex. 2.

[36] *Id.* Ex. 3.

[37] *Id.* Ex. 4 at 2.

[38] *Id.* Ex. 5 at 4.

[39] *Id.* Ex. 6 at 3.

[40] *Id.* Ex 7, Ex. 5 at 2.

[41] *Id.* Ex. 8 at 18.

"whoring."[42]

- "who is" stated falsely that DOE II had checked into a rehabilitation program for heroin use.[43]

- A defendant using the pseudonym "Dean_Harold_Koh" falsely alleged that DOE II performed fellatio on the dean of Yale Law School for a passing grade.[44]

- "playboytroll" falsely claimed that DOE II posed in *Playboy*.[45]

- Two posters attempted to start rumors that DOE II had died or committed suicide: "r@ygold" posted a message falsely stating "[DOE II] found dead in apartment!," and "azn, azn, azn" falsely stated "HOLY SHIT: [DOE II] dead; suicide suspected."[46]

- "reminderdood" falsely accused DOE II of "bashing gay people."[47]

- In a thread entitled, "DOE II, YLS 1L, you're a fucking cunt," defendant ":D" encouraged further attacks on DOE II and used anti-Semitic language to do so: "I'm doing cartwheels knowing this stupid Jew bitch is getting her self esteem raped."[48]

Other pseudonymous AutoAdmit users posted messages that commented crudely on DOE II's breasts, explicitly described the desire to have sexual relations with DOE II, falsely stated that DOE II engaged in certain sexual activities, and encouraged harassment of DOE II.[49]

In early 2007, various AutoAdmit posters launched a website devoted to "rating" female law students from schools around the country, "t14talent—The 'Most Appealing' Women @

---

[42] *Id.* Ex. 9 at 2.

[43] *Id.* Ex. 10.

[44] *Id.* Ex. 11.

[45] *Id.* Ex. 12.

[46] *Id.* Exs. 13-14.

[47] *Id.* Ex. 15.

[48] *Id.* Ex. 16 at 8.

[49] *See id.* Exs. 1 at 8 (message posted by "HI"); 17 at 2, 5 (messages posted by "David Carr"); 18 at 8 (message posted by "A horse walks into a bar"); 19 (message posted by "kr0nz"); 6 at 2 (message posted by "Ari Gold"); 8 at 2-3 (message posted by "yalels2009"); 18 at 7 (message posted by "Vincimus"); 18 at 7 (message posted by "Cheese Eating Surrender Monkey"); 20 (message posted by "SleazyZ"); 21 (message posted by "Leaf"); 22 at 2-3 (message posted by "Prof. Brian Leiter").

Top Law Schools," located at http://t14talent.googlepages.com.[50] ("t14" refers to some people's idea of the country's top 14 law schools.) The contest also was featured on a web log located at http://top14girls.blogspot.com.[51]

Posters "pauliewalnuts," "kibitzer," and/or the other contest organizers copied, and then linked to, certain photographs of DOE II without DOE II's consent or permission.[52] Other defendants copied DOE II's photographs and then published them on AutoAdmit through links to hidebehind.com and other similar sites.[53] DOE II owns the copyrights to five of those photographs and has registered those copyrights with the United States Copyright Office.[54] Pseudonymous poster "pauliewalnuts" first posted the URL to DOE II's image on the t14 webpage on February 20, 2007, in a thread entitled "YLS 1L CGWBT."[55] ("CGWBT" is an acronym for "cheerful girl with big tits.")[56] On the t14 web log, links were posted to webpages containing pictures of DOE II alongside pornographic or otherwise unflattering advertisements.[57]

As with DOE I, the harassment and defamation aimed at DOE II was not confined to AutoAdmit.com. Eventually, it made its way to DOE II's school and home. On March 7, 2007, a poster using the pseudonym "Joel Schellhammer" wrote: "YLS 1L CGWBT [DOE II] HAS A FELON FOR A FATHER!!! YALE LAW."[58] "Joel Schellhammer" then posted links to a news article about DOE II's father's decade-old conviction.[59] This thread was reprinted the next day

---

[50] *Id.* Ex. 23. A poster using the pseudonyms "Todd Christopher" and "pauliewalnuts" was one of the principal organizers of the t14 site. *See id.* Exs. 24 and 25.

[51] *Id.* Ex. 26. This web log was created and maintained by "kibitzer." *See id.* Exs. 18 at 12, 27 at 19, and 28 at 2.

[52] *Id.* ¶ 13, Exs. 23, 26.

[53] *Id*. Exs. 17, 21 and 29 at 6.

[54] *Id.* ¶ 11, Ex. 30.

[55] *Id.* Ex. 31 at 2.

[56] *Id.* Ex. 32.

[57] *Id.* Ex. 26.

[58] *Id.* Ex. 33.

[59] *Id.*

by "hitlerhitlerhitler" who added a link to another news story about DOE II's father.[60]

On March 9, 2007, "Patrick Bateman" emailed DOE II and at least one member of the

Yale Law School faculty the following message:

> **From:** Patrick Bateman <batemanhls08@hotmail.com>
> **Date:** Mar 9, 2007 2:08 PM
> **Subject:** Yale Law School faculty: Notice
> **To:** [Member of the Yale Law School Faculty]
> **Cc:** [DOE II]
>
> Dear Yale Law faculty,
>
> I write to you now about a very important issue that affects a non-trivial number of you. Although you undoubtedly deal with self-entitled, spoiled students on a regular basis, there's one person in particular whose history I feel you must be made aware of before problems arise. [DOE II], a student in your 09 class, has a felon as a father who stole money . . . . Best of luck to you in managing this liability, it is regretful that the admissions process can't encapsulate the entire person.
>
> XOXO
> HTH
> Patrick Bateman (Harvard Law School 08)
> References:
> [Hyperlinks to articles about DOE II and her father].[61]

Defendant "lonelyvirgin" posted "Patrick Bateman"'s message on AutoAdmit.com.[62]

The defamation and harassment ultimately made its way to DOE II's former employer.

In April 2007, a poster using the pseudonym "t14 gunner" posted the following message—which

he claimed to have sent to DOE II's former employer—on AutoAdmit.com:

> Greetings,
> I want to bring your attention to some information potentially harmful to your firm's reputation. Obviously your clients do not want to be represented by someone who is not of the highest character value, which is why I believe you should know a bit more about an employee of yours. I've recently discovered [DOE II] of Yale Law School is one of your summer hires. It is true that she does have a fine academic pedigree, but there is some distressing information about her readily available online. Some of what is written about her is of dubious value. Regardless, there is good reason to believe some of your clients may not be so careful in how they interpret what has been written—especially as to how it

---

[60] *Id.* Ex. 34.

[61] *Id.* Ex. 35.

[62] *Id.* Ex. 36 at 3.

relates to the quality of your firm.  Included below is a sample, but a simple Google search will return an even more extensive record.[63]

Upset by the messages on AutoAdmit, DOE II wrote to the site administrators multiple times, asking them to remove the offensive messages about her.[64]  In her requests, DOE II told them explicitly of the harm she was experiencing because of the harassing, threatening and defamatory postings, including that she had been forced to seek psychological counseling.[65]  The only response that DOE II received was a threat to post her requests on the AutoAdmit site.[66]

The numerous threats, false statements, and sexually-explicit comments about DOE II that were posted by the defendants on AutoAdmit.com have caused her physical illness and severe emotional distress, interfered with her educational progress, damaged her reputation, and caused her pecuniary harm.[67]  DOE II was forced to seek therapy and take medication to treat anxiety and depression to help with the emotional distress from which she continues to suffer.[68]

**D.** **Plaintiffs' attempts to discover the defendants' identities through informal discovery.**

Plaintiffs filed their complaint in this action on June 8, 2007, and their First Amended Complaint ("FAC") on November 8, 2007.  Plaintiffs have made repeated efforts to identify and serve the pseudonymous defendants, thus far, to no avail.[69]

Plaintiffs have sought information relating to the identities of the defendants from several different entities, including AutoAdmit.com, Domains by Proxy, GoDaddy, PenTeleData, Microsoft (owner of Hotmail), HighBeam Research, University of North Carolina, VLEX, ServInt Internet Services,  University of Virginia, Yale Law School, AT&T/SBC and Embarq.[70]

---

[63] *Id.* ¶ 19, Ex. 37.

[64] *Id.* ¶ 21, Ex. 38.

[65] *Id.*

[66] *Id.* ¶ 21, Ex. 39 at 2.

[67] *Id.* ¶ 22-24.

[68] *Id.* ¶ 25.

[69] Mitra Decl. ¶¶ 10-17.

[70] *Id.* ¶ 11, Ex. F.

(These entities are believed to have assigned IP addresses to defendants, to have been used by defendants to send email, or to have IP addresses because defendants have visited their web sites.)  None of the entities contacted have disclosed the information requested.[71]  Plaintiffs also have attempted to contact Ryan Mariner, an individual who is believed to have information regarding one or more of the defendants, to voluntarily provide relevant discovery.[72]  Mr. Mariner has not provided any information as of the date of this filing.[73]  Plaintiffs have contacted Messrs. Cohen and Ciolli  through their counsel, but neither has, thus far, provided any identifying information.[74]

On November 9, 2007, plaintiffs, through their counsel, posted a notice on AutoAdmit.com requesting that defendants come forward for the purpose of being served with the complaint and conducting a meet and confer.[75]  The notice included counsels' contact information.[76]  Plaintiffs' counsel received no response.[77]

On November 27, 2007, plaintiffs' counsel followed up with an additional post on AutoAdmit.com.  The notice stated:

> Plaintiffs' counsel hereby renews the previously-posted request that individuals who have used, or currently use, the above pseudonyms on this web site provide identifying information and/or the identity of counsel representing them so that plaintiffs' counsel may serve them with the complaint and conduct a Fed. R. Civ. P. 26(f) conference. Plaintiffs' counsel may be contacted at (415) 391 5400. Please ask for Ashok Ramani or Steve Mitra. In addition, plaintiffs' counsel may also be contacted by email at doelawsuit@kvn.com.
>
> Plaintiffs' counsel also hereby notifies individuals who have used the above pseudonyms that plaintiffs intend to move the U.S. District Court, District of Connecticut, to allow plaintiffs to conduct expedited discovery to uncover

---

[71] *Id.* ¶ 14, Ex. H.

[72] *Id.* ¶ 13

[73] *Id.*

[74] *Id.* ¶ 12,14, Ex. G.

[75] *Id.* ¶ 15, Ex. I

[76] *Id.*

[77] *Id.* ¶ 15

defendants' identities.[78]

Not a single defendant has come forward as of the date of this filing.[79,80]

### III.     ARGUMENT

Federal Rule of Civil Procedure 26(f) requires litigants to meet and confer regarding a discovery plan, initial disclosures and other matters "as soon as practicable and in any event at least 21 days before a scheduling conference is held or a scheduling order is due under Rule 16(b)[.]"[81]   Before this Rule 26(f) conference, parties are prohibited from proceeding with formal discovery under Federal Rule of Civil Procedure 26(d) and under the local rules of this Court.[82]

When defendants hide their identities and fail to come forward after a lawsuit against them is filed, the rules requiring a meet-and-confer prior to initiating formal discovery puts plaintiffs in a bind:  Prior to a meet-and-confer, they may not conduct discovery; but prior to initiating discovery, they cannot conduct a meet-and-confer—or even serve the defendants— because defendants' identities are unknown.  The Federal Rules permit plaintiffs to apply to the Court for relief in these, and other, circumstances in which pre-meet-and-confer discovery may be necessary.[83]   Here, as discussed in detail below, this relief is unquestionably justified.

**A.     Plaintiffs meet the good-cause standard for permitting discovery prior to the Rule 26(f) conference.**

Federal Rule of Civil Procedure 26(d) states that "[e]xcept . . . when authorized under

---

[78] *Id.* ¶ 16, Ex. J.

[79] *Id.* ¶ 17.

[80] It has become clear that the information that plaintiffs seek was threatened with deletion and, in one case, may already have been deleted.  Internet Service Providers, and the other entities contacted, delete such information at different intervals.  Mitra Decl ¶ 19.  PenTeleData, Inc., for instance, deletes identifying information every 60 days.  Mitra Decl. ¶ 19, Exh. H.  While the entities contacted stated they would preserve the information they have, the fate of information whose relevance is not currently obvious, or that has not come to light, obviously remains threatened.

[81] Fed. R. Civ. P. 26(f).

[82] *See* Fed. R. Civ. P. 26(d); Standing Order on Pretrial Deadlines ¶ 2(d) in the District of Connecticut, Local Rules, at 100.

[83] *See, e.g., Mitra v. State Bank of India*, No. 03-6331, 2005 U.S. Dist. LEXIS 19138, at *26 (S.D.N.Y. September 6, 2005).

these rules or by order or agreement of the parties, a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)."[84]  This Rule has been interpreted to "give[ ] district courts the power to order that discovery takes place before the parties' initial Rule 26(f) discovery conference."[85]  Typically, relief from Rule 26(f)'s prerequisites requires a finding of "good cause."[86]  The standard is a flexible one, based on "the reasonableness of the request in light of all the surrounding circumstances."[87]

Here, the "good cause" requirement is satisfied.  Plaintiffs seek limited information to ascertain the defendants' identities in order to serve them with the complaint and conduct a meet and confer.  Specifically, plaintiffs seek discovery relating to the identities of defendants from AutoAdmit.com, the University of Virginia, University of North Carolina, Yale University, Microsoft (which owns Hotmail), VLEX, HighBeam Research, GoDaddy, Domains by Proxy, ServInt Internet Services, Embarq, PenTeleData, and AT&T/SBC.  These entities are believed to have assigned IP addresses to defendants, to have been used by defendants to send email, or to have IP addresses because defendants have visited their web sites.  Plaintiffs also seek documents and deposition testimony from Messrs. Cohen, Ciolli and Mariner because plaintiffs believe that these individuals know the identities of some of the defendants and/or for the purposes of determining whether and how name changes of people posting on AutoAdmit apply retroactively and are tracked.[88]  Plaintiffs' considerable efforts to identify the defendants without

---

[84] Fed. R. Civ. P. 26(d).

[85] *Mitra v. State Bank of India*, 2005 U.S. Dist. LEXIS 19138, at *26.

[86] *See United States CFTC v. Rodriguez*, No. 06 CV 0855, 2006 U.S. Dist. LEXIS 13773, *3 (S.D.N.Y. Feb. 3, 2006); *Mitra*, 2005 U.S. Dist. LEXIS 19138, at *26 (noting that "[a]lthough [Rule 26(d)] does not say so, it is implicit that some showing of good cause should be made to justify" an order providing relief from the federal rules).

[87] *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327, 2005 U.S. Dist. LEXIS 14276 (S.D.N.Y. July 12, 2005) (citations omitted).

[88] Posters on the AutoAdmit site are sometimes "outed" for a brief period of time before the outing information is removed.  It is believed that the outing information is removed by, or at the direction of the moderators of the AutoAdmit.com board and that therefore they may have knowledge of some of the defendants' identities.  Mitra Decl. ¶ 7.

the benefit of legal process have not been successful.[89]

These circumstances more than justify a subpoena.  Without knowledge of the defendants' identities, this action simply cannot proceed.  In this case, just as in *Sony Music Entertainment v. Does 1-40*,[90] where the plaintiffs sought the identity of copyright infringers, "[a]scertaining the identities and residences of the Doe defendants is <u>critical</u> to plaintiffs' ability to pursue litigation, for without this information, plaintiffs will be unable to serve process."[91]

As noted above, plaintiffs have made every attempt to notify defendants of this action and that they are the subject of a lawsuit, meeting or exceeding the guidelines established by recent case law involving anonymous defendants.  In *John Doe No. 1 v. Cahill*,[92] the court noted:

> [T]o the extent reasonably practicable under the circumstances, the plaintiff must undertake efforts to notify the anonymous poster that he is the subject of a subpoena or application for order of disclosure.  The plaintiff must also withhold action to afford the anonymous defendant a reasonable opportunity to file and serve opposition to the discovery request.  Moreover, when a case arises in the internet context, the plaintiff must post a message notifying the anonymous defendant of the plaintiff's discovery request on the same message board where the allegedly defamatory statement was originally posted.[93]

Similarly, in *Dendrite Intern., Inc. v. Doe No. 3*,[94] the court stated:

---

[89] The subpoenas that plaintiffs seek are attached as Exhibit K to the Mitra Declaration.  The subpoenas reflect the information currently known by plaintiffs.  Plaintiffs request that the Court permit them to supplement the subpoenas as necessary, as new information becomes available.

[90] 326 F. Supp. 2d 556 (S.D.N.Y. 2004).

[91] *Sony*, 326 F. Supp.2d at 566 (emphasis added). The Circuit Court of Virginia recognized in a case involving anonymous defamatory and confidential information, that, disallowing discovery leading to the identity of the people who posted, "would leave [plaintiffs] virtually defenseless to this potentially virulent hazard." *In re Subpoena Duces Tecum to America Online, Inc.*, 52 Va. Cir. 26, 2000 Va. Cir. Lexis 220, No. 40570, at **21-22 (Va. Cir. Ct. Jan 31, 2000), *rev'd on other grounds*, *American Online, Inc. v. Anonymous Publicly Trader Co.*, 261 Va. 350, 542 S.E.2d 377 (Va. 2001).

[92] 884 A.2d 451 (Del. 2005).

[93] *Id.* at 461.

[94] 775 A.2d 756 (App. Div. 2001).

> [P]laintiff [should] undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure, and withhold action to afford the fictitiously-named defendants a reasonable opportunity to file and serve opposition to the application. These notification efforts should include posting a message of notification of the identity discovery request to the anonymous user on the ISP's pertinent message board.[95]

Here, plaintiffs have more than complied with the letter and spirit of these requirements—having expended considerable resources and time in repeated attempts to contact parties who may have identifying information regarding defendants, as well as posting notices on AutoAdmit.com asking defendants to come forward and identify themselves.[96] Plaintiffs will also post notice of this motion on the AutoAdmit board so that defendants have an opportunity to contest this motion should they choose to do so.

**1.      Plaintiffs also meet the heightened standard articulated in *Notaro v. Koch* for permitting early discovery.**

Some courts within this circuit require the meeting of a more stringent standard, articulated in *Notaro v. Koch*[97] for the purpose of seeking leave from the Court to conduct expedited discovery. Under this standard, plaintiffs are required to establish "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted."[98] Even though this standard has been disfavored for the "good cause" standard discussed above,[99] it is nevertheless <u>easily</u> met and exceeded in the circumstances of this action.

**a.      Plaintiffs will suffer irreparable injury if this motion is not granted**

As noted above, plaintiffs are seeking the Court's leave to conduct formal discovery prior

---

[95] *Id.* at 760.

[96] Mitra Decl ¶¶ 10-16.

[97] 95 F.R.D. 403, 405 (S.D.N.Y. 1982).

[98] *Notaro*, 95 F.R.D. at 405.

[99] *Ayyash*, 233 F.R.D. at 326 (noting that "many recent cases reject *Notaro* and apply a more flexible 'good cause' test").

to a meet and confer because, without it, they will be completely stymied in their effort to pursue their legal remedies in court. They will not be able to serve defendants or conduct a meet and confer because defendants have concealed their identities. Plaintiffs will never be able to seek redress for their injuries—which is the very essence of irreparable harm.[100]

### b. Plaintiffs can easily demonstrate far more than "some probability of success on the merits" on each claim in the FAC.

Under the *Notaro* standard, plaintiffs are required to demonstrate "<u>some</u> probability of success on the merits[.]"[101] Here, each of the causes of action is supported with indisputable and highly pertinent facts. Plaintiffs not only meet the requisite burden, they far surpass it.

### (i) Plaintiffs are likely to succeed on their libel claim.

"Libel is defamation of a character usually consisting of the printed word."[102] For liability to attach, the Court must find that the defendants "published false statements that harmed the defendant, and that the defendants were not privileged to do so."[103]

Libelous statements that fall into one of four categories—"1) commission of a crime involving moral turpitude; 2) infection with a loathsome disease; 3) incompetence in business, trade or profession, 4) imputation of unchaste character"—comprise libel *per se*.[104] For these categories of statements "the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it . . . . The individual plaintiff is entitled

---

[100] *See, e.g., Gorham v. New Haven*, 82 Conn. 153, 157 (Conn. 1909)("An injury is irreparable when there is no legal remedy furnishing full compensation or adequate redress . . . ."); *Consolidated Brands, Inc. v. Mondi*, 638 F. Supp. 152, 155 (E.D.N.Y. 1986)("Irreparable harm is established not only where the injury is actual and imminent but where no adequate legal remedy exists which would redress the harm, therefore mandating the exercise of the Court's equity powers.")

[101] *Notaro,* 95 F.R.D. at 405 (emphasis added).

[102] *Miles v. Perry*, 11 Conn. App. 584, 601 n.11, 529 A.2d 199 (1987).

[103] *Torosyan v. Boehringer Ingelheim Pharmaceuticals*, 234 Conn. 1, 27 (Conn. 1995) (citation omitted).

[104] *Sedlak v. Lotto*, NO. CV 92 328128, 1994 Conn. Super. LEXIS 3041, 4-5 (Conn. Super. Ct. Dec. 1,1994). *See also Corbett v. Register Publishing Co.*, 33 Conn. Supp. 4, 13 (Conn. Super. Ct. 1975).

to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the libel caused him."[105]

False statements made about <u>DOE I</u> that constitute libel *per se* include those claiming that she has herpes,[106] and that she had a "lesbian affair" with an administrator at Yale Law School.[107] False statements about <u>DOE II</u> that constitute libel *per se* include those claiming that she has "the clap,"[108] that she dreamed about being raped by her father,[109] that she was "whoring it up" at Yale Law School,[110] that she is a "slut,"[111] that she liked to have sex with family members watching,[112] that she was "into scat,"[113] that she engaged in fellatio for a "P" grade in Civil Procedure,[114] that she was "slutting out,"[115] that she was featured in *Playboy*,[116] and that she was "whoring around like a feral cat" during her first semester of law school.[117]

These outrageous and damaging statements are false.[118] With respect to these statements, no proof of harm is required since they all fall into either the second or fourth category of libel *per se* discussed above. Therefore, with respect to the defendants who made these statements, their liability is indisputable.

---

[105] *Lega Siciliana Soc. Club, Inc. v. St. Germaine*, 77 Conn. App. 846, 852 (Conn. App. Ct. 2003) (citation and internal quotation marks omitted).

[106] These statements were posted by ":D" and "ylsdooder" on AutoAdmit, and in an email to the Yale Law faculty sent by "Patrick Zeke" and then posted on AutoAdmit by "lonelyvirgin." *See* DOE I Decl. Exs. A at 15, D, G, and H.

[107] This statement was posted by "yalelaw." *Id*. Ex. E at 37.

[108] This statement was posted by posted by "Whamo." DOE II Decl. Ex. 8 at 18.

[109] This statement was posted by "Ugly Women," also believed to be known as "t14 gunner." *Id*. Ex. 5 at 4.

[110] This statement was posted by "The Ayatollah of Rock-n-Rollah." *Id*. Ex. 9 at 2.

[111] This statement was posted by "Dirty Nigger." *Id*. Ex. 4 at 1.

[112] This statement was posted by "DRACULA." *Id*. Ex. 6 at 3.

[113] This statement was posted by "Sleazy Z." *Id*. Ex. 7.

[114] This statement was posted by "Dean _Harold_Koh." *Id*. Ex. 11.

[115] This statement was posted by "Whamo." *Id*. Ex. 8 at 18.

[116] This statement was posted by "playboytroll." *Id*. Ex. 12.

[117] This statement was posted by "yalels2009." *Id*. Ex. 8 at 2.

[118] *See* DOE I Decl. ¶¶ 5-6; DOE II Decl. ¶¶ 3-4.

Numerous other statements, may or may not constitute libel *per se*, but certainly are libelous.[119]  Statements made against DOE I that constitute libel include false claims that she received a lower than expected LSAT score[120] and bribed her way into Yale Law School.[121]  Statements made against DOE II that constitute libel include false claims that she engaged in "bashing gay people"[122] and had checked into a program for heroin use.[123]  As already noted, these statements have caused DOE I and DOE II severe emotional distress, including stress, anxiety, depression, and insomnia; damaged their reputation; interfered with their work and academic performance; and caused them pecuniary harm.[124]

Plaintiffs, therefore, have established that they are entitled to relief on the merits of their libel claim.

### (ii)    DOE II is likely to succeed on her claim for copyright infringement.[125]

To establish copyright infringement, a plaintiff must show both that she owns a copyright and that the defendant copied the protected material without plaintiff's authorization.[126]  The Copyright Act makes a certificate of registration from the U.S. Register of Copyrights *prima facie* evidence of the valid ownership of a copyright, and copyright protection extends to photographs.[127]

DOE II has a valid claim for copyright infringement.  She owns copyrights in her

---

[119] Plaintiffs reserve the right to argue that these statements also constitute libel *per se*.

[120] This statement was sent in an email to the Yale Law faculty sent by "Patrick Zeke" and then posted on AutoAdmit by "lonelyvirgin." *See* DOE I Decl. Ex. G-H. The statement that DOE I received a 159 in her LSAT was also made by made by "STANFORDtroll." *Id*. Ex. F.

[121] This statement was posted by posted by "lkjhgf."  DOE I Decl. Ex. E at 24-25.

[122] This statement was posted by "reminderdood."  DOE II Decl. Ex. 15.

[123] This statement was posted by "who is." *Id*. Ex. 10.

[124] DOE I Decl. ¶¶ 10-17; DOE II Decl. ¶¶ 20, 22-33.

[125] This constitutes Claim 1 of the FAC.

[126] *See Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992).

[127] *See id.*

photographs and has registered these copyrights with the United States Copyright Office.[128] Certain anonymous defendants, acting individually or in concert, copied DOE II's copyrighted photographs and published them by uploading them to the website located at http://www.hidebehind.com and linking to them through the t14 sites and the AutoAdmit message board.[129] Defendants "pauliewalnuts" and "kibitzer", among others, then linked to certain photographs without DOE II's consent or permission.[130] All of this activity was done wrongfully and without DOE II's consent or permission.[131]

Because it is beyond dispute that the use of photographs on a website without authorization constitutes infringement,[132] plaintiffs have not only demonstrated that there is "some probability" of success on the merits of their copyrighted claim, but also that there is no disputed issue of material fact with respect to the claim.

      **(iii)**      **Plaintiffs are likely to succeed on the merits of their Invasion of Privacy claims.**

Connecticut has adopted the law defining invasion-of-privacy torts as set forth in the Restatement (Second) of Torts.[133] "Liability for a violation of the right of privacy exists if the defendant's conduct was such that he should have realized that it would be offensive to persons of ordinary sensibilities."[134] Plaintiffs have established probability of success on the merits of each of the branches of the tort listed in the FAC. The defendants' conduct in this case was such that it would be offensive to persons of ordinary sensibilities and, in fact, was harmful and

---

[128] DOE II Decl. ¶ 11, Ex. 30.

[129] *See* DOE II Decl. Exs. 17, 21 and 29 at 6.

[130] *Id.* Exs. 23, 26.

[131] *Id.* ¶ 13.

[132] *See, e.g., Wilen v. Alternative Media Net, Inc.*, 2005 U.S. Dist. LEXIS 1034, No. 03 Civ. 2524 (RMB) (JCF), at *4-5 (S.D.N.Y., Jan. 26, 2005).

[133] *In re State Police Litigation*, 888 F. Supp. 1235, 1270 (D. Conn. 1995) (citations omitted). *See also Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 128 (Conn. 1982) (citing Restatement (Second), Torts § 652).

[134] *Korn v. Rennison*, 21 Conn. Supp. 400, 403-04 (1959).

offensive to the particular plaintiffs in this case.[135]

### (a) Defendants wrongfully appropriated Plaintiffs' name or likeness.

"One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of privacy."[136]  The interest protected by this rule "is the interest of the individual in the exclusive use of his own identity . . . ."[137]  The use by the defendant need not be commercial and the benefit he derives need not be pecuniary.[138]

In this case, "pauliewalnuts," "kibitzer" and other anonymous organizers of the t14 contest appropriated DOE II's likeness by using photographs of her without her permission to promote the website located at http://t14talent.googlepages.com and titled "t14talent—The 'Most Appealing' Women @ Top Law Schools" and the related web log located at http://top14girls.blogspot.com.  This appropriation was done without DOE II's permission and for the benefit of the pseudonymous "pauliewalnuts" and the other organizers.

### (b) Defendants have given unreasonable and offensive publicity to Plaintiffs' lives.

The Restatement (Second) of Torts states:  "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."[139]

Here, the pseudonymous defendants have given publicity to plaintiffs' lives by making them the subject of myriad threads on the AutoAdmit website, providing private information about them, and creating websites dedicated to these purposes.  These statements include those regarding the decade-old conviction of DOE II's father, which was not only posted on AutoAdmit (by "Joel Schellhammer" and "hitlerhitlerhitler"), but also emailed to the faculty at

---

[135] DOE I Decl. ¶ 16; DOE II Decl. ¶ 32.

[136] Restatement (Second) Torts § 652C.

[137] *Id.*, comment a.

[138] *Id.*, comment b.

[139] Rest. (2d) Torts § 652D.

Yale Law School (by "Patrick Bateman").  These statements would be highly offensive to a reasonable person.  Moreover, the plaintiffs are law students.  They are not public figures and the details of their private lives are not matters of legitimate public concern.

### (c)  Defendants have created publicity that places Plaintiffs in a false light.

The Restatement provides that "[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."[140]

By publicizing false and vulgar information about the plaintiffs (as discussed in the section above on libel), the pseudonymous defendants have placed the plaintiffs in a false light that would be highly offensive to a reasonable person.  As discussed in detail above, the defendants have publicized false information about the plaintiffs having sexually-transmitted diseases, being sexually promiscuous, and engaging in bribery.[141]  The defendants created this publicity with knowledge of or reckless disregard for the falsity of the matters publicized.

### (iv)  Plaintiffs are likely to succeed on their Intentional Infliction of Emotional Distress claim.

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that (1) the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was severe.[142]  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all

---

[140] Rest. (2d) Torts § 652E.  *See also Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 131-133 (1982).

[141] *See generally*, Factual Background, *supra*.

[142] *See Petyan v. Ellis,* 200 Conn. 243, 253 (1986).

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!"[143]  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine."[144]

In this case, there is no question that defendants' conduct was extreme and outrageous. Defendants' outrageous conduct includes, for example, posting messages that expressed a wish to rape DOE I and DOE II, referred to DOE II by various racial slurs, made false statements regarding plaintiffs' sexual activities, and accused plaintiffs of having sexually transmitted diseases.[145]  In addition, defendants "Patrick Zeke" and "Patrick Bateman" sent defamatory messages about DOE I and DOE II, respectively, to the Yale Law School faculty, and "t14 gunner" sent a defamatory message to DOE II's former employer.[146]  Defendants' actions are the type of extreme and outrageous conduct for which the tort provides redress.[147]  Moreover, defendants should have known that their attacks, harassment and threats would result in emotional distress to the plaintiffs.  Indeed, at least one poster—:D—intended the attacks on DOE II to cause her emotional distress when he stated: "I'm doing cartwheels knowing this stupid Jew bitch is getting her self esteem raped."[148]

Defendants' extreme and outrageous conduct affected plaintiffs mentally, socially and physically.  For example, as a result of defendants' defamation, harassment and threats, DOE I suffered severe emotional distress and took a leave of absence from school.[149]  DOE II also

---

[143] *Angiolillo v. Buckmiller*, 102 Conn. App. 697, 706 (Conn. App. 2007).

[144]  *Bell v. Board of Education*, 55 Conn. App. 400, 410 (1999).

[145] DOE I Decl. ¶¶ 5-6; DOE II Decl. ¶¶ 3-4.

[146] *See* DOE I Decl. ¶¶ 8,9; DOE II Decl. ¶¶ 16,19.

[147]  *See, e.g.*, *Leone v. New England Communications*, 32 Conn. L. Rptr. 72 (2002) (finding the use of racial slurs extreme and outrageous when the owners of the corporation referred to the plaintiff as "dago, wop, Father Sarducci or Gimabroni," while also placing "sexually offensive comments and pictures on his computer" and making sexual comments).

[148] DOE II Decl. Ex. 16 at 8.

[149] DOE I Decl. ¶ 15.

suffered severe emotional distress and, as a result, sought therapy and took medication for depression and anxiety.[150]

      **(v)**    **Plaintiffs are likely to succeed on their claim for Negligent Infliction of Emotional Distress.**

Unlike a claim for intentional infliction of emotional distress, in order to state a claim for negligent infliction of emotional distress, a plaintiff need not allege extreme and outrageous conduct on the part of the defendant. Rather, "[a] claim based on the negligent infliction of emotional distress requires only that the actor's conduct be unreasonable and create an unreasonable risk of foreseeable emotional harm."[151] Thus, in order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress."[152]

Here, the defendants' extreme and outrageous conduct in the form of rape threats, racist attacks, libelous statements concerning plaintiffs' sexual activity, and defamatory statements about the plaintiffs sent to the Yale Law School faculty, among the other egregious conduct, created an unreasonable and foreseeable risk of causing plaintiffs emotional distress. By posting their attacks against DOE I and DOE II on a website frequented by law students and lawyers, defendants knew or should have known that their comments would be read by plaintiffs' peers, colleagues, potential employers, and by plaintiffs themselves, and would cause plaintiffs, who are young women on the brink of starting their legal careers, emotional distress. As described above, defendants' attacks did indeed cause DOE I and DOE II extreme emotional distress with physical symptoms such as stress, anxiety, depression and insomnia.

---

[150] DOE II Decl. ¶¶ 24-25.

[151] *Olson v. Bristol-Burlington Health District*, 87 Conn. App. 1, 7, *cert. granted*, 273 Conn. 914, 870 A.2d 1083 (2005) (appeal withdrawn, May 25, 2005).

[152] *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446-47 (2003).

### c. Connection between irreparable harm and expedited discovery

Under *Notaro*, the party seeking expedited discovery must establish "some connection between the expedited discovery and the avoidance of the irreparable injury."[153] Here, plaintiffs are seeking leave of the Court to conduct formal discovery for a very limited, but important, purpose: to reveal defendants' identities in order to serve them with the complaint and proceed with this action. The discovery sought is directly connected to the threat of irreparable harm faced by plaintiffs—the inability to seek redress through the courts.

### d. Balancing of injury

Plaintiffs also must show "that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted."[154] Here, the injury that will result without expedited discovery is that plaintiffs will never be compensated for the injuries they have suffered because they will not be able to proceed with this action.

Balanced against this is the harm that defendants will suffer from being unmasked as the posters on AutoAdmit and having to defend their conduct in court. There is simply no contest under the facts of this case. While courts recognize a right to "anonymous speech" under the First Amendment,[155] this right is not implicated here because the speech at issue does not receive First Amendment protection. (This is discussed in further detail below.) More importantly, however, <u>plaintiffs do not wish to chill anonymous speech on the Internet—including defendants' speech on AutoAdmit.com</u>. Defendants may continue to speak anonymously as they have in the past. All plaintiffs are doing is asking the Court for leave to conduct discovery that will allow them to seek redress for wrongs that have unquestionably occurred.

Under these circumstances, justice would not be served by blocking plaintiffs' efforts to conduct expedited discovery. Defendants have been able to inflict injury on plaintiffs by hiding

---

[153] *Notaro,* 95 F.R.D. at 405.

[154] *Id.*

[155] *See, e.g., United States v. Perez*, 247 F. Supp. 2d 459, 461 (S.D.N.Y. 2003).

behind pseudonyms that concealed their real identities. This Court should not allow the defendants to escape, entirely, the consequences of their actions because they chose to attack plaintiffs in such a cowardly manner. Such a result would be unjust and unfair.

**B.** **First Amendment concerns regarding "anonymous speech" are not implicated in this case, but even if they were, plaintiffs have met their burden to unmask the defendants.**

In certain circumstances where parties have sought discovery regarding the identity of anonymous posters on the Internet, courts have balanced the First Amendment right to "anonymous speech" against plaintiffs' rights to conduct discovery and have adopted varying standards for uncovering anonymous posters. These standards are easily met in this case.

For instance, in *In re Subpoena Duces Tecum to America Online*, the Virginia Circuit Court held that a subpoena should issue "(1) when the court is satisfied by the pleadings or evidence supplied to that court (2) that the party requesting the subpoena has a legitimate, good faith basis to contend that it may be the victim of conduct actionable in the jurisdiction where suit was filed and (3) the subpoenaed identity information is centrally needed to advance that claim."[156] As discussed in detail above, plaintiffs have more than a legitimate good-faith basis to assert that they are the victims of the claims set forth in the FAC, and early discovery is needed to uncover the defendants' identities and advance this case.

Other courts have set forth more stringent standards for plaintiffs seeking to conduct discovery to uncover anonymous speakers. For example, in *Cahill*,[157] where the plaintiff claiming defamation on the Internet was a public figure, and the speech at issue involved political criticism, the Delaware Supreme Court required that the plaintiff establish the "prima facie case for each essential element of the claim in question."[158] Similarly in *Sony v. Does 1-40*,

---

[156] *America Online,* 52 Va. Cir. at 37.

[157] 884 A.2d 451 (Del. 2005).

[158] *Id.* at 457, 463 (citation omitted). The court in *Cahill* also termed this a "summary judgment standard" but clarified that it would require a defamation plaintiff to "plead and prove facts with regard to elements of the claim that are within his control." *Id.* at 463, 464. *See also Best Western Inc. v. Doe*, No. CV-06-1537, 2006 WL 2091695, at *4 (D. Ariz., July 25, 2006) (agreeing with *Cahill* and noting that the case required plaintiff to "produce evidence sufficient to establish the plaintiff's *prima facie* case"); *Sony v. Does 1-40*, 326 F. Supp. 2d at 564-65. The

a case pitting record companies against anonymous file sharers on the Internet, the district court in the Southern District of New York first noted that the "speech" at issue in file sharing involved "making a statement by downloading and making available to others copyrighted music . . . ."[159] After acknowledging that this speech was entitled to some protection, the court looked at various factors, including whether plaintiffs had made out a prima facie case of copyright infringement.[160]

Unlike situations where a higher standard may be applicable, the speech at issue in this case does not implicate the First Amendment. "Certain categories of speech such as defamation, incitement [and] obscenity . . . may be barred without trespassing on individual First Amendment rights."[161] Neither does the First Amendment countenance "spreading false information[.]"[162] And, it is beyond question that the First Amendment "does not protect copyright infringement[.]"[163] Nor are plaintiffs public figures or the speech in question on a matter of public concern. Therefore, the higher standard articulated in *Cahill* and *Sony* is not applicable to this case and the Court need not decide the merits of this motion by applying those cases.

But even if the Court were to consider these cases applicable, the standards articulated therein have been met here, as the preceding detailed discussion in this memorandum unequivocally demonstrates. Plaintiffs have established—with the evidence to which they have access at this stage—that they are entitled to relief in this case. They have certainly have established their *prima facie* case.

---

court in *Cahill* stated that the plaintiff could prove its case by submission of "affidavits to substantiate [the defamation] claim." *Cahill*, *supra* at 464. This has been done here.

[159] *Id.* at 564.

[160] *See id.* at 565. The other factors considered by the Court in *Sony* included specificity of the discovery request, absence of alternative means to obtain subpoenaed information, central need for subpoenaed information, and defendants expectation of privacy. Here, all of these factors have been satisfied as the discussion relating to the *Notaro* factors amply shows.

[161] *United States v. Irving*, 452 F.3d 110, 120 (2d Cir. 2006) (emphasis added).

[162] *In re Baxter*, No. 01-00026-M, 2001 U.S. Dist. LEXIS 26001, at *24 (W.D. La. December 20, 2001).

[163] *Sony,* 326 F. Supp. 2d at 562-563 at 562-63.

## C. The Court should consider this motion on an expedited basis

Internet Service Providers, and the other entities that plaintiffs seek identifying information from, delete such information at varying intervals.[164] Plaintiffs have sent out preservation letters to numerous entities that they now seek to subpoena through this motion.[165] Plaintiffs have learned, in the process, that some of the information they seek may <u>already</u> have been deleted, as part of the deletion policy of an Internet Service Provider.[166] Plaintiffs' investigation, in light of the discovery sought in this motion, will undoubtedly reveal additional gaps in information that may be filled by other entities, but that may well be subject to the ongoing threat of deletion.[167] Plaintiffs therefore request that the Court consider the merits of this motion on an expedited basis so that they are able to get access to any additional information they need to identify defendants before it is deleted.

## IV. CONCLUSION

For all of the foregoing reasons, this Court should grant plaintiffs Motion for Expedited Discovery.[168]

---

[164] Mitra Decl. ¶19.

[165] *Id.* Ex. F.

[166] *Id.* ¶19, Ex. H (PenTeleData letter).

[167] Such information could include, for instance, the identities of persons whose assigned IP addresses are identified through discovery allowed under this motion.

[168] In this motion and in the subpoenas attached as Exhibit K to the Mitra Declaration, Plaintiffs have listed the entities and persons that, to their knowledge, potentially have information relating to the defendants' identities   Plaintiffs ask the Court to allow them to conduct additional discovery for the limited purpose of identifying defendants as further information comes to light or as additional investigation sheds light on existing information.

Dated: January 24, 2008

PLAINTIFFS DOE I AND
DOE II

By:     */s/  Steve Mitra*
        Mark Lemley (*pro hac vice*)
        Ashok Ramani (*pro hac vice*)
        Steve Mitra (*pro hac vice*)
        KEKER & VAN NEST, LLP
        710 Sansome Street
        San Francisco, CA 94111
        Telephone: (415) 391-5400
        Facsimile:  (415) 397-7188
        Email:    MLemley@kvn.com
                  ARamani@kvn.com
                  SMitra@kvn.com


        David N. Rosen
        David Rosen & Associates PC
        400 Orange Street
        New Haven, CT 06511
        Telephone: (203) 787-3513
        Facsimile: (203) 789-1605
        Email: drosen@davidrosenlaw.com

# EXHIBIT A

**Unpublished Cases**

LEXSEE 52 VA. CIR 26

**In re Subpoena Duces Tecum to America Online, Inc.**

**Case No. (Misc. Law) 40570**

**CIRCUIT COURT OF FAIRFAX COUNTY, VIRGINIA**

*52 Va. Cir. 26; 2000 Va. Cir. LEXIS 220*

**January 31, 2000, Decided**

## HEADNOTES

HEADNOTE: A non-party to whom a pre-trial subpoena duces tecum has been directed has standing to move to quash or modify it.

A motion to quash a pre-trial subpoena duces tecum will be granted where it makes an unreasonable request in the light of all the circumstances surrounding it and produces an oppressive effect on the movant.

Comity will not be applied where it would defeat constitutional rights.

An Internet service company has the right to appear in court to protect the constitutional rights of its subscribers and customers.

The right to communicate anonymously on the Internet falls within the scope of the protections the First Amendment. However, the First Amendment does not absolutely protect defamation made anonymously nor the release of confidential insider information.

A non-party, Internet service provider must identify subscribers where the party requesting such information has pleaded a claim and it is centrally needed to advance that claim.

**JUDGES:** [**1] BY JUDGE STANLEY P. KLEIN

**OPINION BY:** Klein

## OPINION

[*26] This matter is before the Court on America Online, Inc.'s ("AOL") Motion to Quash Subpoena seeking disclosure of identifying information for four AOL Internet service subscribers.

Plaintiff Anonymous Publicly Traded Company ("APTC") seeks to learn the identities of the subscribers so that it can properly name them as defendants in an action it has instituted in the State of Indiana. AOL asserts that the First Amendment rights of its subscribers preclude APTC from obtaining the relief it seeks in this Court. For the reasons set forth in this opinion, the Motion to Quash is denied.

### I. Background

APTC filed suit in Indiana, anonymously, under the pseudonym of APTC, against five individuals ("John Does") alleging that the John Does published in Internet chat rooms certain defamatory material, misrepresentations, and [*27] confidential material insider information concerning APTC "in breach of the fiduciary duties and contractual obligations owed to [APTC]." See AOL's Motion to Quash Subpoena, Ex. A, Complaint For Injunctive Relief And Damages. In the Indiana proceedings, APTC sought and obtained from the Court an Order Authorizing [**2] Plaintiff To Conduct Discovery In Virginia And Requesting Assistance Of State Of Virginia Trial Courts To Issue Subpoena In Support Of Indiana Discovery. Pursuant To *Va. Code § 8.01-411*, the Clerk of this Court issued a Request For Production To Non-Party, America Online, Inc., to produce any and all documents from which the identity of the four AOL subscribers could be ascertained. [1] As a result of informal discussions between counsel, APTC learned that AOL was unwilling to voluntarily comply with the subpoena, in part, because APTC had failed to identify its true name in the Indiana proceedings. [2] APTC then filed a motion in the Indiana proceedings to allow it

to proceed anonymously until the John Does were identified. On October 15, 1999, the instant Motion Of America Online, Inc., to Quash Subpoena Or, In The Alternative, For A Protective Order was filed with the Clerk of this Court. On October 19, 1999, the Indiana court entered an order authorizing APTC to maintain its anonymity in the Indiana proceedings until APTC determines the identity of the John Does. The Indiana court further ordered that if APTC then decides to go forward with the Indiana lawsuit, it will have to identify [**3] both the defendants and itself in an amended complaint. See APTC's Opposition to AOL's Motion to Quash, Ex. A.

    1   AOL does not challenge the procedural propriety of the subpoena duces tecum issued by the Clerk.

    2   AOL acknowledged on brief that it has complied with hundreds of similar subpoenas issued by Virginia courts when it has been satisfied (1) that the party seeking the information has pleaded with specificity a prima facie claim that it is the victim of particular, specified tortious conduct and (2) that the subpoenaed identity information was centrally needed to advance the claim. AOL's Supplemental Memorandum In Support of Motion To Quash at 4-5.

On October 29, 1999, this Court heard oral argument and took the matter under advisement. Counsel were granted leave to file supplemental briefs and both parties elected to do so. In its supplemental brief, APTC offered to supply the Court with copies of the subject "chat room" postings for in camera review. Response of Anonymous Publicly Traded [**4] Company to Supplemental Memorandum of America Online, Inc., at 5, n. 10. After full consideration of the pleadings and the arguments of counsel, the Court determined that a review of the postings would be appropriate in this case and so advised counsel. The Court received copies of some postings from counsel for APTC and, on December 21, 1999, conducted a further hearing by [*28] telephone conference with counsel to confirm that the Court had received copies of all the relevant postings. During the hearing, counsel for APTC determined that it had not submitted all of the relevant postings; and, as a result, counsel for APTC that day forwarded copies of all of the relevant postings to the Court and to counsel of AOL. The Court allowed counsel for APTC to redact APTC's true name from the copies supplied to counsel for AOL.

The Court further agreed to file the redacted copies of the postings in the Court's file and to place the unredacted copies of the postings in the Court's file under seal. On December 23, 1999, the Court received a letter from counsel for AOL addressing the contents of the postings. Counsel also reiterated his objection to the Court's consideration of the postings. [**5] Ironically, it was counsel's own arguments that convinced this Court to review the contents of the allegedly tortious postings rather than defer to the orders of the Indiana court. The Court has now considered all of the submissions of the parties and the relevant authorities.

    II. Analysis

AOL contends that the subpoena duces tecum issued by the Clerk of this Court unreasonably impairs the First Amendment rights of the John Does to speak anonymously on the Internet and therefore should be quashed pursuant to Supreme Court Rule 4:9(c). APTC responds (1) that this Court's analysis should be limited to whether the subpoena is procedurally defective; (2) that this Court must defer to the orders of the Indiana court under principles of comity; (3) that AOL has no standing to assert the free speech rights of the John Does; and (4) that the subpoena would not unreasonably burden the John Does' free speech or privacy rights. During oral argument, counsel for APTC conceded that First Amendment interests are implicated in the issue now before this Court. [3] Therefore, the Court will address each of APTC's arguments why those First Amendment interests should not be determinative in this matter. [**6]

    3   As a result of this concession, the Court need not rule on whether First Amendment principles affect the issuance of a subpoena by a court in a dispute solely between private citizens. See e.g. *Britt v. Superior Court of San Diego County, 20 Cal. 3d 844, 574 P.2d 766, 773-74, n. 3, 143 Cal. Rptr. 695 (Cal. 1978).*

Rule 4:9(c) reads, in pertinent part, as follows:

Production by a Person Not a Party. - Upon written request therefor filed with the clerk of the court in which the action or suit is pending by counsel of record for any party... the clerk shall... [*29] issue to a person not a party therein a subpoena duces tecum which shall command the person to whom it is directed... to produce the documents and tangible things... designated and described in said request... But, the court, upon written

motion promptly made by the person so required to produce, or by the party against whom such production is sought, may quash or modify the subpoena if it is unreasonable and oppressive.

Va. S. Ct. Rule 4:9(c) (emphasis added). AOL [**7] is the person/entity being required to produce documents under the subpoena and, therefore has standing to challenge the subpoena, according to the plain language of Rule 4:9(c).

In reviewing AOL's challenge, the Court must consider whether the subpoena served on AOL is unreasonable and oppressive. The second prong, which prohibits oppressive subpoenas, clearly applies to the effect of the subpoena on the challenging entity. However, it is unclear whether the first prong requires that a subpoena be reasonable (a) with respect to the burdens placed upon the entity challenging the subpoena or (b) with respect to all of the circumstances surrounding the subpoena. If the reasonableness prong is construed to apply only to the challenging entity, then the reasonableness prong does not add any meaning beyond the oppressiveness prong. Applying the reasonableness prong to all of the circumstances surrounding the subpoena gives meaning to all of the words of the rule. See generally *Commonwealth v. Jones, 194 Va. 727, 731, 74 S.E.2d 817 (1953)* (holding that a statute should be construed so as to give effect to all its component parts). Therefore, this Court holds that the legal standard to be [**8] applied when ruling on a motion to quash a subpoena under Rule 4:9(c) is whether the subpoena is (1) an unreasonable request in light of all the circumstances surrounding the subpoena or (2) that produces an oppressive effect on the entity challenging the subpoena.

A. According Comity to the orders of the Indiana Court

As no final judgment has yet been rendered in the Indiana proceedings, this Court is not bound by the rulings of that court. See *Baker By Thomas v. General Motors Corp., 522 U.S. 222, 118 S. Ct. 657, 663-64, 139 L. Ed. 2d 580 (1998)* (*Full Faith and Credit Clause of the United States Constitution* applies only to final judgments of courts of competent jurisdiction.) Nonetheless, APTC asserts that under traditional notions of comity, this Court should not re-examine the merits of the Indiana court's decision (1) to authorize the issuance of the subpoena duces tecum to AOL to produce documents pertaining to the [*30] identities of the John Does or (2) to allow

APTC to proceed temporarily under a pseudonym.

Traditional notions of comity have long been recognized in Virginia and rest upon "mutual interest and convenience, from a sense of the inconvenience which would otherwise [**9] result, and from moral necessity to do justice in order that justice may be done in return." *McFarland v. McFarland, 179 Va. 418, 430, 19 S.E.2d 77 (1942)*. Although this Court firmly believes in the principles underlying comity and has often deferred to non-binding decisions of judges of other trial courts in Virginia and elsewhere, it is unwilling to blindly defer to a ruling of another court which could substantially abridge the constitutional rights of the John Does. This is especially true when, as here, the judge issuing the order did not have the benefit of the arguments and authorities supporting the positions of both sides. As such, this Court believes it entirely appropriate to analyze the propriety of the issuance of the subpoena duces tecum, as it would be this Court's order, not the Indiana court's order, which would directly abridge the First Amendment rights of the John Does.

However, the Court's analysis of the deference to be given to the Indiana judge's ruling allowing APTC to proceed anonymously for a limited period of time is somewhat different. Although there is clearly a First Amendment interest in ensuring that what takes place in the courtrooms of the United [**10] States is open for public scrutiny, the public's right of access is not absolute. Moreover, the right to open inspection of the proceedings in our courtrooms does not necessarily equate to a right to immediately know the identity of the parties litigating in those courtrooms. As the United States Court of Appeals for the Fifth Circuit has noted:

The equation linking the public's right to attend trials and the public's right to know the identity of the parties is not perfectly symmetrical. The public right to scrutinize governmental functioning is not so completely impaired by a grant of anonymity to a party as it is by closure of the trial itself. Party anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them. The assurance of fairness preserved by public presence at a trial is not lost when one party's cause is pursued under a fictitious name. These crucial interests served by open trials are not inevitably compromised by allowing a party to proceed anonymously.

*Doe v. Stegall, 653 F.2d 180, 185 (1981)* (citations

omitted).

As any First Amendment right of the public to know the identity of the plaintiff in the Indiana [**11] proceedings will only be marginally affected at these [*31] preliminary stages of those proceedings, this Court believes that comity should be accorded to the Indiana court's decision, under its Trial Rules, to allow APTC to proceed anonymously for a limited period of time. Although the Indiana court did not have the benefit of a brief from AOL when it authorized APTC to maintain its anonymity after AOL filed the instant motion, counsel herein agree that the Indiana court was then aware of AOL's objection. In addition, at least part of the salutary prophylactic effect of requiring openness in judicial proceedings has been assured by this Court's requirement that APTC supply copies of the relevant Internet postings to opposing counsel and to the Court. Both this Court and the John Does now either know or can readily ascertain the true identity of APTC. Consequently, any possible abuses of the judicial system by APTC in initiating either the proceeding in the Indiana court or in this Court can be addressed by the respective courts under applicable statutes authorizing sanctions. Hence, this Court defers, in its analysis of the issues before this Court, to the Indiana court's determination [**12] to allow APTC to maintain its anonymity for a limited period of time.

B. Standing

APTC argues that if the subpoena unreasonably burdens the First Amendment rights of the John Does, then the John Does are the proper parties to seek relief from the subpoena, not AOL. APTC's argument ignores longstanding precedent upholding the standing of third parties to seek vindication of First Amendment rights of others in situations analogous to the circumstances presented herein.

In *NAACP v. Alabama, 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163 (1958)*, the United States Supreme Court considered a case involving a finding of contempt against the NAACP for its refusal to turn over its membership lists, after being ordered to do so by an Alabama state court judge. The Supreme Court rejected Alabama's argument that the NAACP lacked standing to assert the constitutional rights of its members, holding that the NAACP "argues more appropriately the rights of its members, and that its nexus with them is sufficient to permit that it act as their representative before this Court." *NAACP, 357 U.S. at 458-59.* In so ruling, the Court addressed the potential effects that disclosure of the identities of its members might have [**13] on the NAACP itself:

The reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected if production is compelled is a further factor pointing towards [*32] our holding that petitioner has standing to complain of the production order on behalf of its members.

*NAACP, 357 U.S. at 459-60.* Similarly, in *NAACP Legal Defense and Educ. Fund, Inc. v. Committee on Offenses Against the Admin. of Justice, 204 Va. 693, 133 S.E.2d 540 (1963)*, the Virginia Supreme Court recognized the right of the NAACP to maintain the confidentiality of its member and donor lists, reasoning that:

There can be no reasonable doubt that a disclosure of the names of those who support the activities of the appellants could have no result other than to injuriously affect the effort of appellants to obtain financial support in promoting their aims and purposes.

*Id. at 698.* See also *Virginia v. American Booksellers Assn., 484 U.S. 383, 392-93, 98 L. Ed. 2d 782, 108 S. Ct. 636 (1998)* (permitting third-party standing in First Amendment free speech context because of potential chilling effect of law on others). It cannot be seriously questioned that those who [**14] utilize the "chat rooms" and "message boards" of AOL do so with an expectation that the anonymity of their postings and communications generally will be protected. If AOL did not uphold the confidentiality of its subscribers, as it has contracted to do, absent extraordinary circumstances, [4] one could reasonably predict that AOL subscribers would look to AOL's competitors for anonymity. As such, the subpoena duces tecum at issue potentially could have an oppressive effect on AOL.

    4   See affidavit of Carrie F. Davis and Ex. A
    therein.

Moreover, it is questionable whether all, or any, of the subscribers have received actual notice of the pendency of these proceedings or have the inclination or financial ability to defend against the subpoenas. See affidavit of Carrie F. Davis and Ex. A therein. As the Supreme Court has recognized, when the right to anonymity is at issue, "to require that [the right] be

claimed by the members themselves would result in nullification of the right at the very moment of its assertion. [**15] " *NAACP v. Alabama, 357 U.S. at 459*. Hence, this Court holds that AOL has standing to assert the First Amendment rights of the John Does.

[*33] C. Whether the Subpoena Would Unreasonably Burden the First Amendment Rights of the John Does

As this Court has determined that the subpoena can have an oppressive effect on AOL, the sole question remaining is whether the subject subpoena is unreasonable in light of all the surrounding circumstances. Ultimately, this Court's ruling on the Motion to Quash must be governed by a determination of whether the issuance of the subpoena duces tecum and the potential loss of the anonymity of the John Does, would constitute an unreasonable intrusion on their First Amendment rights. In broader terms, the issue can be framed as whether a state's interest in protecting its citizens against potentially actionable communications on the Internet is sufficient to outweigh the right to anonymously speak on this ever-expanding medium. There appear to be no published opinions addressing this issue either in the Commonwealth of Virginia or any of its sister states. [5]

5 Although the framework for an analysis of this specific issue appeared to be present in *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 51 U.S.P.Q.2d (BNA) 1130 (N.D. Cal. 1999), the court, in rendering its ruling, focused solely on the procedural propriety of allowing discovery before service of process was effected.

[**16]

The *First Amendment to the United States Constitution* provides, in pertinent part, that "Congress shall make no law... abridging the freedom of speech." This prohibition is equally applicable to the states under the Due Process Clause of the Fourteenth Amendment. *Pennekamp v. Florida, 328 U.S. 331, 349, 90 L. Ed. 1295, 66 S. Ct. 1029 (1946)*; *Grosjean v. American Press Co., 297 U.S. 233, 244-45, 249, 80 L. Ed. 660, 56 S. Ct. 444 (1936)*. The unconditional wording of the First Amendment was not designed, however, to protect all forms of expression. See *Roth v. United States, 354 U.S. 476, 483, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957)* (finding that obscenity is not protected by the First

Amendment); *Beauharnais v. Illinois, 343 U.S. 250, 266, 96 L. Ed. 919, 72 S. Ct. 725 (1952)* (holding that libelous statements are outside the realm of constitutionally protected speech); *Chaplinsky v. New Hampshire, 315 U.S. 568, 573, 86 L. Ed. 1031, 62 S. Ct. 766 (1942)* (finding that "fighting words" are outside the scope of First Amendment protections).

Inherent in the panoply of protections afforded by the First Amendment is the right to speak anonymously in diverse contexts. This right arises from a long tradition of American advocates speaking anonymously from pseudonyms, such as James [**17] Madison, Alexander Hamilton, and John Jay, who authored the Federalist Papers but signed them only as "Publius." In *Talley v. California, 362 U.S. 60, 64, 4 L. Ed. 2d 559, 80 S. Ct. 536 (1960)*, the Supreme Court recognized that "[a]nonymous pamphlets, leaflets, brochures and even books have played an [*34] important role in the progress of mankind," and held that the distribution of unsigned handbills urging a boycott of certain merchants, who were allegedly involved in discriminatory practices, fell within the ambit of the protections afforded by the First Amendment.

In *McIntyre v. Ohio Elections Comm'n., 514 U.S. 334, 131 L. Ed. 2d 426, 115 S. Ct. 1511 (1995)*, the Supreme Court again examined the breadth of the right to anonymity protected by First Amendment principles. Noting that famous works of literature had been penned by authors utilizing assumed names, the Court recognized that "[t]he decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre, 514 U.S. at 341-42* (emphasis added). Specifically acknowledging that "the freedom to publish anonymously extends beyond [**18] the literary realm," the Supreme Court held in McIntyre that an Ohio law prohibiting distribution of anonymous campaign literature was constitutionally infirm. Id.

This Court must now decide whether the First Amendment right to anonymity should be extended to communications by persons utilizing chat rooms and message boards on the information superhighway. It is beyond question that thousands, perhaps millions, of people communicating by way of the Internet do so with a "desire to preserve as much of [their] privacy as possible." *McIntyre, 514 U.S. at 342.* "Through the use of

chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." *Reno v. ACLU, 521 U.S. 844, 117 S. Ct. 2329, 2344, 138 L. Ed. 2d 874 (1997).* To fail to recognize that the First Amendment right to speak anonymously should be extended to communications on the Internet would require this Court to ignore either United States Supreme Court precedent or the realities of speech in the twenty-first century. This Court declines to [**19] do either and holds that the right to communicate anonymously on the Internet falls within the scope of the First Amendment's protections.

As AOL conceded at oral argument, [6] however, the right to speak anonymously is not absolute. See *McIntyre, 514 U.S. at 353* ("We recognize that a State's enforcement interest might justify a more limited identification requirement.") In that the Internet provides a virtually unlimited, inexpensive, and almost immediate means of communication with tens, if not hundreds, of millions of people, the dangers of its misuse cannot be ignored. The protection of the right to communicate anonymously must be balanced against the need [*35] to assure that those persons who choose to abuse the opportunities presented by this medium can be made to answer for such transgressions. See *Denver Area Ed. Tel. Consortium v. FCC, 518 U.S. 727, 741, 135 L. Ed. 2d 888, 116 S. Ct. 2374 (1996)* (stating that First Amendment jurisprudence has always "embodie[d] an overarching commitment to protect speech... but, without imposing judicial formulas so rigid that they become a straightjacket that disables government from responding to serious problems"). Those who suffer damages [**20] as a result of tortious or other actionable communications on the Internet should be able to seek appropriate redress by preventing the wrongdoers from hiding behind an illusory shield of purported First Amendment rights.

6  Tr. at 14.

APTC's Indiana Complaint for Injunctive Relief and Damages alleges that its current and/or former employees have made defamatory material misrepresentations concerning APTC. It further alleges that the John Does have published confidential material information about APTC, in violation of the John Does' fiduciary and contractual duties to APTC, that "will cause [APTC] to continue to suffer immediate and irreparable injury, loss

and damages including potentially adversely affecting the value of its publicly traded stock." Motion of AOL to Quash Subpoena, Ex. A, Complaint For Injunctive Relief And Damages /P 8.

Any defamatory statements made by one or more of the John Doe defendants would not be entitled to any First Amendment protection. *Beauharnais v. Illinois, 343 U.S. 250, 266, 96 L. Ed. 919, 72 S. Ct. 725 (1992).* [**21] Moreover, the release of confidential insider information, relating to a publicly traded company, through a medium such as the Internet, is no less pernicious than the libelous statements that fall outside the scope of First Amendment protections. In this age of communication in cyberspace, the potential dangers that could flow from the dissemination of such information increase exponentially as the proliferation of shareholder chat rooms continues unabated and more and more traders utilize the Internet as a means of buying and selling stocks. As such, the wrongful dissemination of such information through the Internet may also fall outside the scope of First Amendment protections. This Court, however, need not decide that question. Nor must it decide whether less than a compelling state interest might be sufficient to vitiate the anonymity of the John Does herein, because this Court finds that, under the circumstances of this case, the State of Indiana clearly has a compelling state interest to protect companies operating within its borders [7] from such wrongful conduct. [8] To rule [*36] otherwise would leave companies such as APTC virtually defenseless to this potentially virulent [**22] hazard.

7  APTC is a Delaware corporation with its principal place of business in Indianapolis, Indiana. See Complaint For Injunctive Relief And Damages /P 1.
8  Generally, only a compelling state interest can justify burdening First Amendment rights. See *FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 256, 107 S. Ct. 616, 93 L. Ed. 2d 539 (1986); NAACP v. Button, 371 U.S. 415, 438, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963).*

Nonetheless, before a court abridges the First Amendment right of a person to communicate anonymously on the Internet, a showing, sufficient to enable that court to determine that a true, rather than perceived, cause of action may exist, must be made. AOL proposes that this Court adopt the following two prong

test to determine when a subpoena request is reasonable and accordingly would require AOL to identify its subscribers: (1) the party seeking the information must have pleaded with specificity a prima facie claim that it is the victim of particular tortious conduct and (2) the subpoenaed identity information [**23] must be centrally needed to advance that claim. See AOL's Supplemental Memorandum In Support of Motion to Quash at 4-5. APTC responds that this Court should not, in any way, address the merits of its claim and should merely follow the procedures that APTC asserts are compelled by *Va. Code § 8.01-411.* [9] Although this Court agrees with AOL that APTC must establish that there is a legitimate basis to believe that it may have bona fide claims against the John Does before compliance with the subpoena duces tecum is ordered, it agrees with APTC that AOL's proposed test is unduly cumbersome. What is sufficient to plead a prima facie case varies from state to state and, sometimes, from court to court. Compare *CaterCorp v. Catering Concepts, Inc., 246 Va. 22, 431 S.E.2d 277 (1993),* with *Russo v. White, 241 Va. 23, 400 S.E.2d 160 (1991).* This Court is unwilling to establish any precedent that would support an argument that judges of one state could be required to determine the sufficiency of pleadings from another state when ruling on matters such as the instant motion.

9    In its Response of Anonymous Publicly Traded Company To Supplemental Memorandum of America Online, Inc., APTC sets out five reasons why the Court should not adopt AOL's proposed two prong test: (1) AOL's written policy allows it to release subscriber information to protect AOL's interests; (2) the Uniform Foreign Deposition Act, *Va. Code § 8.01-411*, prescribes compliance with state process, not ruling on substantive issues of foreign law; (3) this Court should defer to the Indiana court to make rulings concerning the substantive law of Indiana; (4) to the extent that First Amendment issues are truly implicated, the Indiana courts are equally capable of deciding the issues; and (5) acceptance of AOL's position would enable nonparties to litigate the substantive merits of foreign lawsuits without Virginia courts retaining the ability to draw meaningful boundaries for such litigation.

[**24]  [*37]  The Court was initially inclined to defer to the judgment of the Indiana court, which seemingly has validated the sufficiency of APTC's

Complaint, first by authorizing the out-of-state subpoena request and then by allowing APTC to maintain its anonymity, notwithstanding the known opposition of AOL. However, the Court eventually determined that further examination of the bona fides of APTC's claims was necessary in order to properly evaluate the reasonableness of the subpoena request in light of all the surrounding circumstances. Consequently, this Court required APTC to produce the subject Internet postings, so that the Court could better determine whether there is, in fact, a good faith basis for APTC's allegations.

Therefore, in lieu of the test proposed by AOL, this Court holds that, when a subpoena is challenged under a rule akin to Virginia Supreme Court Rule 4:9(c), a court should only order a non-party, Internet service provider to provide information concerning the identity of a subscriber (1) when the court is satisfied by the pleadings or evidence supplied to that court (2) that the party requesting the subpoena has a legitimate, good faith basis to contend that [**25] it may be the victim of conduct actionable in the jurisdiction where suit was filed and (3) the subpoenaed identity information is centrally needed to advance that claim. A review of the Indiana pleadings and the subject Internet postings satisfies this Court that all three prongs of the above-stated test have been satisfied as to the identities of the subscribers utilizing the four e-mail addresses in question.

In his December 22, 1999, correspondence to the Court, counsel for AOL argued that the methodology utilized by APTC in obtaining the AOL e-mail addresses in question is far from foolproof. This Court recognizes that the methodology may be less than totally certain and that some of the postings may turn out to be from persons who owe no fiduciary or contractual duty to APTC. Nonetheless, this Court finds that the compelling state interest in protecting companies such as APTC from the potentially severe consequences that could easily flow from actionable communications on the information superhighway significantly outweigh the limited intrusion on the First Amendment rights of any innocent subscribers. Hence, this Court finds that the instant subpoena duces tecum does not unduly [**26] burden the First Amendment rights of the John Does and is therefore not unreasonable in light of all the surrounding circumstances. Accordingly, AOL's Motion to Quash is denied in its entirety. [10]

10   In its motion, AOL did not seek a protective

order limiting APTC's use of the subpoenaed information solely to matters relating to the Indiana lawsuit.

**[*38]** III. Conclusion

For the reasons set forth above, the Motion of America Online, Inc., to Quash Subpoena or, in the Alternative, for a Protective Order is denied.

## IN RE RICHARD L. BAXTER

### MISCELLANEOUS NO. 01-00026-M

### UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

#### 2001 U.S. Dist. LEXIS 26001

**December 19, 2001, Decided**
**December 20, 2001, Filed**

**DISPOSITION:** [*1] Motion to intervene anonymously by J. Doe [Doc. # 8] DENIED. Complaint for relief pursuant to the First Amendment to the U.S. Constitution and for injunctive relief attached to Document # 8 DENIED.

**COUNSEL:** For Richard L Baxter, Plaintiff: Shelly D Dick, Victor L Crowell, Forrester Jordan & Dick, Baton Rouge, LA.

For J Doe, Movant: J Michael Rhymes, Monroe, LA.

**JUDGES:** JAMES D. KIRK, UNITED STATES MAGISTRATE JUDGE. U.S. DISTRICT JUDGE ROBERT G. JAMES.

**OPINION BY:** JAMES D. KIRK

**OPINION**

**MEMORANDUM RULING**

Before the court is plaintiff's application for order to conduct discovery [Doc. # 1] and a motion to intervene anonymously by J. Doe and motion to stay this court's order of October 18, 2001 [Doc. # 8]. Also appended to the motion to intervene is a "Complaint for Relief pursuant to the First Amendment to the United States Constitution and for Injunctive Relief," not separately docketed. These matters are referred to the undersigned for decision.

This application was filed by Richard L. Baxter

("Baxter") on August 13, 2001 as a miscellaneous case on the docket of this court and seeks only an order to perpetuate testimony pursuant to Fed.R.Civ.P. 27. The application alleges that Baxter [*2] is a Louisiana resident who seeks an order compelling Homestead Technologies, Inc. ("Homestead"), a foreign corporation located in the State of California, to provide the names and identities of authors, editors and publishers of false and defamatory materials alleged to have been published on a website hosted by Homestead, Truth@ULM.com. [1] The application asserts that those persons' names remain unknown and may be domiciled in Louisiana.

1    Various terms have been used to describe vicious attacks and unfounded rumors on the internet, including "flaming" and cybersmear.

Baxter's application alleges that he expects to be a plaintiff in a suit in this court, but is unable to bring the action because he does not know the identities of the persons who authored, edited and published the materials on the website, nor the details of the extent of the involvement, if any, of Homestead. The proposed defendants are Homestead and the unknown authors, publishers and contributors to the website. Jurisdiction is asserted [*3] by Baxter on the basis of federal question, being specifically the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230. et seq., who alleges that Congress has preempted the field concerning decency in Internet communications. Baxter alleges that his legal rights and remedies are dependent upon the construction and interpretation of that Act, but also he asserts diversity jurisdiction. Baxter's application recites in detail the basis for his proposed defamation suit and seeks to take the depositions of corporate representatives and employees of

Homestead.

A hearing was scheduled on plaintiff's application [Doc. # 2]. Before the hearing could be held, however, Baxter, through counsel, negotiated an arrangement with counsel for Homestead, pursuant to which Homestead was to provide the requested discovery upon receipt of a court order ordering it. Because the motion was unopposed by Homestead and because there were no other parties to this lawsuit, the court entered an order directing Homestead to respond to the interrogatories and request for production of documents attached to the plaintiff's motion [Doc. # 6] and the hearing was canceled.

Immediately [*4] thereafter, the motion to intervene now before the court was filed by J. Doe [Doc. # 8]. The motion to intervene, the memorandum in support and the complaint filed by J. Doe admit that J. Doe is the author of some of the materials which are the subject of this dispute and that J. Doe "may be an interested party" in subsequent proceedings. Doe seeks permission to intervene in this case in order to object to the court's jurisdiction, to object to Baxter's ability to proceed pursuant to Fed.R.Civ.P. 27 (perpetuation of testimony) and to raise issues of free speech [2]. Pending decision on the motion, the undersigned stayed the order [Doc. # 12].

> 2    Doe also suggests that the Eleventh Amendment may be implicated if Baxter is acting on behalf of a state agency, namely the Board of Supervisors of the University of Louisiana system. However, Baxter is not proceeding on behalf of a state agency and there is no evidence before the court that he is, in fact, representing a state agency.

Baxter argues that Doe has no [*5] right to intervene in this proceeding and, until allowed to intervene, has no standing to question the court's jurisdiction or Baxter's right to proceed under Fed.R.Civ.P. 27.

## JURISDICTION

Baxter asserts federal question jurisdiction pursuant to the CDA and vaguely asserts diversity jurisdiction. Although it is no doubt true that, as Baxter asserts, Doe has no right to challenge the court's jurisdiction before being allowed to proceed as a party in the case, this court always has a duty to examine its own jurisdiction. United Transp. Union v. Foster, 205 F.3d 851 (5th Cir. 2000).

As Baxter points out in brief, the Fifth Circuit has held that there need not be an independent basis for federal jurisdiction in a proceeding such as this to perpetuate testimony so long as the contemplated action would be cognizable in federal court. Dresser Industries, Inc. v. U.S., 596 F.2d 1231 (5th Cir. 1979), cert. den., 444 U.S. 1044, 100 S.Ct. 731, 62 L. Ed. 2d 730. Fed.R.Civ.P. 27 requires a petitioner to show that the petitioner expects to be a party in an action "cognizable in a court of the United States." Under the allegations of the application, federal [*6] jurisdiction would exist in such an action and, thus, the action would be cognizable in the federal courts. Therefore, this court must determine whether either federal question or diversity jurisdiction would exist.

Federal Question Jurisdiction

Baxter asserts jurisdiction pursuant to the CDA, 47 U.S.C. § 230, and argues that the federal Government preempted the field covering decency in communications. He also suggests that his legal rights and remedies are dependent upon the construction and interpretation of that Act, thereby vesting jurisdiction in this court.

However, the mere presence of a federal issue does not automatically confer federal question jurisdiction. Rather, for a claim to arise under the Constitution, laws or treaties of the United States, the right or immunity created by the Constitution or laws must be an essential element of plaintiff's claim. See In re Orthopedic Bone Screw Products Liability Litigation, 939 F.Supp. 398 (E.D. Pa. 1996); Transtexas Gas Corp. v. Stanley, 881 F.Supp. 268 (S.D. Tex. 1994). The CDA and the First Amendment do not form essential parts of plaintiff's cause of action, [*7] but only potential defenses to plaintiff's action. In the CDA, the federal Government did not completely preempt the field and plaintiff's claim still lies under the defamation laws of Louisiana. See Ceres Terminals, Inc. v. Industrial Com'n of Illinois, 53 F.3d 183 (7th Cir. 1995) [3].

> 3    "Complete preemption," of the kind which will permit a federal court to exercise subject matter jurisdiction over a complaint which, on its face, alleges only state claims, differs from ordinary preemption. While "the inquiry for ordinary preemption is substantive in nature and focuses on whether a legal defense exists," the inquiry for complete preemption "is jurisdictional in nature and focuses on whether Congress intended to

make the plaintiff's cause of action federal and removable despite the fact that plaintiff's complaint only pleads state claims." Giddens v. Hometown Financial Services, 938 F.Supp. 801 (M.D. Ala. 1996). See also Doleac v. Michalson, 264 F.3d 470 (5th Cir. 2001); Soley v. First Nat. Bank of Commerce, 923 F.2d 406 (5th Cir. 1991).

[*8] Although Section 230 preserves a plaintiff's rights to proceed against the authors of defamatory material on the Internet, Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997), cert. den., 524 U.S. 937, 118 S.Ct. 2341, 141 L.Ed.2d 712 (1998), it does not create an independent cause of action against them. Similarly, though the Act only protects the provider or user of an interactive computer service against suits regarding the content of information provided by another "information content provider," the Act does not affirmatively provide for a cause of action against the provider or user. 47 U.S.C. 230(c)(1).

Therefore, even as to plaintiff's potential claim against Homestead that it is an information content provider, the CDA does not confer federal question jurisdiction.

Diversity Jurisdiction

Plaintiff also asserts jurisdiction on the basis of diversity, 28 U.S.C. § 1332. Clearly, the only potential defendant whose identity is known is Homestead, which is alleged to be a California company. Therefore, if the jurisdictional amount is satisfied, diversity jurisdiction would attach [*9] to that claim. Baxter may or may not sue others whose presence would destroy diversity. While Doe correctly points out that plaintiff has not asserted any amount in dispute in his application, much less an amount to satisfy the jurisdictional amount, the nature of plaintiff's claim and the detailed account of his claim satisfies the court that the jurisdictional amount could, through proper pleading, be met. See Luckett v. Delta Airlines, Inc., 171 F.3d 295 (5th Cir. 1999). Were this court not satisfied that the amount was met, it could simply require supplementation with regard to the amount in dispute by affidavit or otherwise. Id.

If the suit now before the court was one by Baxter against Homestead alleging diversity jurisdiction, Baxter would be expected to assert more specifically the facts supporting diversity jurisdiction. But this is a suit to perpetuate testimony and all that is required is that this

court be convinced that the complainant could, at the proper time, support federal jurisdiction. I believe it would be wholly improper to require applicant to support federal jurisdiction of a proposed suit against parties which include some whose identities [*10] are not yet known at this stage of the proceedings and where all that is before the court is a motion to perpetuate testimony. Baxter has made an adequate showing of jurisdiction for purposes of the matter now pending before the court [4].

> 4  This court can reconsider jurisdiction or the parties may raise the issue again once a damage suit is actually filed, the identity of all parties is known and all facts concerning the jurisdiction or not of this court are known. This court's determination now as to the existence of jurisdiction is simply for the purpose of plaintiff's application under Fed.R.Civ.P. 27. See Dresser Industries, Inc. v. U.S., 596 F.2d 1231 (5th Cir. 1979).

Although not a jurisdictional issue, the proposed intervenor Doe also complains that plaintiff Baxter may not proceed under Fed.R.Civ.P. 27 to perpetuate testimony by utilizing interrogatories or requests for production. However, such procedure is expressly provided for by our rules. Fed.R.Civ.P. 27(a)(3) authorizes this [*11] court to specify whether the deposition shall be by oral examination or by written interrogatories. Rule 30(b)(5) provides that the notice to a deponent may be accompanied by a request for production of documents pursuant to Rule 34. Rule 27(c) provides that the rule does not limit the power of a court to entertain an action to perpetuate testimony and the court's regulation of discovery is always subject to its reasonable discretion.

## MAY DOE INTERVENE?

Fed.R.Civ.P. art. 24 provides for intervention of right "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest unless the applicant's interest is adequately represented by existing parties." Permissive intervention is appropriate where an applicant's claim or defense and the main action have a question of law or fact in common.

In this case, I find that the person proceeding as J.

Doe has an interest relating to the subject matter of this suit and the disposition of the suit, i.e., the possible order to disclose [*12] Doe's real name and, if not allowed to intervene, would not have an effective way to prevent such an order and to protect his interests. Certainly, Homestead is not a party whose presence would protect Doe's interests.

The real question, though, is whether Doe should be allowed to proceed anonymously by intervention. The answer to this question, of course, implicates the laws of defamation and the judicially interpreted constitutional right of freedom of speech as well as evolving policy issues generated by the creation and acceptance of the internet.

Much has already been written, both in case law and journals as well as the popular press, concerning the need to strike the balance between these sometimes competing interests. For example, in one noted case, Blumenthal v. Drudge, 992 F.Supp. 44 (D.D.C. 1998), the court observed that:

> "The near instantaneous possibilities for the dissemination of information by millions of different information providers around the world to those with access to computers and thus to the Internet have created ever-increasing opportunities for the exchange of information and ideas in 'cyberspace.' This information revolution [*13] has also presented unprecedented challenges relating to rights of privacy and reputational rights of individuals, to the control of obscene and pornographic materials, and to competition among journalists and news organizations for instant news, rumors and other information that is communicated so quickly that it is too often unchecked and unverified. Needless to say, the legal rules that will govern this new medium are just beginning to take shape."

"The internet (or 'Net'), heralded as the most significant achievement in human speech since the printing press, has become ground zero in a legal battle over the First Amendment and the right of individuals to speak (or rather type) anonymously. At its best, the Net is the ultimate conduit for free speech and expression; at its worst, the Net can be a character assassin's greatest weapon." Matthew S. Effland, *Free Speech Versus Freedom from Responsibility on the Internet*, 75-NOV Fla.B.J. 63 (2001).

Professor Lidsky of the University of Florida writes:

> "Speech from a 'multitude of tongues' may lead to truth, but it may also lead to the Tower of Babel. And the level of discourse on [certain internet sites] also suggests [*14] that fostering unmediated participation may make public discourse not only less rational and less civil; it also runs the risk of making public discourse meaningless. A discourse that has no necessary anchor in truth has no value to anyone but the speaker, and the participatory nature of internet discourse threatens to engulf its value as discourse.

> The problem, therefore, is to strike a balance between free speech and the preservation of civility. If the goal of making public discourse more participatory and ultimately more democratic is to be realized, the speech of ordinary John Does merits a very wide expanse of 'breathing space,' wider than it currently receives. First Amendment doctrine therefore cannot hold ordinary John Does to the standards of professional journalists with regard to factual accuracy, because part of what gives the Internet such widespread appeal is the fact that it allows ordinary citizens to have informal conversations about issues of public concern. Although any approach to the problems posed by the new Internet libel actions must respond to the unique culture of the message boards, the law cannot allow that culture to degenerate into a realm where [*15] anything goes, where any embittered and malicious speaker can lash out randomly at innocent targets. Although many of the new libel plaintiffs are powerful corporate Goliaths suing to punish and deter their critics, some are not. Some are simply responding in the

only way available to prevent aggressively uncivil speech, the sole purpose of which is to cause emotional and financial harm. Hence, any solution to the problems posed by these new suits must be tuned finely enough to distinguish incivility that must be tolerated for the good of public discourse from incivility that destroys public discourse." Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace,* 49 Duke L.J. 855 (2000) [5].

5    Professor Lidsky's article in the Duke Law Journal is a thoroughly researched, well-written and insightful review of the policy considerations, legal issues, current writings and case law dealing with the Internet, defamation and First Amendment rights.

The benefit of the internet [*16] to matters of public concern is immense, however. As noted by Professor Lidsky, "from a First Amendment scholar's perspective the fascination of the internet lies in its potential for realizing the concept of public discourse at the heart of the Supreme Court's First Amendment jurisprudence. The dominant First Amendment metaphor for describing public discourse is the 'marketplace of ideas.' The marketplace of ideas is a sphere of discourse in which citizens can come together free from government interference or intervention to discuss a diverse array of ideas and opinions. Ideally, the process of interacting in the marketplace of ideas not only fosters the 'search for truth;' it also enables citizens to transcend their differences in order to forge consensus on issues of public concern, or, as Professor Robert C. Post eloquently puts it 'to speak to one another across the boundaries of divergent cultures.' Public consensus, in turn, is an essential precondition of democratic self-government." (Footnotes omitted.) Id.

The district court in South Dakota further observed:

"On the one hand, the ability of individual users to log on the Internet anonymously, undeterred by traditional, [*17] social and legal restraints, tends to promote the kind of unrestrained, robust communication that many people view as

the Internet's most important contribution to society. On the other, the ability of members of the public to link an individual's on-line identity to his or her physical self is essential to preventing the internet's exchange of ideas from causing harm in the real world. *See generally* Lawrence Lessig, *Code and Other Laws of Cyberspace,* 14-17, 24-29 (2000)." Patentwizard, Inc. v. Kinko's, Inc., 163 F.Supp.2d 1069 (D.S.D. 2001) [6].

"There's never been a lack of hostile people with a motive to attack. Aggression is as old as Cain and Abel. Until recently, very few people had the *means* or the *opportunity.* The geometric growth of the internet has provided attackers with these last two ingredients. One result of the internet's growth has been an upsurge of attacks against people, products and institutions that can be launched anonymously and, therefore, with impunity." Dezenhall, Eric, *Nail 'Em!: Confronting High-Profile Attacks on Celebrities & Businesses,"* 156, Amherst, N.Y. Prometheus Books 1999.

6    These tough issues are further complicated by the fact that not all countries' laws yield the same rule nor are they in all cases consistent. *See* Babcock, Powell, Schacter, Schell & Schulz, *Publishing Without Borders: Internet Jurisdictional Issues, Internet Choice of Law Issue, ISP Immunity, and On-Line Anonymous Speech,* 651 PLI/Pat 9 (2001).

[*18] Nevertheless, some courts have recognized that anonymity on the internet, to a certain extent, is valuable. *For example,* in Cyberspace, Communications, Inc. v. Engler, 55 F.Supp.2d 737 (E.D. Mich. 1999), the district judge found, based on testimony presented in that case, that "anonymity of the communicant is both important and valuable to the free exchange of ideas and information on the Internet."

Mindful of these policy considerations, I now embark on further legal analysis of this case.

## DEFAMATION, THE FIRST AMENDMENT AND ANONYMITY

Mover Doe argues that he should be allowed to intervene anonymously to avoid any retaliation against Doe by Baxter. He correctly points out that anonymous filings have long been recognized by the courts. Doe also suggests that Baxter is a "public figure" requiring proof by him of actual malice before recovery may be had under the Supreme Court's pronouncement in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Interestingly, mover, who admits he has made some of the statements on the website at issue, is concerned that if retaliation occurs his "career may be ruined by [*19] virtue of never receiving promotion[s] or raises." No such concern is expressed for the career of Mr. Baxter, who has been the subject of the statements by Doe.

Also curious is mover's assertion in brief that the University of Louisiana is a state agency and, therefore, is subject to immunity because the State has not consented to suit in federal court. This suit does not involve the University of Louisiana [7].

> 7   Even if, as mover alleges, Baxter is fronting for the University of Louisiana system (and there is no evidence whatsoever of that), then by filing suit it has consented to suit in federal court. The University of Louisiana is not a defendant in this suit.

Finally, mover seems to suggest that he seeks to proceed anonymously only in this action, that is, "until such time as Richard L. Baxter feels confident enough to file suit against the authors . . . ."

Baxter opposes Doe's motion to intervene anonymously asserting that there is no First Amendment right to anonymity where defamatory speech is at [*20] issue. He also suggests that if, in fact, Baxter is deemed to be a public figure and a showing of actual malice is required, then that is all the more reason that Baxter needs the name of Doe so that he can obtain proof from Doe of malice. Finally, Baxter suggests that allowing Doe to remain anonymous is, in effect, a grant of absolute immunity to Doe for defamatory speech.

1. Defamation and Free Speech

A long line of Supreme Court precedent has dealt extensively with the balance between society's interest in redressing defamation and a speaker's free speech rights. This case presents the challenge of arriving at that balance in the context of speech published on the Internet.

The laws of defamation are set forth by state law [8]. The First and Fourteenth Amendments to the U.S. Constitution [9] limit the authority of state courts to impose liability for damages based on defamation. Before New York Times, defamatory statements were not within the area of constitutionally protected speech.

> 8   La. C.C. art. 2315.
> 9   Under the First and Fourteenth Amendments, neither the federal nor a state government may make any law "abridging the freedom of speech, or of the press . . . ."

[*21] New York Times and later Curtis Pub. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) "effected major changes in the standards applicable to civil libel actions. Under these cases, public officials and public figures who sue for defamation must prove knowing or reckless falsehood in order to establish liability." Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d. 115 (1979). In other words, a plaintiff, in such circumstances, must prove actual malice. New York Times, 84 S.Ct. 710 at 726.

In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), cert. den., 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983), the Supreme Court further defined "public figure" for the purposes of the First and Fourteenth Amendments:

> For the most part, those who attain this status have assumed roles of especial prominence in the affairs of the society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of [*22] particular public controversies in order to influence the resolution of the issues involved.

Gertz also requires that non-public figures must

demonstrate some fault on the defendant's part in order to recover for defamation. The Gertz court held that "although a showing of simple fault suffices to allow recovery for actual damages, even a private figure plaintiff is required to show actual malice in order to recover presumed [10] or punitive damages." *See* summary by Justice O'Connor in Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), *cert. den.*, 475 U.S. 1134, 106 S.Ct. 1784, 90 L.Ed.2d 330.

> 10    Presumed damages are damages allowed under a state law which provides for a presumption of malice in certain circumstances, e.g., when criminal conduct is alleged.

After Gertz, in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), the Supreme Court recognized [*23] that all speech is not of equal First Amendment importance and that it is speech on "matters of public concern" that is "at the heart of the First Amendment's protection." *See* First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). The Dun & Bradstreet court offered several examples of speech which has historically been accorded no protection at all, including obscene speech, fighting words, speech advocating the violent overthrow of the government, speech concerning certain securities transactions and certain kinds of commercial speech. *See also* R.A.V. v. City of St. Paul Minn., 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), recognizing defamation as an historically regulated category. Therefore, in Dun & Bradstreet, the court held that in a case involving a private figure plaintiff and speech of purely private concern, that is, involving no matters of public concern, a showing of actual malice was unnecessary even to recover presumed or punitive damages.

Finally, Hepps also required that where a newspaper publishes speech of public concern a private figure plaintiff cannot recover damages [*24] without also showing that the statements are false.

In Hepps, Justice O'Connor explained that two issues affect the law of defamation so that it may conform to the First Amendment. The first is whether the plaintiff is a public official or public figure and not a private figure. The second is whether the speech at issue is of public concern.

Where, under this analysis, one is found to have published defamatory falsehoods with the requisite culpability, liability may attach, "the aim being not only to compensate for injury, but also to deter publication of unprotected material threatening injury to individual reputation." Herbert v. Lando. In other words, spreading false information carries no First Amendment protection. Id. The circumstance that the statement may be couched as an opinion as opposed to a fact is not a distinction for purposes of the application of the First Amendment. Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

2. Anonymity

Mover, however, asserts not only his right of free speech, but also asserts as part of that right the right to remain anonymous.

The right to proceed anonymously in a lawsuit [*25] has, on occasion, been recognized by the courts. For example, in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court held that the First Amendment prohibits the Government from compelling disclosures by a minor political party that can show a reasonable probability that the compelled disclosures will subject those identified to threats, harassment or reprisals. Similarly, in Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), the Supreme Court held that requiring disclosure of the membership list of the local branch of the NAACP would interfere with the members' rights to freedom of association. That case, too, relied on the threat of harassment or physical harm as justification for allowing the anonymity. Also, in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the court held that requiring disclosure of the names of members of the association denied them their right to freedom of association. Once again the court relied on the threat of reprisals in making its ruling.

The Fifth Circuit has also recognized a litigant's right to proceed anonymously [*26] in certain circumstances. In Doe v. Stegall, 653 F.2d 180 (5th Cir. 1981) [11], the court allowed a mother and her two children to proceed under fictitious names in a case where they challenged the constitutionality of prayer in school. The Fifth Circuit noted the general principle that parties must disclose their identities to sue in federal court, but weighed against it the "countervailing factors" in the suit, namely threats of violence.

11   *See also* Jane Doe v. School Board of Ouachita Parish, 274 F.3d 289, 2001 WL 1490997 (5th Cir. 2001)

In Stegall, the parties did, however, agree to disclose their identities to the opposing party and to the court. By that method, the court was afforded an opportunity to "scrutinize their standing to sue" and to proceed with any necessary discovery. The court also observed that First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), [*27] finding that "historically, both civil and criminal trials have been presumptively open." There is, the court found, a "clear and strong First Amendment interest" in insuring that "what transpires in the courtroom is public property." Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).

The dissent by Judge Gee described the procedure of filing anonymously a "startling procedure" and opined that "there is something to be said, I think, for the notion that one who strikes the king should do so unmasked or not at all." Judge Gee found the justification for proceeding anonymously lacking in the case and would have required a stronger showing of the threat of reprisal in order to allow the drastic relief.

All of the cases discussed above which have allowed parties to proceed anonymously in certain circumstances relied, as justification, on the threat of reprisal in some form.

Then came the Supreme Court's decision in McIntyre v. Ohio Elections Com'n, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). In McIntyre, a pamphleteer challenged a fine imposed by the Ohio Elections Commission for distributing anonymous leaflets opposing [*28] a proposed school tax. Noting early on in the opinion that there was "no suggestion that the text of her message was false, misleading or libelous," Justice Stevens analyzed the right of a person to remain anonymous. The court found that historically "anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind" *quoting* Talley v. California, 362 U.S. 60, 80 S.Ct 536 at 538, 4 L.Ed.2d 559 (1960). The court found that the decision to remain anonymous may be motivated by fear of economic or official retaliation, by concern about social ostracism or merely by a desire to preserve

as much of one's privacy as possible.

In summarizing the history of anonymous writings, the court reminded us that "even the arguments favoring the ratification of the Constitution advanced in the Federalist Papers were published under fictitious names. 12 "The court found there was a "respected tradition of anonymity in the advocacy of political causes." Justice Stevens concluded that "under our Constitution, anonymous pamphleteering is not a pernicious fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity [*29] is a shield from the tyranny of the majority . . . it thus exemplifies the purpose behind the Bill of Rights and of the First Amendment in particular: to protect unpopular individuals from retaliation - and their ideas from suppression at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct, but political speech by its nature will sometimes have unpalatable consequences and, in general, our society accords greater weight to the value of free speech than to the danger of its misuse . . . ."

12   "Indeed, while we now know that the Federalist Papers were the work of James Madison, John J. and Alexander Hamilton, the documents originally were published under the pseudonym 'Publius'." Babcock, Powell, Schacter, Schell & Schulz, *Publishing Without Borders: Internet Jurisdictional Issues, Internet Choice of Law Issue, ISP Immunity, and On-Line Anonymous Speech*, 651 PLI/Pat 9 (2001).

However, Justice Stevens noted more than once that the issue of falsity [*30] or libel was not present in the speech at issue and he noted that "the state interest in preventing fraud and libel stands on a different footing" than the decision with regard to truthful pamphleteering. He observed that Ohio's prohibition encompassed "documents that are not even arguably false or misleading" and that the State's enforcement interest might justify a more limited identification requirement than the overbroad prohibition of pamphleteering present in the case.

Justice Ginsburg's concurring opinion also notes that "we do not thereby hold that the State may not, in other larger circumstances, require the speaker to disclose its interest by disclosing its identity."

Justice Thomas suggested that the only issue is

whether the First Amendment, as originally understood, protects anonymous writing. He argued that it does, citing specific examples of anonymous political pamphleteering from the early republic. However, he also noted the historical precedent for a policy of refusing to publish unless the author provides his identity to be "handed to the publick if required." [13]

13    Justice Thomas quoted from the Massachusetts Centinel, October 10, 1787.

[*31] Justice Scalia and Chief Justice Rehnquist dissented, not finding adequate evidence as to the original intent of the framers of the Constitution and noting that in circumstances such as those presented in Bates and NAACP v. Alabama, existing law adequately protected litigants. Justice Scalia observed that the record did not contain evidence of threats, harassment or reprisals and that the court had previously rejected the notion of a "generalized right of anonymity in speech," *citing* Lewis Pub. Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed.2d 1190 (1913). Justice Scalia further wrote that the court's protection for anonymous speech did not establish a clear rule of law. Justice Scalia was particularly concerned with how much easier it would be to circulate derogatory information, though perhaps not actionably false, if one could remain anonymous.

In conclusion, Justice Scalia stated "I can imagine no reason why an anonymous leaflet is any more honorable, as a general matter, than an anonymous phone call or anonymous letter. It facilitates wrong by eliminating accountability, which is ordinarily the very purpose of the anonymity. There are of course [*32] exceptions, and where anonymity is needed to avoid threats, harassment or reprisals, the First Amendment will require an exemption from the Ohio law . . . but to strike down the Ohio law . . . will lead to a coarsening of the future."

Despite the Supreme Court's having found constitutional underpinnings for its creation of a right to anonymity, and notwithstanding Justice Scalia's fears concerning the logical consequences of such a holding, the court's holding was, in fact, very limited. It held only that Ohio's law imposing a fine on an individual leafleteer in an election who did not disclose her identity violates the First and Fourteenth Amendments - that is, that such leafleting is political speech and is therefore protected as core free speech.

Justice Ginsburg observed that the ruling would not

necessarily apply "in larger circumstances" and Justice Scalia offered that "there is no doubt, for example, that laws against libel and obscenity do not violate 'the freedom of speech' to which the First Amendment refers . . . ." And, as noted above, the majority reiterated several times in the opinion the implication that the rule would not necessarily hold where fraud or libel was [*33] involved or where the message is false or misleading.

From the McIntyre opinion and from the other cases discussed above, it can be concluded that although the First Amendment includes, in some circumstances (at least where truthful political speech is involved (McIntyre), or there are imminent threats of reprisal (Bates)), a limited right of anonymity exists (subject, perhaps, to some protective disclosure) (Stegall), such a right does not exist where the statements made are libelous, misleading, conducive to fraud or defamatory [14].

14    It seems clear enough that the "larger circumstances" of which Justice Ginsburg wrote must include, at the very least, these categories.

3. Anonymity on the Internet

Applying defamation law to internet communications "helps to make meaningful discourse possible. Defamation law has a civilizing influence on public discourse: it gives society a means for announcing that certain speech has crossed the bounds of propriety." *See* Lyrissa Barnett Lidsky, *Silencing* [*34] *John Doe: Defamation & Discourse in Cyberspace,* 49 Duke L.J. 855 (2000) and sources cited there. "Defamation law has the potential to curb the excesses of internet discourse and to make internet discourse not just more civil, but more rational as well." Id. "Indeed, the widespread use of pseudonyms online is responsible for many of the abuses perpetrated by internet speakers. But revelation of identity has negative consequences as well - it may subject the user to ostracism for expressing unpopular ideas, invite retaliation . . ." or have other negative consequences. Id.

In consideration of these competing interests, courts have, therefore, taken various, but similar, approaches to the problem. In Columbia Ins. Co. v. seescandy.com, 185 F.R.D. 573 (N.D. Cal. 1999), the plaintiff corporation filed a trademark infringement suit against the unknown owners of an allegedly infringing website. The court ruled that in addition to providing sufficient information

to show the court's jurisdiction the plaintiff must identify all previous steps taken to locate the "elusive defendant" in order to show that the party had attempted to comply with the requirements [*35] of service of process. In addition, the court required that the plaintiff show that his suit could withstand a motion to dismiss and, finally, plaintiff was required to file a discovery request with the court justifying the need for the information requested.

In In re Subpoena Duces Tecum to America Online, Inc., 52 Va. Cir. 26, 2000 WL 1210372 (Va. Cir. Ct. 2000), a corporation attempted to learn the identities of anonymous internet posters. That court required mover to show that it had a "legitimate, good faith basis" for the suit and that the subpoenaed information was needed to advance that claim.

In Doe v. 2TheMart.Com, Inc., 140 F.Supp.2d 1088 (2001), the court, in Washington, after noting the decisions of the California court in seescandy.com and of the Virginia court in America Online, adopted a four-part test for determining whether a subpoena to an internet service provider seeking identification of anonymous posters would be allowed. The four factors the court set forth are:

> 1. Whether the subpoena seeking the information was issued in good faith and not for an improper purpose?

> 2. Whether the information sought relates to a core [*36] claim or defense?

> 3. That the identifying information is directly materially relevant to the claim or defense.

> 4. That information sufficient to establish the claim or defense is unavailable from any other source.

Finally, two cases in New Jersey considered the issue. In Dendrite Intern., Inc. v. Doe No. 3, 342 N.J. Super. 134, 775 A.2d 756 (2001) and Immunomedics, Inc. v. Doe, 342 N.J. Super. 160, 775 A.2d 773 (2001), both cases involving corporations seeking the identity of unidentified users of internet service providers' message boards, the court held that it would require a showing of a prima facie case against the anonymous defendants, that is, according to the court, that the action could withstand a motion to dismiss.

None of these tests seems to be perfectly satisfactory. For example, the requirement in seescandy.com and in 2TheMart.Com that the information is unavailable from any other source, is, it seems to me, irrelevant. The issue is the balancing of a plaintiff's right to protect his good name versus the defendant's First Amendment right to free speech. The need to balance those interests and to protect free speech is no less present where [*37] plaintiff attempts to learn the identify by some other "available means" or where he attempts to learn it by subpoena. Indeed, it seems that a defendant's First Amendment rights are more likely to be protected by the court where a subpoena is sought than where a plaintiff attempts to learn the identity of the party "from any other source." Next, the requirement set forth, for example, in 2TheMart.Com that the information must relate to a core claim or defense and be directly materially relevant to the claim in a case such as the present one where the information is obviously needed to identify the defendant in the case. The exercise accomplishes nothing. Finally, the standard set forth in the cases which cast the inquiry as whether or not the subpoena was issued "in good faith," such as 2TheMart.Com and America Online is an inadequate standard for the determination. For a plaintiff may well be in actual subjective good faith in filing the suit believing he has a strong case when, in fact, he may have no case at all.

Finally, the Dendrite and Immunomedics cases come closest to setting forth a useful standard by requiring a showing of the ability to [*38] withstand a motion to dismiss or to prove a prima facie case before a subpoena is issued. Yet the standard of withstanding a motion to dismiss is also inadequate, for the requirement there is only that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Fed.R.Civ.P. 12(b)(6); Beanal v. Freeport-McMoran, Inc., 197 F.3d 161 (1999). Conversely, requiring a prima facie case is too burdensome, for the plaintiff may not be able to make out a prima facie case at this early stage of the proceedings where even the identity of the defendant is unknown and no discovery has taken place.

Therefore, I believe that the proper standard should be, depending upon whether the statements involve public concern or private concern, a showing of at least a reasonable probability or a reasonable possibility of recovery on the defamation claim. Although a

"reasonable probability" [15] would be the preferred standard, requiring a standard higher than a reasonable possibility [16] of recovery is unworkable in cases where the plaintiff is a public figure. In such cases, it may not be known whether the burden of proof (of actual malice) can be satisfied [*39] until the defendant's identity is disclosed and his testimony taken.

15    Regarding reasonable probability, *see, for example,* Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

16    Regarding reasonable possibility, *see* discussion in Elkin, Jeffrey R., "Cybersmear: The Next Generation" 10-AUG Bus.L.Today 42.

Such an approach has been taken before. For example, California's law of defamation requires a showing of a probability of success on the merits where free speech on a public issue is involved. See discussion in Global Telemedia Intern., Inc. v. Doe 1, 132 F.Supp. 2d 1261 (C.D. Cal. 2001) [17].

17    Examples of other suits seeking to compel disclosure of the identity of anonymous or pseudonymous on-line participants include the following non-exclusive list, as compiled by Babcock, Powell, Schacter, Schell and Schulz, *supra:* Quad/Graphics, Inc. v. Southern Adirondack Library Sys., 174 Misc.2d 291, 664 N.Y.S. 2d 225 (Sup. Ct. 1997); McVeigh v. Cohen, 983 F.Supp. 215 (D.D.C. 1998); HealthSouth Corp. v. Krum, No. 98-2812 (Pa. C.P. Centre County 1998); Itex Corp. v. French, No. 98-09-06393 (Cir. Ct. Ore.); Technical Chem. and Prod., Inc. v. John Does 1 through 10, No. 99-004548 (Fla. Cir. Ct. 1999); Raytheon Co. v. John Does 1-21, No. 99-816 (Mass. Superior Ct. 1999); Xircom, Inc. v. John Does, No. 188724 (Cal. Superior Ct. 1999); Hvide v. John Does 1 through 8, No. 99-22831 (Fla. County Cir. Ct. 1999); John Doe a/k/a Aquacool_2000 v. Yahoo!, Inc. (C.D. Cal. 2000); Rural/Metro v. John/Jane Does 1 through 4, 00-21283 EAI (N.D. Cal. 2000); 2TheMart.Com, Inc. Securities Litigation, No. Misc. SACV-9901127 DOC (W.D. Wash. 2001).

[*40] In order to determine whether or not there is a reasonable possibility or probability of success on the merits of the defamation claim, it is necessary that it first be determined whether the plaintiff is a public official or

public figure or is instead a private figure and, second, whether the speech at issue is of public concern.

## PUBLIC OFFICIAL OR PUBLIC FIGURE

Curtis Pub. Co. v. Butts, *supra,* extended the New York Times rule requiring proof of actual malice in a suit against a public official to include also public figures. The court described public figures as "nonpublic persons 'who are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.'" The court then explained that "public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy [18]." [More important,] "public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory [*41] falsehood concerning them." No such assumption is justified with respect to a private individual. Milkovich v. Lorain Journal Co., *supra,* quoting Gertz, *supra,* 94 S.Ct. at 3009.

18    The ability to respond effectively has certainly been lessened with the advent of the Internet. As Eric Dezenhall, a media relation consultant, has observed: ". . . the anonymity of the internet makes it very difficult to supply cyber gossips with correct information. Where will I send it? Internet attackers rarely leave a return address. With a traditional media attack, I know whom to call. The internet provides little or no recourse." Dezenhall, Eric, *Nail 'Em!: Confronting High-Profile Attacks on Celebrities & Businesses,* 160, Amherst, N.Y., Prometheus Books (1999).

Where a public figure voluntarily engages in a public controversy, he is often referred to as a "limited public figure." *See, for example,* concurring opinion in Bartnicki v. Vopper, 532 U.S. 514, 121 S. Ct. 1753, 149 L.Ed.2d 787 (2001). [*42] As such, he has subjected himself to somewhat greater public scrutiny and has a lesser interest in privacy than an individual engaged in purely private matters. Id.

Baxter, at all relevant times, has been the Vice-President for University Advancement and External Affairs of the University of Louisiana at Monroe ("ULM"), Executive Director of the University of

Louisiana at Monroe Foundation (a private, not-for-profit foundation), and a member of the ULM administration. As ULM's Vice-President for University Advancement and External Affairs, his primary job responsibilities, according to the affidavit he filed in this case, are to manage the university's office of development, alumni relations, conference center, public affairs, and the university's performing arts series. He has no direct or indirect supervisory responsibility over any university faculty members in their academic capacities. Only the director of performing arts reports directly to him.

Comparing Baxter to the parties involved in other cases is helpful. Sullivan (of New York Times v. Sullivan) was a city commissioner. Therefore, he was a public official. Butts, whose case extended the New York Times rule [*43] to public figures, was the athletic director of the University of Georgia who had overall responsibility for the administration of its athletic program. Georgia is a state university, but Butts was employed by a private corporation. He was considered by the Supreme Court to be a public figure who "commanded a substantial amount of independent public interest at the time of the publications." He was a public figure by virtue of his public position, notwithstanding that he had not inserted himself at the forefront of a public controversy.

I see little difference in Sullivan, who was an elected city commissioner, and Baxter, an appointed university vice-president. Baxter is, in my opinion, a public official because the public has an interest in the adequacy of his job performance and he has voluntarily exposed himself to an increased risk of injury by choosing to serve the public good. See Dun & Bradstreet, 105 S.Ct. 2939 at 2943. If not a public official, Baxter is at least a public figure, even though he has not thrust himself to the forefront of this controversy. Butts was held to be so as athletic director, even though he was not employed by a governmental agency [*44] or the university at all. Baxter, on the other hand, has duties somewhat comparable to Butts' and is employed by the State, through the university.

I find Baxter to be a public official.

## DID THE PUBLICATION INVOLVE A "MATTER OF PUBLIC CONCERN?"

This brings us to an analysis of whether the allegations made in the only articles authored (at least in part) by mover Doe which have been presented to the court, deal with matters of public concern.

Whether speech addresses a matter of public concern must be determined by its content, form and context, as revealed by the whole record. Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684 at 1690, 75 L.Ed.2d 708 (1983); Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., supra. However, "despite such directions, and because of the case-by-case analysis required, the definition of the term 'public concern' is far from clear-cut." Kirkland v. Northside Independent School Dist., 890 F.2d 794 (5th Cir. 1989), cert. den., 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990). It is not every controversy of interest to the public which is a public controversy. Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). [*45] The Fifth Circuit has held that where speech complains of misbehavior by public officials, however, the speech does implicate public concern. Brawner v. City of Richardson, Tex., 855 F.2d 187 (5th Cir. 1988). Compare Coughlin v. Lee, 946 F.2d 1152 (5th Cir. 1991) ("despite the public context and form in which they released this information, its content did not address a matter of public concern.")

A review of the articles of which Baxter complains is therefore necessary. One of the articles is entitled "Baxter Cracks" [Exhibit B]. It alleges that Baxter is one of the "sewer staff" of the university president and that he has "begun to crack under the strain." Although the article references delinquent loans and bad debt, none of those allegations seems to be directed to Baxter, but rather they appear to be directed to the university president Swearingen. The article goes on to allege that "Baxter's job is to make sure that Swearingen's incompetence and ULM's state of decline under Swearingen are kept under cover" and suggests that reporters for a newspaper have "uncovered a few issues and this apparently causes Baxter to lose sleep." It alleges [*46] that Baxter was upset at one of that newspaper's stories, that Baxter used "colorful expletives," that he physically blocked a radio reporter's entry into a meeting at the university and that he became "so distraught that he had to be escorted from the building." Finally, the article refers to him as "vice-president of excremental affairs" and repeats that "he is cracking under the strain." In the affidavit filed in this lawsuit, Baxter denies all of those claims. In the other article [Exhibit C], Baxter is accused of not being forthright about the use of funds of the athletic scholarship foundation and is charged with an implicit

(by his silence) admission of wrongdoing on the part of the ULM administration.

Some of the statements in the only two articles presented to the court for consideration at this point appear to set forth matters of legitimate public concern, that is, either the expenditure and management of public funds or misconduct. For example, it is suggested that newspaper reporters have "uncovered a few issues" which strongly implies wrongdoing. The author alleges that Baxter was keeping wrongdoing "under cover" and that he was upset about a newspaper story concerning [*47] delinquent loans.

Some of the comments appear to be related only to private concerns [19], for example, that "Baxter cracks," or "is cracking under the strain," that he used "colorful expletives," (implying unfitness) and that he became "so distraught that he had to be escorted from the building."

> 19 Some of the comments could involve elements of both personal interest and public concern. That alone, however, does not foreclose a finding that the speech communicates on a matter of public concern. Thompson v. City of Starkville, Miss., 901 F.2d 456 (5th Cir. 1990).

The other comments, however, appear to be only vituperative babble which do not even purport to further the goal of robust public discussion and can be considered to be mere hyperbole [20], which include, for example, that plaintiff is a member of the "sewer staff" and is Vice-President of "excremental affairs".

> 20 Hyperbole is extravagant exaggeration. Hyperbole, not being statement of fact, is not actionable. See Milkovich v. Lorain Journal Co., supra, and cases cited therein, including Greenbelt Co-op. Pub. Ass'n, Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); Old Dominion Branch No. 496 v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

[*48] I find, therefore, that some of the statements attributed to Mover Doe and any other contributors or authors of Truth@ULM.com do involve matters of public concern, some involve matters of private concern and some are mere hyperbole. Therefore, for purposes of this analysis, this case involves a public official plaintiff and

speech both of public concern and of private concern. In order to recover for defamation, plaintiff must prove, at least as to the speech of public concern, that the statements are false. Philadelphia Newspapers, Inc. v. Hepps, supra [21]. As in New York Times, plaintiff is a public official suing on statements regarding public concerns and therefore he must prove [22] those statements were made with actual malice (regardless of the fact that the defendant is not a traditional media defendant) [23]. As to plaintiff's claims regarding statements which are not of public concern, however, there is no requirement of a showing of actual malice [24]. See Dun & Bradstreet, Inc. v. Greenmoss, Inc., supra [25].

> 21 In Hepps, the Supreme Court held only "that at least where a newspaper publishes speech of public concern, a private figure plaintiff cannot recover damages without also showing that the statements at issue are false." I see no difference here in a newspaper publishing the speech or an Internet user with a modem publishing the speech. As Justice Thomas noted in his concurring opinion in McIntyre v. Ohio Elections Com'n, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995): "When the Framers [of the Constitution] thought of the press, they did not envision the large corporate newspaper and television establishments of our modern world. Instead, they employed the term 'the press' to refer to the many independent printers who circulated small newspapers or published writers' pamphlets for a fee (citations omitted)." He concluded ". . . regardless of whether one designates the right involved here as one of press or one of speech, however, it makes little difference in terms of our analysis which seeks to determine only whether the First Amendment, as originally understood, protects anonymous writing."

It has also been observed that "the internet makes anyone with a modem a reporter, a profession once held in such high esteem that it was Superman's day job," Dezenhall, Eric, *Nail 'Em!: Confronting High-Profile Attacks on Celebrities & Businesses,* 157, Amherst, N.Y., Prometheus Books, 1999, and that "computers offer us the appearance of journalism without the hard work." Id. at 157. "[Computers] allow people to traffic in allegation without confirming the source of their information because there is no

journalistic imperative to verify computerized information the way there is with the print and broadcast media." Id. at 157-8.

[*49]

22  The standard of proof is clear and convincing evidence. Milkovich v. Lorain Journal Co., *supra.*
23  In New York Times, the court held: "We hold today that the Constitution delimits a state's power to award damages for libel in actions brought by public officials against critics of their unofficial conduct."
24  Neither is there a requirement of a showing of culpability or fault under the Gertz standard, since, even though plaintiff is a public official, he is not suing regarding statements of public concern. Gertz dealt with a private figure suing regarding statements involving matters of public concern.
25  Dun & Bradstreet involved a private plaintiff (not a public official or figure) and matters of private concern. When matters of private concern are the subject of the inquiry, the fact that plaintiff is a public official is irrelevant.

In this case, there is a reasonable probability that plaintiff will likely prevail on a claim of defamation concerning some of the statements on matters of private concern [26]. In order to prevail in a [*50] defamation action under Louisiana law, a plaintiff must prove four elements:

    1.  A false and defamatory statement concerning another;

    2.  An unprivileged publication to a third party;

    3.  Fault (negligence or greater) on the part of the publisher;

    4.  Injury.

Fitzgerald v. Tucker, 98-2313 (La. 6/29/99), 737 So.2d 706 (La. 1999). "[A] communication is defamatory if it intends to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person or otherwise exposes a person to contempt or ridicule. (Citations omitted.) Thus, a communication which contains an element of personal disgrace, dishonesty or

disrepute undoubtedly satisfies the definition of defamatory." Id. "Defamation involves the invasion of a person's interest in his or her reputation and good name." Id.

26  As mentioned earlier, some of the statements amount only to hyperbole.

The Louisiana Supreme Court has [*51] explained that "in addition to false defamatory statements of fact and statements of opinion made with actual malice which imply false defamatory facts, yet another type of statement is actionable under Louisiana's law of defamation. A plaintiff may recover for defamation by innuendo or implication which occurs when one publishes *truthful* statements of fact and those truthful facts carry a false defamatory implication about another." (Citations omitted.) "In other words, defamatory meaning can be insinuated from an otherwise true communication. Schaefer v. Lynch, 406 So.2d 185 (La. 1981)." Fitzgerald, *supra.* However, truthful facts which carry defamatory implication are only actionable under Louisiana law if the statements regard a private individual and private concerns. Id.

There is adequate evidence before the court that plaintiff is likely to be able to prove the falsity of some of the statements made. In addition, those statements appear to be defamatory in that they intend to harm the reputation of Baxter and expose him to contempt or ridicule. There has certainly been publication, and fault has been shown (as will be discussed below [*52] with regard to the public concern statements), and plaintiff has reasonably alleged injury.

With regard to the statements on matters of public concern, there is adequate evidence in the record of the reasonable possibility of proof of malice in the form of the intentional publication of false defamatory statements or the reckless disregard for their truth or falsity. For example, some of the hyperbole, (for example, referring to plaintiff as a member of a sewer staff) demonstrates an underlying animus that can only result in a finding of malice as to all of the statements. Personal comments that Baxter has "begun to crack" and was "upset" also show malicious intent as does the intentional incorrect reference to his office. Additional evidence as to malice must come from further development of this case in the form of discovery and trial testimony and, importantly, the testimony of the authors, including Doe. Therefore, as pointed out above, it is impossible at this point in the

proceeding to predict the probability that plaintiff will succeed in proving actual malice. That a reasonable possibility of success exists, however, is clear.

Therefore, I find that there being a reasonable [*53] probability of a finding of defamation with regard to the statements on matters of private concern and a reasonable possibility of a finding of defamation with regard to the matters of public concern, mover is not entitled to assert the defense that the statements were privileged as free speech protected by the First Amendment. Because the statements are not protected by the First Amendment, neither does mover have a right under the First Amendment to proceed anonymously by way of intervention. McIntyre, *supra.*

## CONCLUSION

For the foregoing reasons, IT IS ORDERED that the stay [Doc. # 12] of my October 18, 2001 order [Doc. # 6] is hereby LIFTED and no longer in effect. The October 18, 2001 order is MODIFIED in the following respect: Homestead Technologies, Inc. is HEREBY ORDERED and COMMANDED to respond fully, in writing, under oath and no later than December 27, 2001 to the interrogatories and requests for production of documents propounded by plaintiff.

IT IS FURTHER ORDERED that the motion to intervene anonymously by J. Doe [Doc. # 8] is DENIED.

IT IS FURTHER ORDERED that the complaint for relief pursuant to the First Amendment to the U.S. Constitution [*54] and for injunctive relief attached to Document # 8 is DENIED.

THUS DONE AND SIGNED at Alexandria, Louisiana, this 19th day of December 2001.

JAMES D. KIRK

UNITED STATES MAGISTRATE JUDGE

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2091695 (D.Ariz.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
Best Western Intern., Inc. v. Doe
D.Ariz.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Arizona.
BEST WESTERN INTERNATIONAL, INC., a
non-profit Arizona corporation, Plaintiff,
v.
John DOE, et al., Defendants.
**No. CV-06-1537-PHX-DGC.**

July 25, 2006.

Cynthia Ann Ricketts, Sara Kathryn Regan, Squire
Sanders & Dempsey LLP, Phoenix, AZ, for
Plaintiff.
Daniel Joseph McAuliffe, Snell & Wilmer LLP,
Phoenix, AZ, Richard T. Mullineaux, Robert
Jeffrey Lowe, Kightlinger & Gray LLP, New
Albany, IN, for Defendants.

## ORDER

DAVID G. CAMPBELL, District Judge.

*1 Plaintiff Best Western International, Inc. (" BWI") has filed this action against various John Doe Defendants. BWI claims that the Defendants have posted anonymous messages on an Internet site that defame BWI, breach contracts with BWI, breach fiduciary duties, reveal confidential information, infringe BWI trademarks, and constitute unfair competition. Because the Internet messages have been posted anonymously, BWI has been unable to identify the John Doe Defendants.

BWI has filed a motion to conduct accelerated and expedited discovery. Doc. # 5. The motion seeks permission to serve subpoenas on various Internet Service Providers ("ISPs") and others before an initial conference is held pursuant to Rule 26(f) of the Federal Rules of Civil Procedure. The subpoenas seek disclosure of the identities of the sponsor for the Internet site as well as individuals who have posted messages. BWI contends that such information is needed before the John Doe Defendants can be served with BWI's complaint and can participate in a Rule 26(f) conference. Alleging that it is suffering irreparable injury as a result of comments posted on the site, BWI seeks expedited discovery and expedited consideration of its motion to conduct the discovery. Doc. # 6.

BWI also asks the Court to issue an order requiring the preservation of evidence related to the identities of the John Doe Defendants. Doc. # 7. BWI notes that information concerning Internet users typically is retained for only a short period of time. BWI asks the Court to enter an order requiring the preservation of information until it can be obtained through discovery.

One of BWI's proposed subpoenas would be directed to H. James Dial. Mr. Dial has appeared through counsel, identified himself as one of the John Doe Defendants, and filed an opposition to BWI's motion for discovery and a counter-motion to stay all discovery until completion of a Rule 26(f) conference. Doc. # 11. BWI has filed a response. Doc. # 17.

This order will address four issues: (1) whether BWI has shown good cause to conduct discovery in advance of a Rule 26(f) conference, (2) whether this Court has jurisdiction to rule on the propriety of BWI's proposed subpoenas, (3) what showing BWI must make in order to conduct discovery that implicates First Amendment rights of the John Doe Defendants, and whether BWI has made that showing, and (4) other relevant considerations.

### 1. Good Cause.

Rule 26(d) provides that "a party may not seek discovery from any source before the parties have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2091695 (D.Ariz.)
**(Cite as: Not Reported in F.Supp.2d)**

conferred as required by Rule 26(f)."Fed.R.Civ.P. 26(d). The rule makes clear, however, that this limitation can be overridden by court order. *Id.* An order permitting discovery before a Rule 26(f) conference may be issued for "good cause." *Yokohama Tire Corp. v. Dealers Tire Supply, Inc.,* 202 F.R.D. 612, 614 (D.Ariz.2001).

BWI has satisfied the good cause requirement. BWI has established by affidavit that it is unable to identify the John Doe Defendants by means other than the subpoenas. Doc. # 9. Although Mr. Dial volunteered that he is one of the John Doe Defendants, the action is brought against an apparently large number of individuals who have posted anonymous messages on the Internet site. The case cannot proceed and a Rule 26(f) conference cannot be held until these Defendants are identified.

**\*2** In addition, courts have recognized that ISPs typically retain user information for only a limited period, ranging from a few days to a few months. *UMG Recordings, Inc. v. Does I-IV,* No. 06-0652 SBA (EMC), 2006 WL1343597, at \* 1 (N.D.Cal. Mar. 6, 2006). The loss of evidence seems particularly possible in this case, as the Internet site expressly states to users that "your identity will be totally and forever withheld *and destroyed.*" Doc. # 5, Ex. A at 2 (emphasis added).

Because the identities of the John Doe Defendants is necessary for this case to proceed and there is reason to believe that those identities may be lost if discovery is delayed, the Court concludes that BWI has established good cause to conduct discovery before the Rule 26(f) conference. This conclusion does not, however, answer the question of whether discovery should be permitted in light of the First Amendment rights of the John Doe Defendants. That issue will be addressed below.

**2. The Court's Jurisdiction to Address the First Amendment Question.**

BWI's proposed subpoenas to ISPs and other individuals will be issued by federal district courts in the jurisdictions where those entities and individuals reside. Because only the court issuing a subpoena generally has power to quash it, BWI argues that this Court has no jurisdiction to address the propriety of the subpoenas.

Rule 45(c) does provide that subpoenas should be enforced by the district court which issued them, but this rule "does not alter the broader concept that the district court in which an action is pending has the right and responsibility to control the broad outline of discovery."*Static Control Components, Inc. v. Darkprint Imaging,* 201 F.R.D. 431, 434 (M.D.N.C.2001). General discovery issues should receive uniform treatment throughout the litigation, regardless of where the discovery is pursued. Courts have also recognized that a party's " 'discovery rights [in other districts] can rise no higher than their level in the district of trial.' " *Id. (quoting Fincher v. Keller Indus., Inc.,* 129 F.R .D. 123, 125 (M.D.N.C.1990)).

The First Amendment implications of BWI's proposed discovery constitutes a significant issue in this case. Not only are the First Amendment rights of fundamental importance to the John Doe Defendants, but they also will be preserved or defeated by discovery orders. To the extent that Defendants have a First Amendment right to anonymous speech (a right addressed below), the right will be lost if BWI is permitted to learn the speakers' identities through discovery. This right will be at issue in every district where BWI's subpoenas are served. It makes little sense to leave such a central issue to district-by-district determination.

The Court concludes that it can and should address the First Amendment issues raised by BWI's discovery motion. As the court noted in *Static Control,*"[t]his issue extends well beyond the matter of a specific subpoena."*Id.* at 434 n. 5.

**3. First Amendment Considerations.**

**\*3** BWI is a non-profit member corporation. Doc. # 3 at ¶ 9. BWI's members own and operate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2091695 (D.Ariz.)
(Cite as: Not Reported in F.Supp.2d)

more than 4,000 hotels and lodging properties under the BWI name and trademark. *Id.* at ¶ 10.BWI's board of directors communicates with BWI members through regional governors who are appointed to oversee specific geographic districts. *Id.* at ¶ 11.

BWI's complaint and motions say little about the content of the Internet messages at issue in this case. Mr. Dial asserts, however, that the Internet site was created as a place for BWI members and governors to state their views on various issues concerning BWI. Specifically, Dial asserts that recent proposed changes in BWI's method of operation have drawn extensive comment on the site. The site describes itself as a "site for Best Western members," where members and headquarters staff "can exchange information on a 100% confidential basis."Doc. 5, Ex. A.

Several First Amendment principles are relevant.

First, the Amendment protects anonymous speech. *See Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182, 200 (1999). The Supreme Court has noted that "[a]nonymity is a shield from the tyranny of the majority."*McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 357 (1995). Indeed, "[u]nder our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent."*Id.*

Second, the protections of the First Amendment extend to the Internet. *See Reno v. ACLU,* 521 U.S. 844, 870 (1997)."Courts have recognized the Internet as a valuable forum for robust exchange and debate."*Sony Music Entm't, Inc. v. Does 1-40,* 326 F.Supp.2d 556, 562 (S.D.N.Y.2004)."Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox."*Reno,* 521 U.S. at 870. Courts also recognize that anonymity is a particularly important component of Internet speech. "Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas [;] ... the constitutional rights of Internet users, including the First Amendment right to speak anonymously, must

be carefully safeguarded."*Doe v. 2 The Mart.com, Inc.,* 140 F.Supp.2d 1088, 1092, 1097 (W.D.Wash.2001).

Third, "courts have held that civil subpoenas seeking information regarding anonymous individuals raise First Amendment concerns."*Sony,* 326 F.Supp.2d at 563 (*citing NAACP v. Ala. Ex Rel Patterson,* 357 U.S. 449, 462 (1958); *NLRB v. Midland Daily News,* 151 F.3d 472, 475 (6th Cir.1998); *L.A. Mem'l Coliseum, Comm'n v. Nat'l Football League,* 89 F.R.D. 489, 494-95 (C.D.Cal.1981)).

Fourth, the right to speak anonymously is not absolute. *See McIntyre,* 514 U.S. at 353;*Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 59, 555-56 (1985) (First Amendment does not protect copyright infringement); *Doe v. Cahill,* 884 A.2d 451, 456 (Del.2005) ("Certain classes of speech, including defamatory and libelous speech, are entitled to no constitutional protection.")." Those who suffer damages as a result of tortious or other actionable communications on the Internet should be able to seek appropriate redress by preventing the wrongdoers from hiding behind an illusory shield of purported First Amendment rights. "*In re Subpoena Duces Tecum to America On-Line, Inc.,* No. 40570, 2000 WL1210372, at *5 (Va.Cir.Ct. Jan. 31, 2000).

*4 These principles make clear that the John Doe Defendants have a First Amendment right to anonymous Internet speech, but that the right is not absolute and must be weighed against BWI's need for discovery to redress alleged wrongs. To ensure that the First Amendment rights of anonymous Internet speakers are not lost unnecessarily, courts typically require parties to make some showing before obtaining discovery of the speakers' identities. Courts have recognized a range of possible showings. As the Delaware Supreme Court has explained, "an entire spectrum of 'standards' ... could be required, ranging (in ascending order) from a good faith basis to assert a claim, to pleading sufficient facts to survive a motion to dismiss, to a showing of *prima facie* evidence sufficient to withstand a motion for summary judgment and, beyond that, hurdles even more stringent."*Cahill,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

884 A.2d at 457. BWI urges the Court to adopt the lowest standard-good faith. Doud suggests the more stringent summary judgment standard.

In deciding which standard to apply, the Court must consider the significance of the First Amendment rights at issue in this case. BWI cites several cases in which plaintiffs sued defendants for illegally downloading music from the Internet. Although the courts found that the downloading of information was entitled to some protection under the First Amendment, they recognized that downloading was not purely expressive and therefore was entitled only to "limited" First Amendment protection. *Sony,* 326 F.Supp.2d at 564; *UMG Recordings,* 2006 WL1343597 at *1 ("A person who uses the Internet to download or distribute copyrighted music without permission is engaging in the exercise of speech, but only to a limited extent[.]").

The conduct of the John Doe Defendants, by contrast, is purely expressive. The Defendants are expressing their views on issues of interest to BWI members and governors in a forum specifically designed for an exchange of opinions and ideas anonymously. Such speech is entitled to substantial First Amendment protection.

Given the significant First Amendment interest at stake, the Court agrees with the Delaware Supreme Court in *Cahill,* and concludes that a summary judgment standard should be satisfied before BWI can discover the identities of the John Doe Defendants. The court in *Cahill* described the test in these words: "Before a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process, he must support his defamation claim with facts sufficient to defeat a summary judgment motion."884 A.2d at 460. This standard does not require a plaintiff to prove its case as a matter of undisputed fact, but instead to produce evidence sufficient to establish the plaintiff's *prima facie* case:

[T]o obtain discovery of an anonymous defendant's identity under the summary judgment standard, a defamation plaintiff must submit sufficient evidence to establish a *prima facie* case for each essential element of the claim in question.

In other words, the defamation plaintiff, as the party bearing the burden of proof at trial, must introduce evidence creating a genuine issue of material fact for all elements of a defamation claim *within plaintiff's control.*

**\*5** *Id.* at 465 (quotations and citations omitted, emphasis in original). The emphasized words " within plaintiff's control" recognize that a plaintiff at an early stage of the litigation may not possess information about the role played by particular defendants or other evidence that normally would be obtained through discovery. But a plaintiff must produce such evidence as it has to establish a *prima facie* case of the claims asserted in its complaint.

BWI's complaint provides an example of why the summary judgment standard is appropriate. The complaint alleges that Defendants have improperly posted confidential BWI information on the Internet site, wrongfully posted BWI's trademark on the site, used BWI's equipment to communicate with the site, deprived BWI of the benefits of its contract with Defendants, and made false statements regarding BWI and its business. Doc. # 3 ¶¶ 58-60, 64, 68. But BWI's complaint does not identify a single false statement allegedly made by the John Doe Defendants, identify a single item of confidential information posted on the site by Defendants, describe a single instance where BWI's mark was improperly used, explain how BWI was denied the benefits of its contracts, or explain how BWI equipment was improperly used. The complaint provides no factual support for BWI's claim that Defendants engaged in wrongful conduct not protected by the First Amendment.

At the same time, the Court finds no basis for concluding that BWI's complaint has been asserted in bad faith. Nor, given modern notice pleading standards, would BWI's complaint likely be subject to a motion to dismiss. Thus, if the standard for permitting discovery of the John Doe Defendants' identities required only good faith or the ability to survive a motion to dismiss, BWI's proposed discovery would be permitted and the Defendants' First Amendment right to anonymous speech would be defeated. A good faith allegation of wrongdoing, devoid of factual detail, would suffice.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court concludes that more is needed before a defendant's First Amendment rights may be eliminated. The Court must examine facts and evidence before concluding that a defendant's constitutional rights must surrender to a plaintiff's discovery needs. The summary judgment standard will ensure that the Court receives such facts and evidence.

Other courts have adopted a multi-part test for determining when plaintiffs should be permitted to discover the identity of anonymous defendants. This test includes "(1) a concrete showing of a *prima facie* claim of actionable harm; (2) the specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) a central need for the subpoenaed information to advance the claim; and (5) the Doe defendants' expectation of privacy." *UMG,* 2006 WL1343597 at *1 (citing *Sony,* 326 F.Supp.2d at 564-65). The Court views the first element of this test-"a concrete showing of a *prima facie* claim"-as equivalent to the summary judgment standard. *See Dendrite Int'l., Inc. v. Doe,* 775 A.2d 756, 760 (N.J.App.2001) ("[T]he plaintiff must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis, prior to a court ordering the disclosure of the identity of the unnamed defendant."). The Court need not address parts (2)-(4) of this test, as they clearly have been established by BWI. The fifth part of the test-the John Doe Defendants' expectation of privacy-should be addressed in the briefing by the parties discussed below.

*6 In summary, BWI has not made a sufficient showing to justify discovery that will disclose the identities of the John Doe Defendants. BWI may be able to make such a showing in a renewed motion, but it has not done so in the present motion. The Court therefore will deny BWI's motion for expedited discovery.

**4. Other Considerations.**

If BWI believes that it can satisfy the summary judgment standard, it may seek to do so in a renewed motion to be filed with the Court on or before **August 18, 2006.**In the meantime, the Court will issue BWI's requested motion regarding the preservation of documents. As noted above, there is reason to believe that the information sought by BWI will not be retained by the ISPs or others from whom BWI will seek discovery. The Court will enter BWI's proposed order to preserve such evidence. The Court notes that Mr. Dial did not oppose the entry of such an order.

BWI has asked the Court to require the host of the Internet site to post the preservation order on the site. The Court finds such a requirement unnecessary. BWI may itself make the existence of the order known through its own entry on the site. BWI may also send copies of the preservation order to those from whom it later will seek discovery if the summary judgment standard is satisfied.

If BWI attempts to satisfy the summary judgment standard, BWI should give notice to the John Doe Defendants over the Internet site and afford them an opportunity to oppose the discovery. "When First Amendment interests are at stake, we disfavor *ex parte* discovery requests that afford the Plaintiff the important form of relief that comes from unmasking an anonymous defendant." *Cahill,* 884 A.2d at 461. Therefore, "the plaintiff must undertake reasonable efforts to notify the anonymous defendant of the discovery request and must withhold action to allow the defendant an opportunity to respond." *Id.*

BWI shall notify the anticipated recipients of its discovery requests, as well as the John Doe Defendants, through entries on the Internet site and other reasonable means, that it is seeking discovery of the Defendants' identities and that the potential discovery recipients and John Doe Defendants may respond to its motion, should they choose to do so, within three weeks of the motion's filing. Because the Court will enter BWI's requested order for preservation of documents, evidence should not be lost while these steps are undertaken. Upon receipt of any responses to BWI's renewed motion and the filing of BWI's reply, the Court will again address the question of whether discovery of the John Doe Defendants' identities should be permitted in this case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2091695 (D.Ariz.)
**(Cite as: Not Reported in F.Supp.2d)**

**IT IS ORDERED:**

1. BWI's motion for expedited consideration of motion to conduct accelerated and expedited discovery (Doc. # 6) is **granted.**

2. BWI's motion to conduct accelerated and expedited discovery (Doc. # 5) is **denied.**

3. BWI's motion for expedited consideration of motion for order regarding preservation of documents (Doc. # 8) is **granted.**

**\*7** 4. BWI's motion for order regarding preservation of documents (Doc. # 7) is **granted.** The Court will enter BWI's proposed order separately.

5. H. James Dial's motion to stay all discovery pending resolution of this motion and Rule 26(f) conference (Doc. # 11) is **granted** to the extent that no discovery will occur until after the Court considers BWI's renewed motion for discovery, but is **denied** to the extent that Mr. Dial seeks a stay of all discovery until a Rule 26(f) conference has occurred.

D.Ariz.,2006.
Best Western Intern., Inc. v. Doe
Not Reported in F.Supp.2d, 2006 WL 2091695 (D.Ariz.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**SIPRA MITRA, Plaintiff, - against - STATE BANK OF INDIA, T.S. VAIDYANATHAN, Individually and in his Official Capacity, and S. IYENGER, Individually and in his Official Capacity, Defendants.**

03. Civ. 6331 (DAB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2005 U.S. Dist. LEXIS 19138

September 6, 2005, Decided
September 6, 2005, Filed

**DISPOSITION:** [*1] Defendants Vaidyanathan and Iyenger's motion to dismiss GRANTED IN PART and DENIED IN PART.

**COUNSEL:** For Sipra Mitra, Plaintiff: Roya Moghadassi Weiss, Moghadassi & Associates, New York, NY.

For State Bank of India, Defendant: Edward A. Brill, Tracey Ilene Levy, Proskauer Rose LLP, New York, NY.

For T.S. Vaidyanathan, Defendant: Edward A. Brill, Proskauer Rose LLP, New York, NY.

**JUDGES:** Deborah A. Batts, United States District Judge.

**OPINION BY:** Deborah A. Batts

**OPINION**

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, United States District Judge.

Plaintiff Sipra Mitra brings suit against Defendants the State Bank of India ("SBI"), T.S. Vaidyanathan and S. Iyenger [1] for allegedly discriminating against her with respect to the terms, conditions and privileges of her employment based on her sex and age in violation of the New York State and New York City Human Rights Laws, N.Y. Exec. Law. § 296 et seq.; N.Y.C. Admin.

Code § 8-107 et seq., and for administering voluntary retirement severance packages for employees in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1001 et seq. Presently before the Court is Defendants [*2] Vaidyanathan and Iyenger's (collectively "Individual Defendants") motion to dismiss the action for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), and for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). For the reasons stated below, Defendants' motion is GRANTED IN PART AND DENIED IN PART.

1    In the caption of her First Amended Complaint, Plaintiff incorrectly referred to this Individual Defendant as "I. Ayenger." Hereafter, the official docket and the captions in all papers filed in this case shall contain the correct spelling of Defendant Iyenger's name.

I. BACKGROUND

Plaintiff, an American citizen of Indian national origin, was employed in SBI's New York office from 1971 until her termination in 2003. She began her employment with SBI as a Customer Support Representative. (1st Am. Compl. P2). [2] In 1979, as a result of her excellent job performance, Plaintiff was promoted to the position of Deputy Manager. [*3] (Id. P16). In 1985, Plaintiff began working as the Deputy Manager in SBI's Foreign Exchange and Money Operations Department. (Id.). In 1988, an unposted

managerial position became available in SBI's letters of credit department. Upon learning of this information, Plaintiff, as the only female deputy manager and the most senior deputy manager in SBI, applied for the position to SBI's Vice President of Operations. However, despite her level of experience and credentials, the position was given to a male employee with less professional experience and seniority. (*Id.* PP19, 22).

> 2 On a motion to dismiss under Rule 12(b)(6), the facts alleged in the complaint are presumed to be true, and factual inferences are drawn in the plaintiff's favor. *Mills v Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993).

In 1990 SBI began a policy of sending its managerial employees to India for specialized training. (*Id.* P21). However, rather than provide Plaintiff with such an opportunity, SBI [*4] instead sent only male employees with less seniority and/or professional experience. (*Id.* P23). As a result, on or about January, 2001, Plaintiff repeated her request to participate in said training program. Again, Plaintiff was denied the training opportunity, and two male deputy managers were instead selected to attend the program. (*Id.* P26).

Similarly, beginning in 1992 and continuing until her termination in 2003, SBI consistently denied Plaintiff salary increases. (*Id.* P25). Moreover, she was allegedly told that there had been a salary cap imposed on her managerial title and/or position, while other employees with similar supervisory duties continued to receive salary increases. (*Id.*).

In or about February 2002, it became well-known within SBI that certain Indian bank officials, including Indian employees with the same title or position and/or responsibilities and/or duties as Plaintiff, were offered a voluntary retirement severance package ("VRS"). (*Id.* P28). The VRS package was offered to bank officials who were above 65 years of age or who had served SBI for at least 15 years. The VRS paid an eligible employee three weeks of compensation for every year [*5] of service with defendant SBI, and 18 months of medical coverage. (*Id.* P33). However, while the SBI policy manual provides for the payment of appropriate severance pay, SBI did not issue a written severance policy specifically concerning the VRS package. (*Id.* PP29, 30). Instead, by providing and administering the VRS to the Indian bank officials, SBI has an established pattern and practice of making severance payment to its employees. (*Id.* P31). All the while, SBI maintained a welfare benefit plan for providing severance benefits for employees within the meaning of ERISA. (*Id.* P32).

In the fall of 2002, Plaintiff and four other New York-based deputy managers of SBI spoke to the Individual Defendants concerning the VRS package. (*Id.* P36). Both promised that eligible New York-based managers would be offered the same VRS package as that which would be administered to Indian Bank officials. (*Id.* P34). Subsequently, Plaintiff again applied for a promotion to a managerial position, but a younger male employee with less experience was promoted instead. (*Id.* PP35-36).

On May 27, 2003, Plaintiff was terminated after 32 years of service and replaced by a male employee. [*6] (*Id.* P37, 41). Following her termination, Plaintiff contacted the bank headquarters in India and was assured by the officials that she would be offered the same VRS package offered to the Indian officials of the bank. (*Id.* P38). Nevertheless, she was not offered the VRS package as promised, but instead was given a maximum of 20 weeks of severance pay for her service to the bank. (*Id.* P40).

On July 23, 2003, Plaintiff filed suit in New York State Supreme Court, New York County against SBI and Vaidyanathan, alleging employment discrimination on the basis of sex and age in violation of the New York State and New York City Human Rights Laws, N.Y. Exec. Law § 296, *et seq.*; N.Y.C. Admin. Code § 8-107, *et seq.* On August 21, 2003, SBI and Vaidyanathan filed a Notice of Removal with this Court pursuant to 28 U.S.C. § 1441(d) on grounds that, because SBI is an agent of a foreign government, Plaintiff's lawsuit constitutes a civil action against a foreign state as defined by the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(a). (*See* Notice of Removal, dated August 21, 2003, PP3-4). Thereafter, on September 23, 2003, Plaintiff [*7] filed an Amended Complaint, adding Iyenger as a defendant and an additional cause of action against all three Defendants alleging that they had violated ERISA by denying her the same severance package they were offering and administering to Indian SBI officials of similar rank. (1st Am. Compl. PP57-58).

The Individual Defendants now move to dismiss [3] all claims against them pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted and/or Rule 12(b)(1) for lack of subject matter jurisdiction.

3  Defendant SBI, meanwhile, has answered the First Amended Complaint. (*See* Answer of Defendant State Bank of India, filed October 15, 2003).

## II. DISCUSSION

### A. Rule 12(b)(1) Dismissal

While Individual Defendants' Notice of Motion mentions Rule 12(b)(1) as a ground for dismissal, nowhere in their moving or reply papers do they set forth any basis for dismissal for lack of subject matter jurisdiction. Moreover, Defendant Vaidyanathan, in his Notice of Removal, acknowledged that the [*8] Court has diversity jurisdiction over this case. (Notice of Removal PP3-5). Accordingly, the Court rejects Individual Defendants' argument for 12(b)(1) dismissal as utterly meritless.

### B. Rule 12(b)(6) Dismissal

#### 1. Legal Standard

In a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, it is generally accepted that a complaint should not be dismissed unless it is entirely clear that the plaintiff is unable to prove any set of facts that would support the claim and thereby grant him relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S.Ct. 99, 102 (1957). The complaint must be read "generously, accepting as true the factual allegations in the complaint and drawing all inferences in favor of the pleader." *Bolt Elec. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). A court should grant the motion to dismiss only "if, after viewing a plaintiff's allegations in this most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [*9] " *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992) (*quoting Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119 (2d Cir. 1991)). The Court "is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). In ruling on a 12(b)(6) motion, a court may consider the complaint as well as any additional documents incorporated into or appended to the complaint. *See Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000).

#### 2. NYSHRL and NYCHRL Claims

Individual Defendants argue that Plaintiff's New York State and New York City Human Rights Law claims against them are legally insufficient because Plaintiff fails to allege any specific allegations of actual discriminatory conduct on their parts. (Memorandum of Law In Support of the Motion to Dismiss the Complaint ["Def. Mem."] at 5-6; Reply Memorandum of Law in Support of Motion to Dismiss the Complaint ["Def. Reply"] at 2-3).

The New York State Human Rights Law (NYSHRL) makes it unlawful for "an employer or licensing agency, because [*10] of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition, or carrier status, or marital status of any individual, . . . to bar or discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). As the language of the statute makes clear, liability for discrimination extends only to a plaintiff's employer, and thus an individual corporate manager or supervisor cannot be held liable under § 296(1)(a) unless he or she is "shown to have an ownership interest in [the business employing the plaintiff] or power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542, 473 N.E.2d 11, 483 N.Y.S.2d 659, 660 (1984) (per curiam); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (same) (citing *Patrowich*); *Smith v. AVSC Int'l, Inc.*, 148 F. Supp. 2d 302, 308-09 (S.D.N.Y. 2001) (same). However, under § 296(6), which makes it unlawful "for any person to aid, abet, incite, compel, coerce or attempt any of the acts forbidden [*11] under [the NYSHRL]," N.Y. Exec. Law § 296(6), an individual supervisor or corporate employee who, while not an "employer," "actually participates in the conduct giving rise to the discrimination claim may be held liable" as an aider and abettor of the discrimination. *Tomka*, 66 F.3d at 1317; *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (citing *Tomka*); *D'Amico v. Commodities Exch.*, 235 A.D.2d 313, 315, 652 N.Y.S.2d 294, 296 (N.Y. App. Div. 1st Dep't 1997).

Meanwhile, the New York City Human Rights Law (NYCHRL), which prohibits "an employer or *an employee or agent thereof*" from discharging a person from or discriminating against him in terms, conditions, or privileges of employment on account of "age, race,

creed, color, national origin, gender, disability, marital status, sexual orientation, or alienage or citizenship status," permits even individual corporate employees to be held principally liable for employment discrimination. N.Y.C. Admin. Code § 8-107(1)(a) (*emphasis added*). [4] However, the prerequisite for individual liability under the NYCHRL is identical to that of § 296(6) of the State Human [*12] Rights Law, i.e., "the defendant at issue must have actually engaged in a discriminatory act." *Smith, 148 F.Supp.2d at 308* (citing *Stallings v. U.S. Electronics, Inc., 270 A.D.2d 188, 707 N.Y.S.2d 9 (N.Y. App. Div. 1st Dep't 2000))*; *Feingold, 366 F.3d at 158* (noting that the "same standards of analysis" used to evaluate aiding and abetting claims under the NYSHRL apply to claims against individual defendants under the NYCHRL) (listing cases). Thus, under either the NYSHRL or NYCHRL, an individual corporate manager or supervisor may only be held liable for discrimination if he or she (1) has an ownership interest in the plaintiff's employer, (2) has the power to do more than carry out personnel decisions made by others, or (3) actually participated in one or more discriminatory acts. [5]

[4] The NYCHRL also contains an aider/abettor liability provision similar to the one contained in the NYSHRL. *See* N.Y.C. Admin Code § 8-107(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter. . .")

[*13]

[5] Contrary to Individual Defendants' assertion, individual corporate supervisors or managers who are "employers" can be held vicariously liable for discriminatory acts under the NYSHRL even if they did not personally commit such acts as long as they "became party to [the discrimination] by encouraging, condoning, or approving it." *Harrison v. Indosuez, 6 F.Supp.2d 224, 233 n.5 (S.D.N.Y. 1998)* (quoting *State Div. of Human Rights v. St. Elizabeth's Hosp., 66 N.Y.2d 684, 687, 487 N.E.2d 268, 496 N.Y.S.2d 411, 412 (1985))*.

In the present case, Plaintiff's First Amended Complaint fails to allege any facts tending to show that the Individual Defendants fit into any of the three categories of defendants subject to individual liability under the NYSHRL or NYCHRL. The First Amended Complaint does not specifically allege that, at the time of

the alleged discrimination against Plaintiff, Vaidyanathan and Iyenger had ownership interests in SBI or had the authority to make the relevant personnel decisions on their own, and the fact that they held the positions of Country Head and Branch [*14] Head does not, by itself, establish either of these prerequisites to individual NYSHRL and NYCHRL liability. *See Patrowich, 63 N.Y.2d at 542* ("A corporate employee, *though he has a title as an officer and is the manager or supervisor of a corporate division,* is not individually subject to suit. . . under New York's Human Rights Law. . . if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others.") (*emphasis added*). Moreover, the Amended Complaint does not specifically allege that either Individual Defendant actually participated in any of the alleged discriminatory acts against the Plaintiff.

Plaintiff in turn alleges in her opposition papers to the present motion that both Individual Defendants were shareholders of, and thus had an ownership interest in SBI, that Defendant Vaidyanathan himself made SBI's employment policies, and that Vaidyanathan directly participated in terminating Plaintiff's employment with SBI because he was the one that gave her a few days notice of her termination. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint ["Pl. Mem."] [*15] at 8; Affidavit of Sipra Mitra ["Mitra Aff."] PP4-5, 7, 12). However, while these allegations are clearly relevant to whether Plaintiff should be granted leave to amend her Complaint again, *see* Part II.C. *infra,* they do not change the fact that the First Amended Complaint itself fails to state legally sufficient claims for relief against the Individual Defendants under either the NYSHRL or NYCHRL. Accordingly, Rule 12(b)(6) dismissal of these claims is warranted.

3. ERISA Claim

The Individual Defendants also contend that Plaintiff's ERISA claim against them fails as a matter of law because there is no allegation in the First Amended Complaint that Vaidyanathan or Iyenger are plan administrators for the VRS package. (Def. Mem. at 6).

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.,* is a "comprehensive and reticulated statute" that governs employee benefit plans. *Mertens v. Hewitt Assocs., 508 U.S. 248, 124 L. Ed. 2d 161, 113 S. Ct. 2063 (1993)*. Its original design was implemented to protect employee

pensions and benefit plans by "setting forth certain general fiduciary duties applicable to the management of both pension and [*16] non-pension benefit plans." *Varity Corp. v. Howe,* 516 U.S. 489, 496, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996). Accordingly, "in a recovery of benefits claim, only the plan, and the administrators and trustees of the plan in their capacity as such, may be held liable." *Crocco v. Xerox Corp.,* 137 F.3d 105, 107 (2d Cir. 1998) (quoting *Leonelli v. Pennwalt Corp.,* 887 F.2d 1195 (2d Cir. 1989)).

An ERISA "plan administrator" is "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary [of Labor] may by regulation prescribe." 29 U.S.C. § 1002(16)(A). A "plan sponsor" in turn is "the employer in the case of an employee benefit plan established or maintained by a single employer," and an "employer" for ERISA purposes includes "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. §§ 1002 (5) [*17] ,(16)(B).

The Individual Defendants contend that nowhere in the First Amended Complaint does Plaintiff allege facts tending to show that they meet the ERISA definition of plan administrators with respect to the VRS package. In fact, they point out, the Complaint specifically alleges only that SBI is an ERISA plan administrator. (Def. Mem. at 6; 1st Am. Compl. P9). Plaintiff, however, argues that the First Amended Complaint, which alleges that the Individual Defendants promised that she and other "eligible local-based bank officials (deputy managers) would be offered the same VRS package" as Indian bank officials (1st Am. Compl. P34), pleads facts tending to show that the Individual Defendants "acted in the capacity of or had the discretionary authority or responsibility of administering the VRS package," i.e., that they were *de facto* VRS package plan administrators. (Pl. Mem. at 6). [6] The Individual Defendants in turn submit a written copy of what they claim is the VRS plan at issue and note that because the written plan specifically designates only SBI as the plan administrator, they cannot, under clear Second Circuit precedent, be sued as "*de facto* plan administrators. [*18] " (Reply Memorandum of Law in Further Support of Motion to Dismiss ["Def. Reply"] at 4; Affidavit of Arun Bisaria

["Bisaria Aff."], Ex. A (The State Bank of India Voluntary Retirement Plan for Local 2110-Represented Employees) P6). [7]

[6] Plaintiff actually argues that the Individual Defendants meet the statutory definition of plan fiduciaries under 29 U.S.C. § 1002(21)(A) rather than plan administrators under § 1002(a)(16). (Pl. Mem. at 6-7). However, because Plaintiff appears to be seeking recovery of damages and plan benefits for herself rather on behalf of the plan for a breach of fiduciary duty to the plan (*see* 1st Am. Compl. PP45, 56-58), she may only sue under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), which only permits suits against plan administrators and not other plan fiduciaries. *See Crocco,* 137 F.3d at 107 n.2 (noting that plan beneficiary seeking recovery of plan benefits for herself could only sue under § 502(a)(1) (B), which permits suits only against plan administrators, rather than under § 502(a)(2), which permits suits seeking damages on behalf of the plan itself to be brought against any plan fiduciaries) (citing *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir. 1993)).

[*19]

[7] Because the plan for the VRS package is incorporated by reference into the First Amended Complaint (*see* 1st Am. Compl. P28), the Court may consider the written plan submitted by the Individual Defendants in ruling on their Rule 12(b)(6) motion. *See Tarshis,* 211 F.3d at 39.

The Individual Defendants are quite correct that the law of this Circuit prohibits so-called "*de facto* plan administrators" from being sued under ERISA for denial of employee benefits when the benefit plan at issue expressly designates one or more plan administrators. *See Crocco,* 137 F.3d at 107 (holding that plaintiff's employer could not, as de-facto plan administrator, be held jointly liable with named plan administrator in a suit to recover benefits under § 502(a)(1)(B) of ERISA). However, in the present case, the Court is not convinced that the written plan submitted by the Individual Defendants is in fact the plan under which Plaintiff is seeking to recover benefits. After all, the VRS package for which Plaintiff claims she was promised and was never reduced to writing, was [*20] allegedly offered only to Indian SBI officials and select American SBI managers (1st Am. Compl. PP29, 34), while the written plan submitted by

the Individual Defendants covers "Local 2110-Represented Employees" of SBI. (Bisaria Aff., Ex. A). Thus the Court must assume, for the purposes of the present motion, that there were no specifically-designated plan administrators for the specific VRS package at issue. Moreover, while SBI, as Plaintiff's employer and the sponsor of the VRS package, would therefore be deemed the plan administrator, *see* 29 U.S.C. § 1002(16)(A)(ii), the Individual Defendants, to the extent they were in fact administering the VRS package on SBI's behalf, would qualify as employers, plan sponsors, and therefore plan administrators under ERISA. *See United States v. Carson*, 52 F.3d 1173, 1189 (2d Cir. 1995) (holding that where union's pension plan did not name a plan administrator, union officer who acted on behalf of union in relation to the union's pension plan was an employer, plan sponsor and plan administrator under §§ 1002 (5) and (16)).

Unfortunately for Plaintiff, none of the aforementioned allegations in the First [*21] Amended Complaint, even if true, would tend to show that the Individual Defendants acted on SBI's behalf with respect to the administration of the VRS package. The Complaint merely alleges that the Individual Defendants promised Plaintiff and four other U.S.-based SBI deputy managers that they would be offered the same VRS package as administered to SBI Indian officials. (1st Am. Compl. P34). However, the mere fact that the Individual defendants made such a promise does not, by itself, suggest they could and did take part in deciding to whom SBI's VRS package benefits would be administered. Therefore, having failed to plead facts sufficient to establish that the Individual Defendants are employee benefit plan administrators, Plaintiff cannot state a viable claim against them under ERISA.

C. Leave to Amend

In addition to opposing the present motion, Plaintiff, in her opposition papers, requests leave to amend her Complaint to cure the aforementioned deficiencies in her ERISA, NYSHRL and NYCHRL claims against the Individual Defendants. (Pl. Mem. at 7, 9-10). Under Federal Rule of Civil Procedure 15(a), leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a) [*22] . While "it is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d

195, 198 (2d Cir. 1990), a court may deny leave to amend on grounds of bad faith, undue prejudice to the opposing party, repeated failures to cure deficiencies in amendments previously allowed, or futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Ultimately, however, the decision to grant leave to amend a complaint rests within the discretion of the district court. *Id.*

The Individual Defendants argue that Plaintiff's request is procedurally deficient because she has not filed a formal motion for leave to amend, has not "set forth with particularity the grounds supporting her application," has not presented "any justifiable excuse for her failure to incorporate the currently proposed amendments in her First Amended Complaint," and has deprived Defendants of notice of the precise nature of her proposed pleading changes by failing to provide them with a copy of her proposed pleading amendments. (Def. [*23] Reply at 5). As an initial matter, Plaintiff's failure to file a formal motion for leave to amend is not fatal to her request. *See McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) ("The lack of a formal motion is not a sufficient ground for a district court's dismissal without leave to amend, so long as the plaintiff has made its willingness to amend clear.").

Further, while Plaintiff has not submitted a proposed Second Amended Complaint to the Court or Defendants, her motion opposition brief and affidavit clearly detail the additional factual allegations she would include in such complaint to cure the deficiencies in her ERISA, NYSHRL and NYCHRL claims- e.g., the Individual Defendants' ownership interest in SBI (Mitra Aff. P7; Pl. Mem. at 10), Defendant Vaidyanathan's personal involvement in her termination (*id.* P12), and the Individual Defendants' authority to make and enforce personnel and management decisions on behalf of SBI, including the possible exercise of discretion with respect to the administration of the VRS package to U.S-based SBI managers. (*Id.* PP4-5, 11; Pl. Mem. at 7) - so that Defendants have clearly been put on notice of the precise [*24] nature of her proposed changes. [8] Finally, while Plaintiff has already amended her Complaint once previously, such amendment, which was done as of right and simply added Defendant Iyenger and her ERISA claim, was not made with notice of or with the intention to cure the aforementioned pleading deficiencies, and thus Plaintiff is not guilty of "repeated failures to cure deficiencies in amendments previously allowed." *Foman,*

371 U.S. at 182. Therefore, Plaintiff's request for leave to amend is not procedurally deficient.

8 Indeed, the inclusion of such specific proposed changes in her motion opposition papers distinguishes Plaintiff's request for leave to amend from that of the plaintiff in *AT&T Corp. v. American Cash Card Corp.*, 184 F.R.D. 515 (S.D.N.Y. 1999), a case the Individual Defendants contend stands for the proposition that an actual proposed amended complaint must accompany a request for leave to amend, because the *AT&T* plaintiff not only failed to submit a proposed amended complaint, but did not even "provide the Court with any suggestion as to the nature of the proposed amendments *in any of its papers submitted to the Court.*" *Id.* at 520 (emphasis added).

[*25] The Individual Defendants also contend that Plaintiff's proposed amendments would be futile because, even with the additional factual allegations in her motion opposition papers, she would still fail to state viable ERISA, NYSHRL, and NYCHRL claims against them. (Def. Reply at 5-6). The Court disagrees. After all, Plaintiff alleges in her motion opposition papers that both Vaidyanathan and Iyenger were personally involved in the decision to terminate her and replace her with a younger male employee (Mitra Aff. P12, Pl. Mem. at 9), which, if true, would satisfy the actual participation prerequisite for individual liability under the NYCHRL and § 296(6) of the NYSHRL. Further, Plaintiff's additional allegation that both Individual Defendants had ownership interests in SBI and that Vaidyanathan, as SBI Country Head, had the authority to make personnel decisions for all the SBI branches in the U.S. (Mitra Aff. PP4, 7; Pl. Mem. at 10), would, if true, establish that they were "employers" for the purposes of the NYSHRL and NYCHRL. Finally, Plaintiff's additional allegations that the Individual Defendants, by virtue of their positions as Country and New York Branch Head, had the authority [*26] to "make and enforce [SBI's] policies," and that they decided independently of SBI management in India to deny Plaintiff the VRS package (Mitra Aff. PP4, 11; Pl. Mem. at 7) tend to show that the Individual Defendants administered the VRS package on behalf of SBI and, as such, meet the definition of employer, sponsor and plan administrator under ERISA.

Accordingly, because Plaintiff's proposed amendments would not be futile, Plaintiff's request for leave to amend is GRANTED.

D. Leave to Conduct Immediate Discovery

Plaintiff's motion opposition brief also includes a request for an order authorizing her to conduct expedited discovery of the Individual Defendants pursuant to Federal Rule of Civil Procedure 26(d). 9 (Pl. Mem. at 10-11). "Although [Rule 26(d)] does not say so, it is implicit that some showing of good cause should be made to justify such an order." Charles Alan Wright, *et al.*, 8 Federal Practice and Procedure Civil § 2046.1 at 592 (2d ed. 1994). Requests for expedited discovery are typically appropriate in cases "involving requests for preliminary injunction or motions challenging personal jurisdiction." Fed.R.Civ.P. 26 advisory committee notes to 1993 Amendments [*27] to Subdivision (d).

9 Plaintiff actually cites to Rule 26(c)(2) as the basis for its expedited discovery request; however, Rule 26(c)(2) deals with protective orders, while Rule 26(d), which gives district courts the power to order that discovery take places before the parties' initial Rule 26(f) discovery conference, is the appropriate vehicle for Plaintiff's request.

Plaintiff contends that, due to SBI's "policy and practice of changing the higher echelon of the managerial and supervisory employees," the Individual Defendants were to be stationed in New York for a period of four years, which either has expired or soon will expire, after which they will return to India, thereby raising "substantial barriers to the conduct of discovery in this case." (Pl. Mem. at 11). However, if the Individual Defendants are still employees of SBI, and there is no indication that they are not, Plaintiff will likely be able to obtain discovery from them at any point through service of Rule 30(b)(6) deposition notices and subpoenas [*28] on SBI, who will almost certainly have to designate the Individual Defendants to testify on its behalf given their alleged involvement in the events recounted in Plaintiff's Complaint. See Fed.R.Civ.P. 30(b)(6) (providing that a party may notice and subpoena for deposition "a public or private corporation" and that such corporation "shall designate one or more officers, directors, or managing agents, or other persons" to testify on its behalf, "and may set forth, for each person designated, the matters on which the person will testify."). Thus Plaintiff has failed to provide good cause for commencing discovery

immediately, and, as such, her request for expedited discovery is denied.

## III. CONCLUSION

For the reasons stated above, Defendants Vaidyanathan and Iyenger's motion to dismiss is GRANTED IN PART and DENIED IN PART as follows:

(1) All of Plaintiffs' causes of action against the Defendants Vaidyanathan and Iyenger are DISMISSED WITHOUT PREJUDICE under F.R.C.P. 12(b)(6) for failure to state a claim upon which relief may be granted;

(2) However, dismissal of Plaintiffs' claims against Defendants Vaidyanathan and Iyenger under F.R.C.P. 12(b)(1) for lack of subject [*29] matter jurisdiction is DENIED.

Plaintiff may amend her First Amended Complaint within forty-five (45) days of the date of this Order solely for the purpose of curing the deficiencies in her claims against the Individual Defendants. The Individual Defendants shall in turn respond to such Second Amended Complaint within thirty (30) days of being served with it. Finally, Plaintiff's request for expedited discovery with respect to the Individual Defendants is DENIED.

SO ORDERED

DATED: New York, New York

September 6, 2005

Deborah A. Batts

United States District Judge

LEXSEE

**U.S. COMMODITY FUTURES TRADING COMMISSION, Plaintiff, v. LAZARO JOSE RODRIGUEZ, Defendant**

**06 CV 0855**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2006 U.S. Dist. LEXIS 13773**

**February 3, 2006, Decided**
**February 3, 2006, Filed**

**COUNSEL:** [*1] For U.S. Commodity Futures Trading Commission, Plaintiff: Linda Y Peng, U.S. Commodity Futures Trading Commission, Division of Enforcement, New York, NY.

**JUDGES:** The Honorable Judge Kimba M. Wood; Buchwald, J.

**OPINION BY:** Kimba M. Wood

**OPINION**

*EX PARTE* **STATUTORY RESTRAINING ORDER**

**Freezing Assets, Prohibiting, the Destruction or Alteration of Books, Records or other Documents, for Expedited Asset Discovery, and an Order to Show Cause Why a Preliminary Injunction Should Not Be Entered**

Plaintiff, U.S. Commodity Futures Trading Commission (the "Commission"), has fled a complaint for a permanent injunction and other relief, and moved *ex parte*, pursuant to Section 6c of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 13a-1 (2001), for a statutory restraining order freezing assets, prohibiting the destruction of books, records, or other documents, granting leave to the Commission to engage in expedited asset discovery for the purpose of discovering the nature, location, status, and extent of assets, and ordering Defendant Lazaro Jose Rodriguez ("Rodriguez" or "Defendant") (d/b/a The FIRM "Financial" and as Financial Investments Require Money

[*2] -- Financial Consultants) ("The FIRM") to show cause why a preliminary injunction should not be issued. The Court has considered the pleadings, the declaration with attached exhibits, and the memorandum of law filed in support of the Commission's application and now, being fully advised in the premises, it finds that:

(1) This Court has jurisdiction over the subject matter of this case, and Section 6c of the Act, 7 U.S.C. § 13a-l, authorizes *ex parte* relief;

(2) There is good cause to believe that the Defendant has engaged in, or is about to engage in fraud constituting a violation of 7 U.S.C. § 6b(a)(2)9C)(i) and (C)(iii), and 6c(b) [1], 17 C.F.R. § 33.10(a) and (c) (2005); [2]

(3) Absent the entry of this statutory restraining order, the Defendant is likely to cause the dissipation or transfer assets and destruction of business records. As such, good cause for the freezing of Defendant's assets and for entry of an Order prohibiting the Defendant from destroying records and denying agents of the Commission access to inspect and copy records;

(4) Good cause exists for the freezing of Defendant's [*3] assets and for entry of an order prohibiting Defendant from destroying records and denying agents of

the Commission access to inspect and copy records;

(5) Good cause exists to permit asset discovery before the meeting of counsel pursuant to Rule 26(d) of the Federal Rules of Civil Procedure;

(6) Pursuant to Rule 30(a)(2) of the Federal Rules of Civil Procedure, immediate depositions are consistent with the principles of Rule 26(b)(2) for the Federal Rules of Civil Procedure;

(7) Weighing the equities and considering the Commission's likelihood of success in its claims for relief, the assurance of a statutory restraining order is in the public interest; and

(8) This is a proper case for granting an *ex parte* statutory restraining order to preserve the status quo, protect customers from loss and damage, and enable the Commission to fulfill its statutory duties, therefore the Court orders as follows:

1   Sections 4b(a)(2)(C)(i) and (C)(iii) and 4c(b) of the Commodity Exchange Act (the "Act").)

[*4]

2   Sections 33.10(a) and (c) of the Commission's Regulations (the "Regulations").

## DEFINITIONS

For the purposes of this Order, the following definitions apply;

1. "Assets" means any legal or equitable interest in, right to, or claim to, any real or personal property, including but not limited to chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds mail or other deliveries, inventory, checks, notes, accounts, credits, receivables, contracts, insurance policies, and all cash, wherever located, whether in the United States or abroad.

2. The term, "document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), and includes, but is not

limited to, writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations from which information can be obtained and translated, if necessary; through detection devices into reasonable usable form. A draft or non-identical copy is a separate document within the [*5] meaning of the term.

3. "Defendant" refers to Lazaro Jose Rodriguez ("Rodriguez") (d/b/a The FIRM "Financial" and as Financial Investments Require Money -- Financial Consultants) ("The FIRM") and any person insofar as he or she is acting in the capacity of an officer, agent servant, employee, or attorney of the Defendant and any person who receives actual notice of this Order by personal service or otherwise insofar as he or she is acting in concert or participation with the Defendant.

## RELIEF GRANTED

### *I. Asset Freeze*

**IT IS HEREBY ORDERED** that the Defendant, except as otherwise ordered by this Court, is restrained and enjoined from directly or indirectly:

A. Transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing dissipating, converting, withdrawing; or otherwise disposing of any assets, wherever located, including assets held outside the United States, except as provided in this Order, or as otherwise ordered by the Court;

B. Opening or causing to be opened any safe deposit boxes titled in the name or subject to access by Defendant.

### *II. Identification and Preservation of Assets*

[*6] **IT IS FURTHER ORDERED,** pending further Order of this Court; that any financial or brokerage institution or business entity that holds, controls, or maintains custody of any account or asset titled in the name of, held for the benefit of, or otherwise under the control of the Defendant, or has held, controlled, or maintained custody of any such account or asset of the Defendant at any time since March 2005

shall:

A. Prohibit the Defendant and all other persons from withdrawing, removing, assigning, transferring; pledging, encumbering, disbursing, dissipating, converting, selling or otherwise disposing of any such asset, except as directed by further order of the Court;

B. Deny Defendant and all their persons access to any safe deposit box that is titled in the name of Defendant or otherwise subject to access by Defendant;

C. Provide the Commission within five (5) business days of receiving a copy of this Order, a statement setting forth:

(1) the identification number of each such account or asset titled in the name of the Defendant or held on behalf of, or for the benefit of the Defendant or under the control of the Defendant;

(2) the balance [*7] of each such account, or a description of the nature and value of such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, the name of the person or entity to whom such account or other asset was remitted and

(3) the identification of any safe deposit box that is either titled in the name of the Defendant, or is otherwise subject to access by the Defendant;

D. Upon request by the Commission, promptly provide the Commission with copies of all records or other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, trading records, and safe deposit box logs; and

E. Cooperate with all reasonable requests of the Commission relating to implementation of this Order, including producing records related to Defendant's accounts.

### III. [*8]  *Accounting of Assets*

**IT IS FURTHER ORDERED** that within five (5) business days following the service of this Order, the Defendant shall:

A. Provide the Commission with a full accounting of all funds, documents, and assets both within and outs de the United States which arc (1) titled in the name of the Defendant; or (2) held by any person or entity, for the benefit of the Defendant; or (3) under the Defendant's direct or indirect control and

B. Provide the Commission access to all records of accounts or assets of the Defendant held by financial institutions located both within and outside the territorial United States by signing the Consent to Release of Financial Records attached to this Order.

### IV. *Maintenance of and Access to Business Records*

**IT IS HEREBY ORDERED** that Defendant, and all persons or entities who receive notice of this Order by

personal service or otherwise, are restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents that relate to the business practices or business finances of Defendant.

### V. Commission's [*9] Access to and Inspection of Documents

**IT IS FURTHER ORDERED** that representatives of the Commission be immediately allowed to inspect the books, record, and other documents of Defendant and his agents including, but not limited to, paper documents, electronically stored data, tape recordings, and computer discs, wherever they may be situated and whether they are in the possession of Defendant or others, and to copy said documents, data and records, either on or off the premises where they may be situated. Upon request of the Commission, the Defendant is ordered to deliver to the Commission documents if the Defendant, including but not limited to all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, cancelled checks, records of wire transfers, and check registers), lists of customers, title documents, other papers, all keys, computer passwords, entry codes, and combinations to locks necessary to gain or to secure access to any of the assets or documents of the Defendant, including but not limited to, access to the Defendant's business premises, means of communication, accounts, [*10] computer systems, or other property and information identifying the accounts, employees, properties, or other assets or obligations of the Defendant.

### VI. Service of Order

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile transmission, upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of the Defendant or that may be subject to any provision of this Order.

### VII. Expedited Asset Discovery

IT IS FURTHER ORDERED hat the Commission is granted leave, at any time after service of this Order, to take the deposition of and demand the production of documents from any person or entity for the purpose of discovering the nature, location, status, and extent of assets of the Defendant, and the location of documents

reflecting the business transactions of the Defendant; forty-eight (48) hours notice shall be deemed sufficient for any such deposition and five (5) days notice shall he deemed sufficient for the production of any such documents.

### VIII. Depositions

**IT IS FURTHER ORDERED** that the limitations and conditions set forth [*11] in Federal Rule of Civil Procedure 30(a)(2)(B) regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Order. No depositions taken pursuant to Paragraph VII s all count toward the ten-deposition limit set forth in Federal Rule of Civil Procedure 30(a)(2)(A).

### IX. Service on the Commission

**IT IS FURTHER ORDERED** that the Defendant shall serve all pleadings, correspondence, notices required by this Order, and other materials on the Commission by delivering a copy to Linda Y. Peng, Senior Trial Attorney, Division of Enforcement, U.S. Commodity Futures Trading Commission, Eastern Regional Office. 140 Broadway, 19th Floor, New York, New York 10005.

### X. Order to Show Cause

**IT IS FURTHER ORDERED** that Defendant shall appear before this Court on the 17 day of February, 2006 at 11:00 a.m., at Room 21A, before the Honorable Judge Buchwald at the United States Court house for the Southern District of New York, 500 Pearl Street, New York, NY 10007,, so show cause why this Court should not enter a preliminary injunction.

A. Enjoining [*12] the Defendant from further violations of the Act; specifically, prohibiting the Defendant from violating Sections 4b(a)(2)(i) and (iii) and 4c(b) of the Act, and 7 U.S.C. § 6b(a)(2)(C)(i) and (C)(iii) (2002), and Section 33.10(a) and (c) of the Regulations, 17 C.F.R. § 33.10(a) and (c) (2005), including but not limited to, (1) misappropriating customer funds for personal use and benefit and (2) defrauding customers by guaranteeing profits in trading commodity futures and options; and prohibiting the Defendant from engaging in any commodity-related activity, including soliciting customer funds;

B. Continuing the freeze on the assets of the Defendant;

C. Ordering the Defendant, financial or brokerage institutions, business entities, and others to provide all documents specified in this Order to the Commission; and

D. Ordering any additional relief this Court deems appropriate.

Should the Defendant wish to file a memorandum of law or other papers concerning the issuance of a preliminary injunction against the Defendant, such materials shall be filed, served and received by all parties at least two (2) days before the hearing date ordered [*13] above.

## XI. Force and Effect of Order

**IT IS FURTHER ORDERED** that this Order shall remain in full force and effect until further order of this Court, and that this Court retains jurisdiction of this matter for all purposes

**ORDERED** that Security in the Amount of $ be Posted by 2006 (Bond Requirement Waived - Federal Agency)

**SO ORDERED,**

On this 3 day of February 2006.

The Honorable Judge Kimba M. Wood

United States Distract Court

Southern District of New York

PATRICIA A. SEDLAK, ET AL v. MICHAEL LOTTO, ET AL

NO. CV 92 328128

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW
HAVEN, AT NEW HAVEN

1994 Conn. Super. LEXIS 3041

November 29, 1994, Decided
December 1, 1994, FILED

NOTICE:          [*1]      THIS DECISION IS
UNREPORTED AND MAY BE SUBJECT TO
FURTHER APPELLATE REVIEW. COUNSEL IS
CAUTIONED TO MAKE AN INDEPENDENT
DETERMINATION OF THE STATUS OF THIS CASE.

JUDGES: Beverly J. Hodgson, Judge of the Superior
Court

OPINION BY: Beverly J. Hodgson

OPINION

MEMORANDUM OF DECISION

The Defendants, Michael Lotto and BIC
Corporation, have moved to strike certain counts of the
complaint. Specifically, defendant Lotto has moved to
strike the second, third and fourth counts of the plaintiff's
third amended complaint on the ground that each of these
counts fails as a matter of law to state a cause of action.
Defendant BIC Corporation has moved to strike the same
three counts plus counts five and eight. Though only
defendant Lotto's motion was printed on the short
calendar, all parties agreed that BIC's motion to strike
should be heard at the same time. This court will
therefore decide both motions.

Standard of review

The function of a motion to strike is to test the legal
sufficiency of a pleading. Practice Book § 152; _Ferryman
v. Groton,_ 212 Conn. 138, 142, 561 A.2d 432 (1989). A

motion to strike admits all facts well pleaded; _Cyr v.
Brookfield,_ 153 Conn. 261, 263, 216 [*2] A.2d 198
(1965); and the allegations of the complaint are to be
given the same favorable construction as a trier of fact
would be required to give them in admitting evidence
under them. _Ferryman v. Groton,_ 212 Conn. 138, 142,
561 A.2d 432; _Benson v. Housing Authority,_ 145 Conn.
196, 199, 140 A.2d 320 (1958). Facts necessarily implied
by the allegations of a complaint are sufficiently pleaded
and need not be expressly alleged. _Bouchard v. People's
Bank,_ 219 Conn. 465, 471, 594 A.2d 1 (1991); _Ferryman
v. Groton,_ 212 Conn. 138 146, 561 A.2d 432. If any facts
provable under the express and implied allegations in the
plaintiff's complaint support a cause of action, the
complaint is not vulnerable to a motion to strike.
_Bouchard v. People's Bank,_ 219 Conn. 465, 71, 594 A.2d
1; _Senior v. Hope,_ 156 Conn. 92, 97-98, 239 A.2d 486
(1968).

Second Count

In the second count of her complaint, as amended,
the plaintiff alleges that defendant Lotto, her supervisor
in the shipping department at BIC Corporation, made and
published to her co-workers demeaning and defamatory
statements which she claims constituted "slander per se"
(Third Amended Complaint, Count [*3] Two, para. 9).
Both Defendants assert that the statements alleged to
have been made by defendant Lotto are not, as a matter of
law, actionable defamation _per se_ and that this count
should therefore be stricken as failing to state a cause of
action.

The plaintiff has characterized the Second Count of
her complaint as one raising a claim of defamation _per se._

Page 1

Specifically, the plaintiff alleges that

almost every day during 1990, defendant Lotto repeated and published personal, intrusive, demeaning and defamatory statements about the plaintiff in front of co-workers at the break table and at other times, concerning plaintiff's personal and professional life, physical habits and appearance, and sexual and moral characteristics, including:

a) that there was a big, black sweaty truck driver on the dock and that from now on all of the black drivers were for me [sic] because they were her kind of people;

b) that the only reason she and her husband were married so long was because her husband worked the day shift and she worked the night shift so he didn't have to put up with her;

c) asked why Plaintiff never changed her clothes;

d) asked why Plaintiff [*4] always wore the same shirt;

e) that her boots weren't becoming to a woman;

f) that her clothes were too tight and she was putting on too much weight;

g) that she should walk alongside her forklift instead of driving it so that she could take off that weight;

h) that she was too old to have children;

i) that she paid too much money for her haircut;

j) that she was not dressed as a woman should be dressed;

k) that, after she commented to her coworkers that she didn't graduate from high school, that's why she was so stupid;

l) why Plaintiff didn't take a bath before she put her clothes on;

m) why does she always wear that tee-shirt.

In responding to the Defendants' motions to strike, the plaintiff acknowledges that a cause of action for slander *per se,* that is, slander actionable without the need to prove actual damages, is limited under Connecticut law to a very few kind of statements which are recognized as so likely to cause damages that no actual proof of damage is required: 1) commission of a crime involving moral turpitude; 2) infection with a loathsome disease; 3) incompetence in business, trade or profession, 4) imputation [*5] of unchaste character. Wright Fitzgerald, and Ankerman, Connecticut Law of Torts § 147 (3d ed. 1991); *Moriarty v. Lippe,* 162 Conn. 371, 294 A.2d 326 (1972).

Under Connecticut Law, words of abuse that charge specific bad acts or constitute "general abuse" are not within the four categories identified above. *Moriarty v. Lippe,* 162 Conn. 371, 385, 294 A.2d 326; *Zeller v. Mark,* 14 Conn. App. 651, 655, 542 A.2d 752 (1988).

In response to the defendants' motion, and apparently recognizing the limitations of *Moriarty,* the plaintiff has narrowed her claim to a single one of the alleged

slanderous statements by defendant Lotto: "a) that there was a big, black sweaty truck driver on the [loading] dock and that from now on all of the black truck drivers were for me [sic] because they were her kind of people."

The plaintiff asserts that the words "for her" meant that she would be sexually interested in the persons described and that such a statement constituted an allegation that she was unchaste and sexually active outside her marriage. The defendants assert, unpersuasively, that Lotto's statement should be taken as a comment on the plaintiff's racial tolerance rather [*6] than on her sexual availability. The Appellate Court in _Miles v. Perry_, 11 Conn. App. 584, 603, 529 A.2d 199 (1987) noted that words claimed to be libelous should not be enlarged by innuendo but "must be accorded their common and ordinary meaning." For purposes of a motion to strike, the court finds that the plaintiff has accurately identified the ordinary meaning of the statement at issue and that the allegation that defendant Lotto made this statement is sufficient to allege a cause of action sounding in slander _per se_ because the statement asserts that the plaintiff is unchaste. See _Ventresca v. Kissner_, 105 Conn. 533, 536, 136 A. 90 (1927); _Clauss v. Schofield_, 4 CSCR 557 (1989).

The defendants argue that an allegation of unchastity as to a married person should no longer be cognizable as slander _per se_ because of the decriminalization of adultery in Connecticut. General Statutes § 53a-81, which made adultery a crime, was repealed by P.A. 91-19 § 2. The movants contend that it was the criminal nature of unchastity, not the moral issue, that made a claim of unchastity actionable as slander _per se_ and that this court should ignore the historic recognition [*7] of the harm of such an allegation and instead apply "modern meanings and morals." Since adultery still has serious consequences under other laws, notably, the standards concerning fault in dissolution of marriage, _General Statutes § 46b-40_, this court declines the invitation to abandon longstanding tort law without guidance from Connecticut Supreme Court.

All of the other statements set forth at paragraph 6 of the second count of the third amended complaint constitute verbal abuse of a general nature that is not actionable as slander _per se_. The motion to strike of Defendant Lotto is granted as to all allegations of slander _per se_ in the second count except the one alleged at paragraph 6 (a), discussed above.

Defendant BIC Corporation has also moved to strike the claims of slander _per se_ made against it by the plaintiff in the second count. The plaintiff has not claimed that the alleged statement about her sexual availability was made by defendant Lotto acting on behalf of defendant BIC Corporation; rather, the claims against BIC in the second count are 1) that BIC failed to order Lotto to cease such comments "thereby condoning said acts and conduct and adopting them [*8] as its own." (Second Count, para. 11) and 2) that BIC falsely told all employees in the shipping department that a complaint had been made about offensive and vulgar language at the break table and chastised employees.

BIC claims that the second claim is not actionable as slander _per se_. This court finds that advising other employees of the plaintiff's complaint about abusive language at the break table does not fall within any of the categories held to be actionable as slander _per se_. BIC's motion to strike that claim is therefore granted, as is its motion to strike the claim that it is liable for the alleged slanderous statement of defendant Lotto, since the plaintiff has failed to allege agency or authorization.

_Third and Fourth Count_

In the third count of her third amended complaint, the plaintiff alleges that the defendants violated her privacy and gave unreasonable publicity to her personal and private matters by the repeated comments about her hygiene, intelligence, marital relationship and personal tastes in clothing and hair styling.

In the fourth count, the plaintiff asserts that the defendants put her in a false light.

The Connecticut Supreme Court recognized [*9] a cause of action for violation of a right to privacy in _Goodrich v. Waterbury Republican-American, Inc._, 188 Conn. 107, 448 A.2d 1317 (1982). The Court noted that the basic right "to be let alone" is violated by four types of intrusion: a) unreasonable intrusion upon the seclusion of another; b) appropriation of another's name or likeness; c) unreasonable publicity given to the other's private life; or d) publicity that unreasonably places the other in a false light before the public. _Goodrich v. Waterbury-Republican-American, Inc._, 188 Conn. 107 at 128, 448 A.2d 1317.

In commenting on the plaintiff's hygiene and relationship with her husband, the plaintiff does not assert

that defendant Lotto suggested that he actually possessed any private information about her, but only that he made remarks which, on their face, suggested that he was conjecturing or speculating about her hygienic preparations for coming to work and her relationship with her husband. Neither the cases cited by the plaintiff nor the Restatement of Torts nor any Connecticut case suggests that such utterances give rise to a claim for violation of privacy in any of first three varieties of that claim enumerated [*10] in *Goodrich*, though they may, of course, support other causes of action. The motion to strike the third count is therefore granted as to both defendants.

In the fourth count, the plaintiff alleges that the statements of Lotto and the statements of BIC's manager about a complaint of offensive and vulgar language puts the plaintiff in a false light, one of the varieties of invasion of privacy recognized in *Goodrich*.

The Supreme Court noted in *Goodrich, 188 Conn. 107 at 131, 448 A.2d 1317*, that

> The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true...and (2) is such a "major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position. [citation omitted].

The defendants base their argument in part upon a claim that the comments made were, as a matter of law, not misrepresentations. While a claim of putting a person in a false light may be defended by an attempt to establish that the light is instead a true one, see *Goodrich, 188 Conn. 107 at 131-32, 448 A.2d 1317*, such a finding cannot be made [*11] in the context of a motion to strike. Claims of inadequate intelligence and hygiene and of a loveless marriage are depictions that may be found to have reasonably been expected to cause offense to a reasonable person.

The motion to strike these claims against defendant Lotto is denied. The plaintiff has not alleged that Lotto's statements were made as an agent for BIC, and the motion to strike the fourth count is therefore granted as to BIC. The alleged statements of BIC's managers

concerning a report of vulgar and offensive language do not state a cause of action. The making of such reports is acknowledged by the plaintiff (Third Amended Complaint, second count, para. 10), and advising others that a complaint had been made cannot be found to have cast the plaintiff in a false light. Accordingly the motion to strike is granted as to all claims against BIC stated in the fourth count.

*Fifth Count*

In the fifth count of her third amended complaint, the plaintiff alleges numerous acts of harassment and criticism by defendant Lotto and claims that Defendant BIC failed to require Lotto to cease such treatment of the plaintiff and failed to remove him as her supervisor, thereby [*12] condoning the continuation of the conduct toward her. The plaintiff alleges that the defendant then or should have known that this situation would cause her emotional distress and that the distress has resulted in mental, emotional and physical harm to her (Third Amended Complaint, Fifth Count, paras. 14, 15).

Defendant BIC claims that the Worker's Compensation Act, General Statutes §§ 31-275-355a, supplies the exclusive remedy to the plaintiff and has moved to strike the fifth count on that basis.

Defendant BIC acknowledges that *§ 31-284 (a)* does not preclude a worker's cause of action for intentional torts because the Connecticut Supreme Court has recognized an exception: the statutory bar applies "unless the employer has committed an intentional tort or where the employer has engaged in wilful or serious misconduct." *Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 106, 639 A.2d 507 (1994)*.

Defendant BIC asserts that the exception for intentional torts is limited to intentional assaults, apparently because the *Jett v. Dunlap, 179 Conn. 215, 217, 425 A.2d 1263 (1979)* concerned an assault. The discussion of *Jett* in *Suarez* suggests no such limitation of the exception [*13] to intentional assaults, but suggests that *any* intentional tort by the employer remains actionable to avoid misuse of the bar of *§ 31-284 (a)*.

BIC is, however, on sound ground in its alternative argument, which is that the complaint must be of an intentional tort by the employer, and not such a tort by a supervisor acting on his own and not as the alter ego of the employer. As the Supreme Court noted in *Suarez, 229*

Conn. 99 at 106, 639 A.2d 507.

In *Jett*, we recognize the distinction between the actor who is "merely a foreman or supervisor" to which attribution of corporate responsibility for his or her conduct is inappropriate, and the actor who "is of such a rank in the corporation that he [or she] may be deemed the alter ego of the corporation under the standards governing disregard of the corporate entity," to which attribution of corporate responsibility is appropriate.

The Court noted in *Suarez* that the plaintiff in *Jett* had not alleged that the employer directed or authorized the conduct at issue but only that it condoned the conduct after the fact. The Court explained that since the injury resulted not from the employer's subsequent ratification [*14] of the conduct but from the supervisor's tort, the Court had held that the condonation was not an intentional tort and did not "relate back." *Suarez, 229 Conn. 99 at 107, 639 A.2d 507.*

The intentional tort at issue in *Jett* is described in that case, *Jett v. Dunlap, 179 Conn. 215 at 216, 425 A.2d 1263*, as an isolated incident in which a supervisor insulted and then struck the plaintiff employee. The ruling does not suggest that the plaintiff's employment continued after the incident and that he continued to be subjected to harassing behavior by the supervisor after reporting it to the employer.

The plaintiff in the case before this court alleges, in effect, that the employer left her under the supervision of a person who was continually subjecting her to abuse after she complained of such treatment and that this course of conduct, not the initial incident, constituted an intentional tort.

In *Suarez, 229 Conn. 99 at 112, 639 A.2d 507*, the Supreme Court noted that it was inappropriate to decide the issue of intentional injury as a matter of law upon a motion for summary judgment, because issues of intent must be decided in the context of facts and are "best left

[*15] to the jury." The plaintiff has sufficiently alleged that defendant BIC left her in a situation of abuse after she had made complaint, and this court does not find, as a matter of law, that the plaintiff has failed to state a cause of action for an intentional tort not barred by the Worker's Compensation Act.

The motion to strike the fifth count is denied.

*Eighth Count*

In the eighth count, the plaintiff claims that defendant BIC negligently inflicted emotional distress upon her by failing to prevent defendant Lotto's alleged conduct. This claim of negligence is subject to the bar of the Worker's Compensation Act. General Statutes § 31-284 (a).

The plaintiff does not claim that any exception exists to allow the claim made in this count.

The motion to strike the eighth count is granted.

*Conclusion*

*Second Count.* Motion to strike granted as to all allegations of slander *per se* except that alleged in paragraph 6a as to defendant Lotto; the motion is denied as to that claim and granted as to all slander defamation claims of this count as to defendant BIC.

*Third Count.* Motion to strike granted as to both defendants.

*Fourth Count.* Motion to strike [*16] denied as to defendant Lotto, granted as to defendant BIC.

*Fifth Count.* Motion to strike denied.

*Eighth Count.* Motion to strike granted.

Beverly J. Hodgson

Judge of the Superior Court

11/30/94

PATRICK WILEN, Plaintiff, - against - ALTERNATIVE MEDIA NET, INC. and
CLAUDIO R. LOVO, Defendants.

03 Civ. 2524 (RMB) (JCF)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 1034; 74 U.S.P.Q.2D (BNA) 1053; Copy. L. Rep. (CCH)
P28,934

January 25, 2005, Decided
January 26, 2005, Filed

**PRIOR HISTORY:** Wilen v. Alternative Media Net,
Inc., 2004 U.S. Dist. LEXIS 24686 (S.D.N.Y., Dec. 3,
2004)

**DISPOSITION:** [*1] Magistrate's recommendation
adopted. Judgment entered in favor of plaintiff and
against defendants with post-judgment interest.

**COUNSEL:** For Patrick Wilen, Plaintiff: Andrew
Berger, Tannenbaum, Helpern, Syracuse & Hirschtritt,
L.L.P., New York, NY.

**JUDGES:** Richard M. Berman, U.S.D.J.

**OPINION BY:** Richard M. Berman

**OPINION**

*DECISION AND ORDER*

**I. Background**

On April 11, 2003, Patrick Wilen ("Plaintiff") filed a
complaint against Alternative Media Net, Inc.
("AltMedia" or the "corporation") and its President,
Claudio R. Lovo ("Lovo") (collectively, "Defendants")
alleging copyright infringement under the Federal
Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§
101 et seq. (See Complaint, dated April 10, 2003
("Complaint" or "Compl.") PP1, 9.) Plaintiff, a
professional photographer, asserts that in late 2002 or

early 2003, AltMedia and Lovo appropriated seven
photographs copyrighted by Plaintiff and "copied them
without authorization on AltMedia's web site called
'tvchismes.com.'" (Compl. PP1, 2, 21, 22, 32.) AltMedia
was alleged to have replaced Plaintiff's copyright notice
[*2] on these photographs "with a prominent yellow
banner stating "Tvchismes.com." (Compl. P27.)

In May, June, and July of 2003, Lovo, acting without
counsel and purportedly on behalf of himself and the
corporation, AltMedia, attempted to move to dismiss the
action. (See Defendant's Sworn Motion to Dismiss, dated
May 28, 2003; Letter from Lovo to the Court, dated June
23, 2003 ("June 23, 2004 Letter"); Letter from Lovo to
the Court, entitled "Motion to Dismiss," dated July 7,
2003 ("July 7, 2003 Letter").)

At the initial pre-trial conference with the Court held
on July 8, 2003, at which Lovo appeared, the Court
dismissed Lovo's proposed motion to dismiss "without
prejudice," stating that the Court was "not going to accept
[the proposed motion] at this time because it purports to
be made on behalf of both [Lovo] and the corporation
and, as we just said, the corporation needs to be
represented by counsel." (Transcript of Proceedings held
on July 8, 2003 ("Tr."), at 3-4; see also Order, dated July
8, 2003). The Court advised Lovo that "a corporation
must be represented by counsel" and directed that he
obtain counsel for AltMedia by July 29, 2003. [1] (Tr. at 2;
Case Management [*3] Plan, dated July 8, 2003). At the
July 8, 2003 conference, Lovo indicated that he would
continue to represent himself *pro se.* (Tr. at 2.) By letter
dated July 28, 2003, Lovo informed the Court that "I

cannot comply with your order" to obtain counsel for AltMedia because "I don't have any financial capacity to afford counsel." (Letter from Lovo to the Court, dated July 28, 2003.)

> 1. In attempting to move to dismiss, Lovo failed to follow the Court's individual rules, which require premotion conference letters. The Court directed Lovo to comply with this rule on two separate occasions. (*See* Order, dated June 9, 2003; Tr. at 2.)

Both Lovo and AltMedia subsequently (*i.e.* after the purported motion to dismiss was denied without prejudice) failed to answer the Complaint and, despite notice, failed to appear at a scheduled conference with the Court on December 29, 2003. On or about June 7, 2004, Plaintiff moved for default judgment by way of an order to show cause. (*See* Order to Show Cause [13].) Defendants [*4] did not file any response to this application and, despite notice, again failed to appear on the hearing date of July 6, 2004. A default judgment against both Defendants was signed by the Court on that date, and the matter was referred to United States Magistrate Judge James C. Francis, IV, for an inquest to determine damages. (*See* Default Judgment Order, dated July 6, 2004; Order of Reference to a Magistrate Judge, dated July 6, 2004.) An inquest was held by Magistrate Judge Francis on August 20, 2004, and again, despite notice, Defendants failed to appear.

On December 6, 2004, Magistrate Judge Francis issued a thoughtful and comprehensive Report and Recommendation ("Report") recommending that "judgment be entered in favor of the plaintiff and against the defendants, jointly and severally, in the amount of $ 180,888.42 ($ 140,000 in copyright damages and $ 40,888.42 in attorneys' fees and costs)." (Report at 7.) The Report also found that Plaintiff had "registered each of his photographs and has not authorized the defendants to utilize them. AltMedia, as directed by Mr. Lovo, copied seven of the photos and displayed them on the 'members only' section of its Web site. Accordingly, [*5] the defendants have engaged in copyright infringement." (Report at 4) (citations omitted.) On December 20, 2004, Lovo submitted objections to the Report, purportedly on behalf of himself and the corporation. [2] (Defendant Lovo's "Appeal and Objection," received December 20, 2004 ("Lovo Obj.")) Plaintiff responded to these objections by letter dated January 6, 2005.

> 2  To the extent Lovo's objections purport to be lodged on behalf of AltMedia, they need not be considered because corporations may not appear *pro se*, as Lovo is well aware. *See, e.g., Jacobs v. Patent Enforcement Fund, Inc.,* 230 F.3d 565, 568 (2d Cir. 2000) (holding that a corporation cannot appear *pro se*); *S.E.C. v. Research Automation Corp.,* 521 F.2d 585, 589 (2d Cir. 1975) (holding that a corporation cannot appear except through an attorney and "where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it.").

**For the reasons set forth below, the Court adopts [*6] the Report in all material respects.**

## II. Standard of Review

The Court may adopt those portions of a magistrate judge's report to which no objections have been made and which are not facially erroneous. *See* Fed. R. Civ. P. 72(b); *see, e.g., Pizarro v. Bartlett,* 776 F. Supp. 815, 817 (S.D.N.Y. 1991); *Nelson v. Smith,* 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985). The Court conducts a *de novo* review of those portions of the report to which timely objections have been made. *See, e.g., Pizarro,* 776 F. Supp. at 817. Once objections have been received, a district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the magistrate judge. *See, e.g., Deluca v. Lord,* 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994); *Walker v. Hood,* 679 F. Supp. 372, 374 (S.D.N.Y. 1988).

Where, as here, a party is proceeding *pro se,* "lenience is generally accorded." *Bey v. Human Res. Admin.,* 1999 U.S. Dist. LEXIS 6302, No. 97 Civ. 6616, 1999 WL 31122, at *2 (E.D.N.Y. Jan. 12, 1999).

## III. Analysis

The facts as set forth in the Report are incorporated herein unless otherwise [*7] noted.

The Court has reviewed Lovo's objections, the record and applicable legal authorities, and has conducted a *de novo* review. There is no basis to depart from the Report's recommendations. [3]

> 3  As to any portions of the Report to which no objections have been made, the Court concludes that the Report is not clearly erroneous. *See*

_Pizarro v. Bartlett, 776. F. Supp. 815, 817 (S.D.N.Y. 1991)_. Any Objections that are not specifically discussed in this Order have been considered _de novo_ and rejected.

In his objections, Lovo raises what appears to be a defense to liability arising out of his and the corporation's use of Plaintiff's photographs. Based upon the allegations of the Complaint, Magistrate Judge Francis dealt with liability by finding that Plaintiff had registered his photographs, that "AltMedia, as directed by Mr. Lovo" copied and displayed the photographs without authorization, and "accordingly, the defendants have engaged in copyright infringement." (Report at 4.)

The Court, in its discretion and in the interest [*8] of giving a _pro se_ litigant "extra leeway," is treating this "Appeal and Objection" as a motion to set aside the entry of default. _See Meehan v. Snow, 652 F.2d 274, 276, 277 (2d Cir. 1981)_ ("Opposition to a motion for a default judgment can be treated as a motion to set aside the entry of default despite the absence of a formal _Rule 55(c)_ motion."); _see also Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993)_ (_pro se_ litigants are afforded "extra leeway in meeting the procedural rules governing litigation"). [4]

> [4] _Fed. R. Civ. P. 55(c)_ permits the Court to set aside an entry of default "for good cause shown." _See Fed. R. Civ. P. 55(c)_; _see also Enron, 10 F.3d at 95_.

### A. Liability

Lovo asserts, as he did in his purported motion to dismiss (_see_ June 23, 2003 Letter; July 7, 2003 Letter), that his (and his corporation's) use of Plaintiff's photographs is protected by the "fair use" doctrine. (Lovo Obj. at 2-3.) Lovo contends:

> TVCHISMES. [*9] COM made a parody named 'The Magic of Photoshop 7.0' and made 'fair use' of certain pictures of the Plaintiff from a calendar entitled Sissi 2003. We have featured before [on the website] and made a parody of the noticeable 'digital retouching' that the photographer and her make up artist made on the said calendar. In order to illustrate our point, we made 'fair use' of the Plaintiff picture 'cycle photo' and clearly

labeled a parody in the Spanish text accompanying a series of photos and video captures.

(_Id_. at 2.)

Courts have generally considered three factors in determining whether to set aside a default: "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." _Enron, 10 F.3d at 96_.

### Willfulness

Lovo's default was wilful. "[A] default may be found to have been willful where the conduct of counsel or the litigant was egregious and was not satisfactorily explained." _Gonzalez v. City of New York, 104 F. Supp. 2d 193, 196 (S.D.N.Y. 2000)_ (citing _S.E.C. v. McNulty, 137 F.3d 732, 738-39 (2d Cir. 1998)_). Lovo [*10] has not made a serious effort to comply with the Court's directions in this case. He has not attempted to defend the case appropriately after his proposed motion to dismiss was not accepted on July 8, 2003. Despite notice, he failed to appear at court proceedings on at least three separate occasions. He has not found counsel for AltMedia and has not indicated that the corporation has ceased business operations. [5] Accordingly, Lovo's default was willful. _See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)_ (corporate president's "failure to appear for a deposition, dismissing counsel, giving vague and unresponsive answers to interrogatories, and failing to appear for trial were sufficient to support a finding that he had 'failed to plead or otherwise defend' under _Federal Rule Civil Procedure 55_."); _SEC v. U.N. Dollars Corp., 2003 U.S. Dist. LEXIS 1099, No. 01 Civ. 9059, 2003 WL 192181, at *1 (S.D.N.Y. Jan. 28, 2003)_ ("While leeway is often afforded to _pro se_ litigants regarding knowledge of legal procedure . . . _pro se_ defendants are still required to make a good faith effort to comply with Federal Rules in their defense of a civil action.") (citation [*11] omitted).

> [5] Indeed, the fact that Lovo's objections purport to concern "my corporation and me" suggests that AltMedia is still in operation. (Lovo Obj. at 5.)

### Defense

Lovo asserts (unpersuasively) that his and AltMedia's appropriation of the photographs copyrighted

by Plaintiff constituted "fair use." (Lovo Obj. at 2-3.) "Fair use" of a copyrighted work includes use for "purposes such as criticism, comment, news reporting, teaching, scholarship, or research." 17 U.S.C. § 107. Whether a particular use constitutes a "fair use" within the meaning of the statute is determined by reference to the following four factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted [*12] work." *Id.* These factors are to be considered together, and no single one is dispositive. *See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577-78, 127 L. Ed. 2d 500, 114 S. Ct. 1164 (1994).*

Lovo has not shown "fair use." Plaintiff sought default judgment with respect to only the first claim in the Complaint, namely that Lovo and AltMedia copied seven photographs and placed them in a "membership section" of their website, altering these images by obliterating Plaintiff's copyright notice and replacing it with AltMedia's own label, "tvchismes.com." (*See* Compl. PP2, 24, 27, 33-39; *id.* Exs. A & C; Order to Show Cause at 1; Memorandum of Law in Support of Plaintiff's Application for a Default Judgment, dated June 7, 2004, at 3; Report at 2, 4.) Lovo's assertion that the use of Plaintiff's photographs was a parody relates entirely to address this claim and, instead, addresses only the second claim in the Complaint, which is not currently before the Court. [6] (*See* Lovo Obj. at 2-3; *see also* Compl. PP22-23, 40-45; *id.* Ex. B.) As the willful concealment of the copyright notices on the seven photographs at issue constituted the only change to those photographs, any defense based upon [*13] these photographs being a parody lacks merit. *See Campbell, 510 U.S. at 578-79* (holding that the heart of the fair use inquiry "is to see . . . whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new . . . altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'"); *On Davis v. The Gap, Inc., 246 F.3d 152, 174-76 (2d Cir. 2001)* (same).

6  Plaintiff's second claim concerns two of the seven photographs, reproduced in a public section of AltMedia's website, to which the Defendants

made additional changes. (*See* Compl. PP2, 22-23, 40-45; *id.* Ex. B.) Plaintiff's motion for default judgment and, consequently, the default judgment, make no mention of this second claim. (*See* Order to Show Cause at 1; Memorandum of Law in Support of Plaintiff's Application for a Default Judgment, dated June 7, 2004, at 3; Report at 2, 4.)

### [*14] *Prejudice*

While delay, standing alone, does not establish prejudice, *Enron, 10 F.3d at 98,* Plaintiff would be prejudiced if entry of default were set aside "given that the case has already been delayed extensively . . . and that allowing [Lovo] to continue to defend would cause substantial further delay in concluding the case . . . ." *S.E.C. v. Alexander, 2004 U.S. Dist. LEXIS 12001, No. 00 Civ. 7290, 2004 WL 1468528, at *6 (S.D.N.Y. June 28, 2004)* (finding prejudice where defendant had failed to respond to complaint within time frame specifically prescribed by the court and "failed to participate in any meaningful way in the discovery process"). Lovo has refused to follow the Court's instructions, including obtaining counsel for the corporation, AltMedia. He has failed to appear at court proceedings on at least three separate occasions. And, he has defiantly asserted that "even if there is a judgment against my corporation and me, [Plaintiff] will never be able to collect it." (Lovo Obj. at 5.) There is no reason to believe that Lovo will be cooperative should this case be permitted to progress.

Further, setting aside entry of default is not warranted here as Lovo [*15] has not shown good cause and the Court has found that the "willfulness" and "meritorious defense" factors weigh heavily against him. *See Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 244 (2d Cir. 1994).*

### B. Objections As To Damages

Lovo asserts that he "never profited from the posting of Plaintiff's photos" because the "significant number of 'hits' that the Plaintiff states [the website in question] received, does not mean that every 'hit' paid $ 9.95 . . . . The site is free except for an insignificant paid membership that does not exceed 30 [or] 40 per month." (Lovo Obj. at 2.) Lovo also contends that he "is not a wealthy individual" and that "even if there is a judgment against my corporation and me, they will never be able to collect it." (*Id.* at 4-5.) He asks "What's the purpose of

continuing with this?" (*Id.*)

The Copyright Act provides that a copyright owner may elect between actual damages or statutory damages at any time before final judgment is rendered. 17 U.S.C. § 504(b) & (c). Magistrate Judge Francis correctly found that "in this case, the plaintiff has elected statutory damages" under the Copyright [*16] Act. (Report at 4.) Magistrate Judge Francis also correctly determined that:

> Given the absence of evidence presented to the Court regarding the parties' profits and losses . . . . I must rely principally on the fact that the defendants' action were willful, as evidenced by its blatant concealing of the copyright notice appearing on each photo. Furthermore, the need to deter AltMedia and others from committing similar violations in the future supports [statutory damages of] $ 20,000 for each of the seven infringed photos.

(*Id.* at 5-6) (citing *Eastern Am. Trio Prods. v. Tang Elec. Corp.*, 97 F. Supp. 2d 395, 419 (S.D.N.Y. 2000); *ASA Music Productions v. Thomsum Elecs.*, 49 U.S.P.Q. 2d 1545, 1552 (S.D.N.Y. 1998)).

Lovo's contention that he did not profit from the infringement does not mitigate Magistrate Judge Francis' assessment of damages, which, as noted above, is based principally on the Defendants' willful infringement.

(Report at 5.) Lovo's contention that he will be unable to pay any damages is also unpersuasive. Although the Court has discretion to award a plaintiff statutory damages within a range set by the Copyright [*17] Act "as the court considers just," 17 U.S.C. § 504(c)(1) & (2); *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1116 (2d Cir. 1986), a defendant's ability to pay damages is not generally a factor that is considered in determining the amount of statutory damages awarded under the Act. *See, e.g., Fitzgerald*, 807 F.2d at 1116-17. The Court perceives no legal or equitable basis to disturb Magistrate Judge Francis' recommendations as to damages.

**IV. Conclusion and Order**

For the reasons stated herein and therein, the Court adopts Magistrate Judge Francis' Report [17]. The Clerk of the Court is respectfully directed to enter judgment in favor of Plaintiff and against the Defendants, jointly and severally, in the amount of $ 140,000 in copyright damages and $ 40,888.42 in attorneys' fees and costs, for a total of $ 180,888.42. Plaintiff is also awarded post-judgment interest calculated from the date of entry of this Order of Judgment. 28 U.S.C. § 1961.

Dated: New York, New York

January 25, 2005

**Richard M. Berman, U.S.D.J.**