# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DOE I, and DOE II, | Case No. 3:07CV00909 (CFD) |
| Plaintiffs, | |
| v. | September 10, 2008 |
| Matthew C. Ryan, a.k.a. ":D"; and individuals using the following pseudonyms: pauliewalnuts; neoprag; STANFORDtroll; lkjhgf; yalelaw; Spanky; ylsdooder; HI; David Carr; vincimus; Cheese Eating Surrender Monkey; A horse walks into a bar; The Ayatollah of Rock-n-Rollah; DRACULA; Sleazy Z;  Whamo; Ari Gold; Ugly Women; playboytroll; Dean_Harold_Koh; kr0nz; reminderdood; r@ygold; who is; Joel Sche11hammer; Prof. Brian Leiter; hitlerhitlerhitler; lonelyvirgin; Patrick Zeke <patrick8765@hotmail.com>; Patrick Bateman <batemanhls08@hotmail.com>; [DOE I] got a 157 LSAT; azn, azn, azn; Dirty Nigger; leaf; t14 gunner; kibitzer; yalels2009; AK47, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO "A HORSE WALKS INTO A BAR"'S *A.K.A.* RYAN MARINER'S MOTION TO DISMISS

### I.      INTRODUCTION

Defendant "A Horse Walks Into a Bar" *a.k.a.* Ryan Mariner ("Mariner") offers three

reasons why the Court should dismiss Plaintiffs' Second Amended Complaint ("Complaint").

Each fails:

(1)  Mariner's attempt to avoid liability *as a matter of law* for his misconduct is

unfounded.  He admits to posting sexually-explicit comments about one of the plaintiffs in this

case, but ignores the key context:  that the statements came on the heels of *hundreds* of

threatening, defamatory, and disgusting comments that had been posted about that plaintiff on

Dockets.Justia.com

the same Internet message board, which Mariner knew was frequented by the plaintiff's peers and easily viewable by anyone on the Internet. In these circumstances, Mariner's statements form the basis for Plaintiff DOE II's claims against Mariner for intentional and negligent infliction of emotional distress, and libel, and are not subject to dismissal as a matter of law.

(2) Mariner's criticism of the Complaint as failing the "well-pleaded complaint" rule is wrong. He misinterprets the governing standard and, more importantly, attempts to apply eighteenth-century formalism to a twenty-first-century case. Plaintiffs have filed suit based on anonymous conduct linked to specific accounts on the AutoAdmit website and the Hotmail email service. It would make no sense to assert specific causes of action against each such user name, because the same person may in fact have registered and used multiple user names.

(3) Contrary to Mariner's assertion, Plaintiffs did not intentionally delay prosecuting their claims against Mariner. Quite the opposite: Plaintiffs diligently engaged in discovery to uncover the real identity of A Horse Walks Into a Bar, and immediately after they learned that that defendant might be Mariner, they tried numerous times to subpoena Mariner. But he dodged service for several weeks. Thus, if anyone delayed the prosecution of this case, it was Mariner, not Plaintiffs.

For these reasons and others set forth below, the Court should deny Mariner's motion to dismiss. Should the Court grant Mariner's motion, it should afford Plaintiffs leave to amend as to him.

## II.    FACTUAL BACKGROUND

Plaintiffs summarize only the facts relevant to Mariner's motion to dismiss. In brief, AutoAdmit.com is an Internet discussion board on which participants post and review comments and information about undergraduate colleges, graduate schools, and law schools. The web site, which describes itself as "[t]he most prestigious law school discussion board in the world," draws between 800,000 and one million visitors per month. *See* Second Amended Complaint

("Complaint") ¶ 10.  Anyone who uses the Internet and visits the AutoAdmit site, either directly or via an Internet search engine such as Google, may view the messages posted to the discussion board.  Individuals who register with the AutoAdmit site may, but are not required to, provide their real names.  *See id.* ¶¶ 12-14.  Registered AutoAdmit users may post new messages and respond to the messages of other registered users.  *See id.*  After a participant posts a new message, any further comments or responses to the subject area of that message are collected as a "thread."   The threads on the AutoAdmit site can be found by searching on the site or through search engines such as Google.  *See id.*  By entering a person's name as a search term, a search engine will list various threads in which that name appears in search results.  *See id.*

A.     **Plaintiff DOE II becomes the victim of persistent harassment, threats, and defamation on AutoAdmit.com.**

In early February 2007, DOE II, then a first-year law student at Yale Law School, learned from one of her friends that she was the subject of a message thread on the AutoAdmit.com message board.  Complaint ¶¶ 8, 35.  Thereafter, DOE II visited the website and found the first of many messages about her, most of which consisted of attacks on her personality and her reputation, as well as containing many sexual and vulgar comments about her.  *Id.* ¶ 35.

The first message about DOE II that appeared on AutoAdmit was posted on January 31, 2007, by an anonymous poster using DOE II's initials as a pseudonym.  *Id.* ¶ 36.  In that message, the poster linked to a photo of DOE II and encouraged others to "Rate this HUGE breasted cheerful big tit girl from YLS."  *Id.*  Within a week, dozens of additional messages about DOE II appeared in this thread.  *See id.*  Many of the messages commented crudely on DOE II's breasts; others described in graphic detail the poster's desire to have sexual relations with her.  *See id.*  Even more disturbing, certain anonymous posters appeared to be among DOE II's classmates at Yale Law School.  In particular, one poster wrote a message describing DOE II's attire while she exercised at the law school gym, which prompted another user to post a

message suggesting that someone should follow DOE II to the gym, take her picture, and then post it on AutoAdmit. *Id.* ¶ 38.

In February 2007, various AutoAdmit posters launched a website devoted to "rating" female law students from schools around the country, "t14talent—The 'Most Appealing' Women @ Top Law Schools," located at http://t14talent.googlepages.com. *Id.* ¶ 39. ("t14" refers to some people's idea of the country's top 14 law schools.) DOE II's image was posted on the t14 webpage on February 20, 2007, in a thread entitled "YLS 1L CGWBT." *Id.* ¶ 40. ("CGWBT" is an acronym for "cheerful girl with big tits.")

**B.     "A Horse Walks Into a Bar" joins in the attacks against DOE II on AutoAdmit.**

By the end of February 2007, DOE II's name and image—and the attacks against her—had become well-known on AutoAdmit. On February 21, 2007, after hundreds of messages had been posted about DOE II on AutoAdmit and she had been "rated" by several anonymous posters on the t14talent website, an individual using the pseudonym "A Horse Walks Into a Bar" decided to pile on in the attacks against DOE II. Specifically, in response to a message stating "I want to titty fuck [DOE II] for persian new year", A Horse Walks Into a Bar posted a message stating "get in line," suggesting that there were numerous people who desired or planned to have sexual relations with DOE II, and that she would be a promiscuous, willing partner. *See id.* ¶ 42. Other posters responded to A Horse Walks Into a Bar's message by describing crude fantasies involving DOE II's breasts. *See id.* A Horse Walks Into a Bar described one such fantasy as follows: "I would make a sundae including (but not limited to) whip cream, chocolate sauce, sprinkles and a cherry." *Id.*

**C.     The harassment and defamation aimed at DOE II continues to proliferate on AutoAdmit and ultimately reaches her home, school and former employer.**

The harassment aimed at DOE II was not confined to the AutoAdmit website; ultimately, it made its way directly to the email inboxes of DOE II and the Yale Law School faculty.

Specifically, on March 9, 2007, an AutoAdmit poster using the moniker "Patrick Bateman" emailed DOE II and at least one member of the Yale Law School faculty the following message:

> Dear Yale Law faculty,
>
> I write to you now about a very important issue that affects a non-trivial number of you. Although you undoubtedly deal with self-entitled, spoiled students on a regular basis, there's one person in particular whose history I feel you must be made aware of before problems arise. [DOE II], a student in your 09 class, has a felon as a father who stole money . . . . Best of luck to you in managing this liability, it is regretful that the admissions process can't encapsulate the entire person.

Complaint ¶ 62. This message was posted as a thread on AutoAdmit.com the same day it was sent to the Yale Law School faculty. *Id.* ¶ 63.

The harassment and defamation aimed at DOE II on AutoAdmit.com continued to proliferate throughout the Spring of 2007. In early April 2007, one user falsely alleged that DOE II performed fellatio on the dean of Yale Law School for a passing grade, and another falsely claimed that she posed in *Playboy*. *Id.* ¶¶ 53-54. Eventually, the defamation and harassment made its way to DOE II's former employer: on April 28, 2007, an anonymous AutoAdmit user posted the following message—which he claimed to have sent to the law firm where DOE II was formerly a summer associate—on AutoAdmit.com:

> Greetings,
>
> I want to bring your attention to some information potentially harmful to your firm's reputation. Obviously your clients do not want to be represented by someone who is not of the highest character value, which is why I believe you should know a bit more about an employee of yours. I've recently discovered [DOE II] of Yale Law School is one of your summer hires. It is true that she does have a fine academic pedigree, but there is some distressing information about her readily available online. Some of what is written about her is of dubious value. Regardless, there is good reason to believe some of your clients may not be so careful in how they interpret what has been written—especially as to how it relates to the quality of your firm. Included below is a sample, but a simple Google search will return an even more extensive record.

*Id.* ¶ 65.

**D.**     **DOE II sues several anonymous AutoAdmit users, including A Horse Walks Into Bar, for, *inter alia*, emotional distress and harm to her reputation.**

On June 8, 2007, DOE II filed a complaint against several anonymous AutoAdmit posters, alleging, *inter alia*, libel, invasion of privacy, and negligent and intentional infliction of emotional distress. *See* Doc. # 1. In the complaint, DOE II describes the harm she experienced because of the harassing, threatening and defamatory postings on AutoAdmit, including the fact that she had been forced to seek therapy. *See id.* ¶ 42. In addition, DOE II alleged that defendants' conduct caused her physical illness and severe emotional distress, interfered with her educational progress, damaged her reputation, and caused her pecuniary harm. *Id.* ¶¶ 61, 90.

**E.**     **Plaintiffs learn that A Horse Walks Into a Bar is Ryan Mariner.**

In March 2008, Chip Vermette, an attorney at Litchfield Cavo LLP in Connecticut, contacted Plaintiffs' counsel to state that he was representing the defendant identified in the complaint as "A Horse Walks Into a Bar." Declaration of Rose Darling in Support of Plaintiffs' Opposition to Mariner's Motion to Dismiss, filed herewith, ("Darling Decl.") ¶ 2. In mid-March 2008, Plaintiffs attempted to subpoena Mariner for documents and deposition testimony. *Id.* ¶ 3. Mariner, however, evaded service, and after more than six attempts, Plaintiffs were unable to serve him personally. *Id.*, Ex. A.

Frustrated by Mariner's dodging of service, in April 2008, Plaintiffs' counsel asked Mr. Vermette (the attorney representing A Horse Walks Into a Bar) whether his client's real name was Ryan Mariner. Darling Decl. ¶ 4. Mr. Vermette refused to confirm or deny his client's real identity. *Id.*

On June 11, 2008, Plaintiffs' counsel told Mr. Vermette that they planned to amend the complaint to identify the real identities of certain defendants and were evaluating what action to take as to A Horse Walks Into a Bar. *Id.* ¶ 5. Once again, Plaintiffs' counsel asked Mr. Vermette whether Mariner was his client, and if so, whether he would agree to accept service of an amended complaint in the event that Plaintiffs decided to name Mariner as a defendant. *Id.*, Ex. B. Later that day, Anthony Collins, an attorney from Hoppe, Collins, & Ojeda LLC in

Atlanta, Georgia, contacted Plaintiffs' counsel to confirm that he and Mr. Vermette represented Ryan Mariner *a.k.a.* A Horse Walks Into a Bar. *Id.*, Ex. C.

On August 5, 2008, Plaintiffs filed a Second Amended Complaint. *Id.* ¶ 6; *see* Doc. # 51. Based on the information available at that time, and in an abundance of caution, Plaintiffs thought it was prudent not to identify Mariner as the real person behind the pseudonym "A Horse Walks Into a Bar." Darling Decl. ¶ 6. There was no pecuniary motivation behind this decision. *Id.* Thus, the amended complaint continued to name "A Horse Walks Into a Bar" as a defendant and did not identify that defendant by his real name, Ryan Mariner. *Id.*; *see generally* Doc. # 51. In addition, Plaintiffs explained in the complaint that while they had learned the real identities of several additional defendants in this case, they were seeking to resolve their claims against these defendants and therefore were continuing to identify them in the complaint by their AutoAdmit pseudonyms. *See* Doc. # 51 ¶ 4. Indeed, shortly after filing the Complaint, Plaintiffs' counsel reached out to Mariner's counsel to pursue settlement. Darling Decl. ¶ 7. Mariner's counsel ignored the overture, and responded with a motion to dismiss. *Id.*

## III. LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King's Spalding*, 467 U.S. 69, 73 (1984). The function of a motion to dismiss is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (*quoting Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that the plaintiffs have a valid claim for relief. *Bell Atl. Corp. v. Twombly*, --- U.S. ----, ----, 127 S.Ct. 1955, 1969 (2007); *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), *cert. granted*, *Ashcroft v. Iqbal*, --- U.S. ----, 128 S.Ct. 2931 (2008);

*Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

## IV.    ARGUMENT

**A.    Mariner has not carried his burden to prove that he is entitled to judgment as a matter of law on the entire Complaint.**

Plaintiff DOE II has pleaded three valid causes of action against A Horse Walks Into a Bar *a.k.a.* Ryan Mariner:  (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; and (3) libel.

### 1.    Plaintiffs have stated a claim against Mariner for intentional infliction of emotional distress.

To state a claim for intentional infliction of emotional distress, a plaintiff must plead facts showing (1) the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was severe.  *See Petyan v. Ellis,* 200 Conn. 243, 253 (1986).  "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!"  *Angiolillo v. Buckmiller*, 102 Conn. App. 697, 706 (2007), *cert. denied*, 284 Conn. 927 (2007).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine."  *Id.*

In this case, Mariner's statements that others should "get in line" to "titty fuck [DOE II] for persian new year" and that he wished to engage in vulgar acts involving DOE II's breasts qualifies as "extreme and outrageous."  *See* Complaint ¶ 42.  Such "sexually offensive" comments are the type of extreme and outrageous conduct for which the tort of intentional infliction of emotional distress provides redress.  *See, e.g.*, *Leone v. New England Commc'ns*, 32 Conn. L. Rptr. 72 (2002) (finding that defendant's conduct in placing "sexually offensive comments and pictures on his computer" and making sexual comments was extreme and

outrageous).

In his motion to dismiss, Mariner argues that his statements were "merely insulting or displayed bad manners" and therefore are not actionable. Mariner is wrong. In particular, Mariner ignores the unique context in which his statements were made, akin to throwing more fuel onto a fire that results in a more severe burn. His statements were posted on an Internet message board that he knew was frequented by DOE II's peers and publicly viewable to her family, friends and colleagues. *See* Complaint ¶¶ 10-12. In addition, at the time Mariner's comment appeared on AutoAdmit in late February 2007, DOE II had already endured months of threats, harassment and sexually-explicit taunting on the same message board. *See id.* ¶¶ 35-41. Furthermore, the harassment and defamation had already made its way to DOE II's home, school and former employer. *See id.* ¶¶ 62-65. By that time, AutoAdmit users, including Mariner, knew DOE II's full name, her email address, and where she went to school. *See id.* ¶¶ 35-61. Photos of her had been posted on the site; posters frequently talked about wanting to rape her; and others encouraged people to stalk her. *See id.* And even worse, *all* of these messages could be easily found on the Internet by merely typing DOE II's name into a search engine like Google. *See id.* ¶ 12.

Under these circumstances, Mariner's conduct was extreme and outrageous, and he knew or should have known that his statements would cause DOE II emotional distress. *See id.* ¶ 89. As a result of Mariner's statements, which came after DOE II had already endured months of harassment on AutoAdmit, DOE II suffered severe emotional distress, including physical illness. *See id.* ¶¶ 71, 92. At the least, it would be inappropriate and premature for the Court to weigh the statements' impact on DOE II and rule, as a *matter of law*, that she cannot seek redress.

Mariner's attempt to rely on *Arnold v. United States Int'l Video Stores, No. 3:93CV1976*, 1995 U.S. Dist. Lexis 18309 (D. Conn. July 21, 1995) is unavailing. That case, which was

decided on the evidence, not the pleadings, is factually different in several respects. In *Arnold*, the court found that an employer was entitled to summary judgment on an employee's claim for intentional infliction of emotional distress based on three incidents: (1) the employer's private remark to the plaintiff when they first met at a movie screening that she hold his bucket of popcorn to give him an excuse to reach between her legs; (2) the employer's private proposition to the plaintiff to accompany him to his hotel room; and (3) the employer's remark to three individuals, spoken outside of the employee's presence and discovered by her only after she resigned, that she was the "type that will blow you to get ahead." *Arnold*, 1995 U.S. Dist. Lexis 18309, *16-17. Here, unlike the comments made by the defendant in *Arnold*, Mariner's sexually-explicit comments were not simply made in private to DOE II or a few other people, they were *broadcast* on a website frequented by DOE II's classmates and peers and readily accessible to her friends, family and potential employers. Thus, potentially *thousands* of people or more were able to view Mariner's crude comments about DOE II, which, as discussed below, had the effect of lowering DOE II's reputation in the community and/or deterring other people from associating or dealing with her. *See* Complaint ¶ 71. This factual distinction, coupled with the lower standard of proof that DOE II must meet to survive a motion to dismiss, make this case distinguishable from *Arnold*.

Accordingly, DOE II has plead facts sufficient to state a claim against Mariner for intentional infliction of emotional distress, and thus the Court should deny Mariner's motion to dismiss.

### 2. Plaintiffs have stated a claim against Mariner for negligent infliction of emotional distress.

Unlike a claim for intentional infliction of emotional distress, in order to state a claim for negligent infliction of emotional distress, a plaintiff need not allege extreme and outrageous conduct on the part of the defendant. Rather, "[a] claim based on the negligent infliction of

emotional distress requires only that the actor's conduct be unreasonable and create an unreasonable risk of foreseeable emotional harm." *Olson v. Bristol-Burlington Health District*, 87 Conn. App. 1, 7, *cert. granted*, 273 Conn. 914 (2005) (appeal withdrawn, May 25, 2005). Thus, in order to state a claim of negligent infliction of emotional distress, the plaintiff must plead facts showing that (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446-47 (2003).

As discussed in Section A.1 above, Mariner's conduct created an unreasonable and foreseeable risk of causing DOE II emotional distress. In particular, Mariner should have known that his sexually-explicit statements about DOE II, piled on top of hundreds of other harmful statements broadcast on a website frequented by her classmates and peers, would cause DOE II emotional distress. *See* Complaint ¶¶ 97-98. These statements contributed to causing DOE II emotional distress, which was manifested in part by physical illness. *See id.* ¶ 71. Thus, DOE II has pleaded facts sufficient to state a claim for negligent infliction of emotional distress, and should not be subject to a ruling otherwise as a matter of law.

**3. Plaintiffs have stated a claim against Mariner for libel.**

Libel is written defamation. *Charles Parker Co. v. Silver City Crystal Co.*, 142 Conn. 605, 611 (1955). To state a claim for defamation under Connecticut law, DOE II must plead facts showing that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. *See Cweklinsky v. Mobil Chemical Co.*, 267 Conn. 210, 217 (2004) (citations omitted). "A defamatory statement is defined as a communication that tends to 'harm the reputation of another

as to lower him in the reputation of the community or to deter third persons from associating or dealing with him . . . .'" *Doe I v. Individuals*, 561 F. Supp.2d 249, 256 (D. Conn. 2008) (*quoting QSP, Inc. v. Aetna Casualty & Surety Co.*, 256 Conn. 343, 773 A.2d 906, 916 (2001)). Moreover, as this Court noted in *Doe I v. Individuals*, "in the similar context of slander (spoken defamation), any statement that imputes 'serious sexual misconduct' to a person subjects the publisher to liability, without any need to prove the special harms required for other slanderous speech." *Id. citing* 3 Restatement (Second), Torts § 574, at 195-96.

Mariner's statement that others should "get in line" to have sexual relations with DOE II is defamatory "because any discussion of DOE II's sexual behavior on the Internet tends to lower her reputation in the community." *Doe I*, 561 F. Supp.2d at 256. In particular, one who reads this statement could reasonably draw a false inference that DOE II is sexually promiscuous or that several people have had or plan to have sexual relations her. Moreover, because this statement—along with the hundreds of other offensive and defamatory comments that were posted about DOE II on AutoAdmit—was easily located on the Internet by performing a Google search for DOE II's name, it was easily viewable by her classmates, peers and potential employers. *See* Complaint ¶ 12. Mariner's statement—which was piled on top of many other defamatory statements—has contributed to causing DOE II emotional distress, including physical illness. *See id.* ¶ 71. Accordingly, DOE II has pleaded sufficient facts to state a claim for libel, and thus the Court should deny Mariner's motion to dismiss.

**B.     Mariner misreads the well-pleaded complaint rule.**

Mariner argues that Plaintiffs failed to meet the well-pleaded complaint standard because they did not assert specific causes against each pseudonymous defendant named in the Complaint. But that is not the law. The general pleading standard in federal court is one of notice, not code, pleading. *See* Fed. R. Civ. P. 8(a). That is, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." *Id.* "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, --- U.S. ----, ----, 127

S.Ct. 2197, 2200 (2007) (internal quotation marks omitted). Plaintiffs' choice in this case to bring their claims against "one or more defendants" comports with this standard, which, contrary to Mariner's assertion, does not require specification of every fact in support of every cause of action against every defendant. *R.S. ex rel. S. v. Ridgefield Bd. of Edu.*, 534 F. Supp.2d 284, 287 (D. Conn. 2008) (rejecting defendant's argument that plaintiff's negligence claim brought against all the defendants should be dismissed because plaintiff did not specify which allegations in the complaint applied to the defendant).

Moreover, even if Mariner's overly-strict view of the pleading standard were the law—it's not—applying that standard in this case would make little sense. Plaintiffs have filed suit for misconduct attributable to specific AutoAdmit user names and certain Hotmail email service accounts. But lawsuits proceed against people, not user names or email accounts. As has been seen by the pre-service discovery taken to date, some defendants have used multiple AutoAdmit user names. It would thus have been a pointless exercise to have required Plaintiffs to assert specific causes of action against each user name or email account.

As to Mariner, Plaintiffs opted not to name him directly in an abundance of caution, and because Plaintiffs intended to reach out to him to discuss settlement (which they did shortly after filing the Complaint). Now that he has made the tactical decision to out himself to the world, Plaintiffs have identified which specific causes of action pertain to Mariner. There is thus no prejudice as to Mariner; at the very least, should the Court grant Mariner's motion to dismiss, it should allow leave to amend for Plaintiffs to assert with greater specificity causes of action for intentional infliction of emotional distress, negligent infliction of emotional distress, and libel, for the reasons described in Section I above.

**C.      Plaintiffs have not intentionally failed to prosecute their claims against Mariner.**

Mariner's assertion that Plaintiffs failed to serve the complaint within the 120-day time frame required by Rule 4(m) of the Federal Rules of Civil Procedure is nonsensical. At the time Plaintiffs filed their original complaint, Plaintiffs did not know the real identities of any of the pseudonymous defendants in this case, including A Horse Walks Into a Bar. Plaintiffs of course

could not serve process on defendants who were unknown. Crediting this limitation, the Court granted Plaintiffs' request to engage in expedited discovery in order to uncover the defendants' identities. *See* Doc. # 23. As a logical follow up to that order, the Court extended the time for Plaintiffs to amend the complaint to replace the names of the pseudonymous defendants with the defendants' real names and to serve those defendants with process. *See* Doc. ## 35, 43 and 50. Thus, Plaintiffs did not intentionally fail to prosecute this case. To the contrary, Plaintiffs engaged in months of protracted discovery, diligently hunting down information leading to the defendants' identities in order to pursue their claims against them.

Similarly, Plaintiffs have diligently pursued their claims against A Horse Walks Into a Bar. In March 2008, after the Court granted Plaintiffs' motion for expedited discovery, Plaintiffs attempted to subpoena Mariner in order to discover whether he had posted messages on AutoAdmit under the pseudonym "A Horse Walks Into a Bar." *See* Darling Decl. ¶ 3. But because Mariner repeatedly dodged service, Plaintiffs were not able to confirm his identity at that time. *See id.* Moreover, it was not until June 11, 2008, the day that counsel for A Horse Walks Into a Bar identified his client as Ryan Mariner, when Plaintiffs finally were able to confirm that A Horse Walks Into a Bar and Mariner were the same person. *See id.* Ex. C. On August 5, Plaintiffs filed an amended complaint, and as a prudent measure based on the information available at that time, they continued to name Mariner by his pseudonym "A Horse Walks Into a Bar." *See* Complaint ¶ 4.

Plaintiffs' actions reveal that they have diligently pursued their claims against A Horse Walks Into a Bar, and in good faith refrained from revealing Mariner's true identity based on the information that was available to them. Indeed, Plaintiffs pursued settlement with Mariner immediately thereafter, and were met with silence—followed by his motion to dismiss.

\\

\\

\\

# V.    CONCLUSION

Mariner offers three flawed reasons for dismissing Plaintiffs' Complaint.  The Court should reject them all, and Mariner's motion to dismiss.  Should the Court grant Mariner's motion, it should afford Plaintiffs leave to amend as to him.

Dated: September 10, 2008

PLAINTIFFS DOE I AND
DOE II


By:    */s/ Ashok Ramani*
    Mark Lemley (*pro hac vice*)
    Ashok Ramani (*pro hac vice*)
    KEKER & VAN NEST, LLP
    710 Sansome Street
    San Francisco, CA 94111
    Telephone: (415) 391-5400
    Facsimile:  (415) 397-7188
    Email: .........................................................
    ..................................................................

    ..................................................................
    David N. Rosen
    David Rosen & Associates PC
    400 Orange Street
    New Haven, CT 06511
    Telephone: (203) 787-3513
    Facsimile: (203) 789-1605
    Email: drosen@davidrosenlaw.com

## <u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the foregoing was mailed, first class, postage prepaid, on September 10, 2008, to:

| | |
|---|---|
| Charles E. Vermette, Jr.<br>LITCHFIELD CAVO LLP<br>40 Tower Lane, Suite 200<br>Avon, CT 06001<br><br>W. Anthony Collins Jr.<br>Hoppe, Collins & Ojeda, LLC<br>1827 Powers Ferry Road SE<br>Building 7, Suite 350<br>Atlanta, GA 30339 | *Attorneys for Defendant A Horse Walks Into a Bar* |
| James A. Newsom<br>MUNISTERI SPROTT RIGBY NEWSOM<br>AND ROBBINS, P.C.<br>3323 Richmond Avenue<br>Houston, TX 77098<br><br>Susan O'Donnell, Esq.<br>Halloran & Sage LLP<br>One Goodwin Square<br>Hartford, CT 06103-4303 | *Attorneys for Defendant Matthew C. Ryan* |

*/s/ Alisa J. Thompson* .........................
Alisa J. Thompson